## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

-----------------------------------------------------------X

**J. ENDRES,**                                                    Civ. No.

**Plaintiff,**

**COMPLAINT**

**v.**

**NORTHEAST OHIO MEDICAL**                    **JURY TRIAL**
**UNIVERSITY, NORTHEAST OHIO**               **DEMANDED**
**MEDICAL UNIVERSITY BOARD OF**
**TRUSTEES, SANDRA EMERICK,** individually
and as Chief Student Affairs Officer of
**NORTHEAST OHIO MEDICAL**
**UNIVERSITY and JAY A. GERSHEN**, individually
and as President of **NORTHEAST OHIO MEDICAL**
**UNIVERSITY**
**4209 St. Rt. 44 , P. O. Box 95**
**Rootstown, Ohio 44272**
**and 2112 Euclid Avenue**
**Cleveland, Ohio 44115**

**Defendants.**
-----------------------------------------------------------X

Plaintiff J. Endres, (  Endres and/or Plaintiff) by his attorneys Nesenoff & Miltenberg,

LLP, and Berkman, Gordon, Murray & DeVan, as and for his Complaint, respectfully alleges as

follows:

### THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants

Northeast Ohio Medical University ("NEOMED" or the "University"), Northeast Ohio Medical

University Board of Trustees ("Defendant Board"), Sandra Emerick ("Defendant Emerick"), and

Jay A. Gershen ("Defendant Gershen") (collectively, "Defendants"), concerning allegations

made against Plaintiff, a former student at NEOMED, for false allegations of academic

misconduct during the fall 2015 semester, which resulted in his expulsion on November 18, 2015 communicated to plaintiff by letter received on November 19, 2015.

2.      These allegations refer to what was purportedly the viewing of another student's computer screen during an exam (the "Incident").

3.      Defendants were informed by Plaintiff that it is physically impossible to commit the misconduct of which he was accused. Indeed, that a simple, less than 5 minutes field test at Olson Hall which replicates the exact quick side-glances of the alleged misconduct, would conclusively demonstrate. that it was physically impossible to get any legible information from the computer screen he was allegedly glancing at. There was no known record of any kind from Defendants such factual-finding was conducted. Defendants conducted a ruthless and improper investigation and adjudication process, doctored records, refused to conduct field tests, prohibited Plaintiff to submit relevant evidence and ultimately found Plaintiff "Responsible" of academic misconduct by the University's Committee on Academic and Professional Progress ("CAPP"). Plaintiff was subsequently dismissed from NEOMED.

4.      Throughout the investigative process, Defendants demonstrated substantial procedural errors in violation of the Fourteenth Amendment and state laws. When Defendants subjected Plaintiff to disciplinary action, they did so in an arbitrary and capricious way, deprived him of due process, and failed to adhere to NEOMED's own guidelines and regulations.

5.      Throughout the entire process, Defendants ignored the most basic tenets of due process: they concealed *ex parte* evidence from Endres, foreclosing him from significant portions of his hearings and evidence presented against him, precluding him from presenting relevant and material factual evidence refuting the accusations against him, , failing to make a record of the proceedings, no explanation of  material relied upon in reaching the decision, and

2

depriving Plaintiff of any meaningful opportunity to tell "his side of the story in order to make sure that an injustice is not done." *Goss v. Lopez,* 419 U.S. 1. 565, 581 (1975).

6.      Plaintiff has been greatly damaged by Defendants' arbitrary and capricious actions: Plaintiff 's educational and academic experience was derailed and halted by his dismissal from the University; his reputation tarnished; his medical career prospects severely damaged, if not terminated; and the monies spent on obtaining an education at NEOMED squandered.

7.      Plaintiff seeks redress against Defendants due to the actions, omissions, errors, flawed procedures and overall failure to provide Plaintiff with a meaningful standard of due process and equity, concerning the wrongful allegations of academic misconduct made against J. Endres.

8.      Plaintiff therefore brings this action to obtain relief based on, among other things, 42 U.S.C. § 1983, the Fourteenth Amendment, and the Americans with Disabilities Act (the "ADA").

## THE PARTIES

9.      Plaintiff is a natural person, citizen of the United States and resident of the State of Ohio. During the events described herein, Plaintiff was a student at NEOMED.

10.      Defendant NEOMED is a public, state, coeducational university located in Cleveland and Rootstown, Ohio. It is the recipient of state and federal grants and contracts.

11.      Defendant NEOMED Board of Trustees is the corporate body that controls Northeast Ohio Medical University, a public university incorporated in, and with its principal place of business in, the State of Ohio.

12.     Upon information and belief, Defendant Emerick is an individual residing in the State of Ohio and was the Chief Officer of Student Affairs at NEOMED at all relevant times herein.

13.     Upon information and belief, Defendant Gershen is an individual residing in the State of Ohio and is and was President of NEOMED at all relevant times herein who had and has the ultimate responsibility and authority for the discipline of all students of NEOMED.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under federal law, including 42 U.S.C. § 1983, the Fourteenth Amendment and the Americans with Disabilities Act. This Court has personal jurisdiction over Defendant NEOMED on the grounds that Defendant NEOMED is conducting business within the State of Ohio in this district.

15.     This Court has personal jurisdiction over Defendants Emerick and Gershen on the grounds that they reside in this district and were acting as officials of NEOMED at all relevant times.

16.     Venue in this action properly lies in this district pursuant to 28 U.S.C. §1391 because the defendants are residents of this district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     Plaintiff's Educational and Medical Background

17.     Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), a neurodevelopment condition with a complex etiology, when he was six (6) years old, as evidenced by Plaintiff 's medical records from Northwest Pediatric. Since he was first diagnosed,

Plaintiff received effective treatment and was medicated correctly by Ritalin. From grades 1 through 12 of his education, Plaintiff went to his school's nurse's office at noon each day to take his afternoon dosage of Ritalin.

18.     Ritalin helped Plaintiff concentrate, suppress his hyperactivity, and allowed him to overcome his ADHD and excel personally and academically. Although he needs the ADHD medication to help him concentrate for the daily routines, for the subjects he is passionate about, he has laser focus. Plaintiff had never requested any kind of academic accommodation throughout his school years. He was in the gifted program of Dublin, Ohio schools from third grade to middle school. He graduated from Dublin Scioto high school as valedictorian and was a National Merit semi-finalist and finalist. He won scholarships to Ohio State University, Case Western Reserve University, and was accepted to the competitive accelerated BS/MD program offered by NEOMED.

19.     Plaintiff received his B.S. Degree with Magna Cum Laude from Kent State University - NEOMED's BS/MD undergraduate portion in two years. After meeting all of the NEOMED "Phase 1" requirements, including GPA and MCAT scores, Plaintiff matriculated to the Medical School ("Phase 2") at NEOMED in August 2014, at the age of 20.

## II.     Agreements, Representations, Covenants & Warranties Between Plaintiff and NEOMED

20.     Upon enrolling at NEOMED, Plaintiff relied on the representations and assurances made by NEOMED and its representatives. Upon his acceptance, NEOMED provided Plaintiff with copies of its school policies, including its Student Handbook (the "Code").

21.     The Code states in relevant part:

> Northeast Ohio Medical University (NEOMED) students are expected to read, understand, sign and abide by the "Expectations

of Student Conduct and Professional Commitment" while enrolled and involved in NEOMED, its partner institutions and hospitals, and NEOMED-sponsored activities. Failure to do so may result in referral and review by either the Committee on Academic and Professional Progress (CAPP) or Student Conduct procedures. Student conduct or professional behavior concerns should be reported by faculty, staff or students using the "Conduct Concern Notes" available through the Office of Student Affairs.

See Code, (**Exhibit A**) p. 104-106.

22. NEOMED's Code sets forth the procedures by which NEOMED students who have been accused of violating one or more of the enumerated academic policies are investigated, heard, and, possibly, disciplined. See Code (**Exhibit A**), pp. 104-106.

23. NEOMED's Code delineates that the President of the University has the ultimate responsibility and authority for the discipline of all students, however, all complaints of alleged misconduct are received by the Chief Student Affairs Officer who works in collaboration with the Director of Enrollment Services and Registrar. Further, if necessary, the associate dean for Academic Affairs of the student's college to make the initial determination as to whether the matters alleged in the Complaint are best resolved through the formal disciplinary process; or by way of referral to the Committee on Academic and Professional Progress (CAPP) or some other mechanism such as counseling or mediation.  See Code, pp. 105 (B)(4)(5).

24. The "Complaint" is defined in the Student Handbook as "Complaint includes a written document or verbal report setting forth the facts and reasons that a party or parties believe are sufficient to support a claim against a student or students for a violation of the expectations for Student Conduct and Professional Behavior." See Code, pp. 103 (A)(2).

25. NEOMED's Code expressly covenants to provide the following procedure and rights to the accused student in an alleged complaint of misconduct investigation

6

Hearing Procedure:

- The hearing shall be adversarial in nature and shall be conducted fairly and impartially. (pp 105, [8])

Student's right of hearing:

- To know the nature and source of evidence used to support the Complaint; to cross-examine witnesses against the student; to testify; and to present the testimony of witnesses and other evidence in the student's behalf;

  - All hearing shall be closed to protect the student's rights of confidentiality.

<u>See</u> Code (**Exhibit A**), p. 106.

### III.     Plaintiff's Change in Medication; The HDS Examination

26.     During his second semester in NEOMED's Medical Program, in or around March 2015, after 14 years on Ritalin Plaintiff began experiencing new problematic side effects of his ADHD medication. Plaintiff felt that Ritalin over-sedated him and made him feel lethargic.

27.     In or about May 2015, Plaintiff was accepted to be a neurological research assistant for the summer of 2015. By that point, Plaintiff had already passed all the 14 classes out of 15 classes for the first-year requirements of NEOMED's medical school.

28.     By late May 2015, Plaintiff began to experience over-sedation side effects of Ritalin, and therefore ceased taking Ritalin on a regular basis. Thereafter, Plaintiff failed BMB (Brain Mind and Behavior), his very last course of the first year at medical school, which had commenced in April 2015, shortly after Plaintiff 's decreased Ritalin intake. Because he failed the BMB course, Plaintiff also lost the research assistant position of the summer of 2015.

29.     Plaintiff went to see his doctor, Dr. Caroline Ramos, M.D. on April 13, 2015. He did not want to change his ADHD medication in the middle of the semester, so despite the new

side effects, after an hour-long consultation with Dr. Ramos, he asked Dr. Ramos to continue on his Ritalin prescription.

30.     Between June 2015 and August 2015, Plaintiff went through the ADHD medication adjustment to find one he could tolerate and be able to take on the regular basis.

31.     On July 13, 2015, Plaintiff failed the BMB remediation exam. Based on the Code, all students of NEOMED's School of Medicine who failed any courses were subject to the Phase 2 CAPP Review for academic action. In the Phase 2 CAPP Student Interview Form, Plaintiff disclosed that one of the reasons for his failure of the BMB course was due to issues with his ADHD medication. However, he did not ask for any academic accommodations. The Phase 2 CAPP Review concluded with the decision to require Plaintiff to repeat the M1 year. That decision was expected, and was the usual result for M1 students in similar situations.

32.     Plaintiff returned to NEOMED for the fall semester of 2015 to repeat the first year of the medical program at NEOMED. Plaintiff was looking forward to the school year and was determined to do well in his studies.

33.     Plaintiff also switched to a new ADHD medication, Strattera, in or about August 2015. Strattera was a non-stimulant and would not sedate him as Ritalin had. However, while Strattera would help him concentrate, it would not suppress his fidgeting.

**IV.      The HDS (Human Development & Structure) Quiz**

34.     In the fall semester of 2015, Plaintiff enrolled in Human Development & Structure ("HDS"), in which Hans Thewissen is the course director. HDS was considered to be the most difficult course in the first year of NEOMED's medical problem, and the course was weighted the most heavily for the first-year medical students. Plaintiff had taken course during the Fall of 2014 and had passed.

35.     NEOMED records class lectures and exams on video through a video camera installed openly in the corner of the classroom. All students were aware of the camera. Plaintiff was especially familiar with the recording equipment located at the Olson Hall, as he had a part-time job as a student tech assistant, helping NEOMED professors in setting up the video camera recording for the lectures.

36.     NEOMED employs a computerized testing system that students take online via "ExamSoft". All online exams are taken on NEOMED's computers/laptops. Students were handed the laptops when they entered the testing room along with a piece of 8 ½" x 11" paper (the answer sheet). The brightness of the computers used for the tests was locked at near the lowest level. Students could not adjust the brightness. Further, students were only aware of their seat assignments approximately 15 to 20 minutes prior to the commencement of the Exam.

37.     For multiple choice questions, students were to answer the questions directly from the computer, and it was optional to write their answers on the answer sheet. For exams that only has multiple-choice questions, the score can be immediately shown when students sign-off from the exam. Students were to return the laptops along with the answer sheet when they exit the testing room.

38.     On September 28, 2015, in a video recorded for a HDS quiz (the "Exam") at Olson Hall, Plaintiff displayed behavior that appeared as fidgety, looking-around the room, restless, and appears distracted by something to his right. Unknown to Endres, his saccadic eye-movements to right, due to distractions made him suspicious looking. There were 160 Students who took the Exam, at the same time. There were 25 multiple choice questions in the Exam and would count as 5% of the final grade. It was also the first exam for the M1 Students (the first-year medical students) in the Fall 2015 semester.

39. Four proctors oversaw the Exam at Olson Hall, while the room was recorded by a video camera openly installed in the corner of the room. Three of the proctors walked around the room during the Exam, while the fourth proctor sat in the video equipment booth and operated the video camera.

40. Plaintiff sat at seat number 29. He was right in front of the Camera. Throughout the Exam, Plaintiff was distracted at times by the light of another person's screen, or movement by another student. He would frequently look around the room and fidget throughout the exam prolonged.

41. Furthermore, a new feature had been introduced to the ExamSoft software used at the HDS quiz, which allowed students to zoom in and out of photos and diagrams. The student to Plaintiff 's right, at seat 30, "Student B," who Plaintiff did not know, frequently zoomed in and out of photos and diagrams on his computer screen, causing flashes of colors at the corner of his eye, and he would briefly glance over. It was physically impossible to discover any legible information from the computer screen of seat 30 by doing the same eye-movements due to the distance between them and the low-level of brightness that the computer screens in the Exam were set to (and could not be altered by any of the students).

42. Plaintiff was unaware that his fidgeting and sideway glances, which lasted no more than one second, made him appear suspicious to the proctors. Plaintiff was similarly unaware that the camera was zoomed in and focused on him by the proctor, from approximately five (5) minutes into the Exam until the moment when the Student to his right at seat 30 completed the Exam and exited the room.

43. The Exam was the first examination Plaintiff had ever taken while on Strattera, a non-stimulant medication that he had just switched to a month ago from Ritalin (stimulant).

Endres was fully aware Strattera did not suppress his fidgeting and it never occurred to him that his fidgeting could be an issue during the exam.

44.     After the conclusion of the Exam, one of the Exam's proctor, Suzanne Hricks, filled out an Irregularity Report, a report that allows the proctor to list students' names and check off any "irregular behavior" they observe of that student. The listed irregular behaviors include:

(i)      Unauthorized use of books, papers, calculators, PDA;
(ii)     Failure to stop working when time is called at the end of the exam;
(iii)    Bringing unauthorized electronic devices into the testing room;
(iv)     Copying answers; and
(v)      Other.

45.     Below the list of irregular behaviors was a section marked "Details" with blank space for the proctor to fill in information. Ms. Hricks did not check off any of the five options printed as irregular behaviors, and instead wrote in the "Details" section that "[s]tudent appeared to be repeatedly looking at the computer of the student in Seat #30" and further noted in her email of the Irregularity Report that "perhaps the student is simply nervous." *See* Proctor's Report, attached as **Exhibit B**.

46.     The computer screen that Ms. Hricks alleged that Plaintiff was glancing over at was seat 30. Seat 30 was located approximately 5 feet away from Plaintiff 's seat 29. There was an empty seat in between seat 29 and seat 30 (*See* **Exhibit C**). Endres did not know the student who was seated at seat 30 ("Student B").

47.     Ms. Hricks sent the Irregularity Report to Defendant Emerick the same day. Plaintiff was not aware that an Irregularity Report had been filled out, nor that it was sent to Defendant Emerick.

**V.     Defendant Emerick's Improper Investigation**

48.     Unbeknownst to J. Endres, Defendant Emerick launched a "superficial investigation" prior to speaking to Plaintiff (the "Investigation"), which Defendant Emerick conducted from September 30 to October 2, 2015. The three-day investigation consisted solely of Defendant Emerick requesting the answer key for Plaintiff and Student B's submitted exams, as well as her own viewing of the video recording of the Exams. Defendant Emerick concluded the Investigation without notifying Plaintiff or obtaining a statement or information from him.

49.     Defendant Emerick mischaracterized Plaintiff 's split-second glances towards seat 30, as she saw in the video recording, as "clearly showing him viewing peer's computer screen repeatedly during the exam." (*See* Emerick Investigation & Conclusion, attached hereto as **Exhibit D**).

50.     In an email to Mr. Thewissen on October 2, 2015, Defendant Emerick stated that 84% of Endres' and the student B's test were identical. This calculation included both identical correct and wrong answers. This data was later proved completely incorrect and misleading. Of the 84% of identical answers, six (6) questions were answered incorrectly by both students and 15 questions were answered correctly by both students. Four (4) questions were answered incorrectly but differently by both students.

51.     Based on the actual exam data of the entire class who completed the Exam at the same time, over half of the students – more than 80 out of 160 students – had 85% identical answers with at least one other student in the class. Defendant Emerick would not have known this fact because she only did one comparison. Also, applying those assumptions would mean, then half of the class might also commit the misconduct.

52.     Additionally, Plaintiff scored a 72, which was in the top 15% of the class. Student B had scored a 64. The average score of the class for the HDS quiz was 56.5.

53.     On October 2, 2015, Defendant Emerick sent (i) her "findings" along with a link to the video (attached hereto as **Exhibit D**); and (ii) the breakdown of correctly/incorrectly answered questions to Mr. Thewissen, CAPP Co-Chair, Heidi Terry, Director of Student Enrollment Service, and Elisabeth Young, Vice Dean of the School of Medicine. In her email, without hearing any explanation from Endres, Defendant Emerick reporting in boldface that "84%'' of the tests were identical," a fact that, untethered from the entire class data, was essentially meaningless. There was no investigative record of any kind to indicate any fact-finding efforts employed, nor that a field test was conducted to support her accusations and conclusion.

54.     Furthermore, upon information and belief, at some point between September 30 and October 2, 2015, the Student Handbook's "Irregular Behavior Section" was altered in order to add additional items that would match Defendant Emerick's accusations against Endres. The item added to the list was "looking at a peer's examination."

**VI.      Plaintiff 's Unjust Disciplinary Process**

55.     Defendant Emerick decided the matter should be referred to CAPP, whose purpose is to review issues for Academic Performance and Professionalism, rather than for alleged disciplinary misconduct. Her improper referral, to apply the "Procedures of CAPP review" (*See* Code, pp. 63 (A)(6)) instead of the "Disciplinary Hearing Procedures" (*See* Code, p. 105) was significant.

56.     The CAPP Procedures for Hearing, (the "CAPP Procedures," *See* Code, p. 63 (A)(6)), provides:

> (a) Students are notified in writing by Enrollment Services that they will be discussed or required to attend a CAPP meeting in person.

(b) The CAPP Interview Form, which accompanies the communication sent to students required to attend the meeting, must be completed and returned to the CAPP administrative secretary no less than two days before the meeting.

(c) At the meeting, students will be given the opportunity to speak to the unsatisfactory performance issue and may be questioned by the CAPP members.

(d) CAPP members will discuss and vote on the case in closed session with a majority vote required for action.

57.     The CAPP Procedures do not provide any of the minimum requirements that guarantee the fundamental fairness and due process. For instance, a CAPP hearing notice does not afford the accused student the right to know the explanation of the evidence behind the charges and the evidence to be presented against the accused student in advance of the hearing.

58.     In the CAPP hearing notice that Plaintiff received for his first hearing on October 8, 2015, it stated that "As a result of professional development concern (the alleged academic misconduct)", the committee will "discuss the professionalism concern, your overall educational performance and record and decide how to best to proceed.". The notice did not specify what exactly he was being accused of, except for a vague term of "alleged academic misconduct."

59.     Furthermore, the CAPP Procedures do not afford the accused students the right to be present when the case is presented to the CAPP hearing panel or to know what evidence or information was presented to the CAPP hearing panel. The case presentation and pre-discussion are to be held behind closed doors. The student can speak of the academic performance issue: "At the meeting, students will be given the opportunity to speak to the unsatisfactory performance issue and may be questioned by the CAPP members" (*See* Code, p. 63 (A)(6)(c)).

60.     As such, in all the CAPP hearings, Plaintiff was barred from the hearing portion wherein Defendant Emerick presented her evidence, and was denied the knowledge of what

evidence Defendant Emerick used against him. After Defendant Emerick finished her presentation and discussion with the CAPP hearing panel, Endres was then called into the room to speak and answer questions from the CAPP hearing panel.

61.    Further, the CAPP procedures do not include the opportunity for the accused student to question the evidence of the charges against them or the information just presented to the CAPP hearing panel behind closed doors.

62.    The CAPP hearing panel questioned Plaintiff after Plaintiff spoke for 25 minutes. None of the questions the CAPP hearing panel asked were related to the information just presented by Defendant Emerick. Plaintiff was not to ask Defendant Emerick or the CAPP hearing panel about what evidence she just presented

## VII.    <u>Plaintiff Is Denied an Explanation of Evidence Relied on By Defendants</u>

63.    On October 7, 2015, five days after Defendant Emerick concluded her investigation and referred the case to CAPP for academic action, Plaintiff was called in for a brief meeting with Defendant Emerick. The meeting lasted approximately 15 minutes. During this meeting, Plaintiff was first notified of the allegations against him and informed of the irregularity report.

64.    In the same meeting, Defendant Emerick showed Plaintiff the video recording of the Exam for the first time and told Plaintiff that she had brought the case to CAPP. She did not disclose or share any information of fact-finding, or evidence she felt supported her accusations and conclusions with regard to Plaintiff 's conduct. Plaintiff was completely stunned to hear of this accusation and was shell-shocked to see how "bad" his fidgeting and side-glances caused by distractions looked. It was the first time he saw how his fidgeting movements were seen by a third party.

15

65.     Plaintiff informed Defendant Emerick that he had just switched the medication for his ADHD from Ritalin (a stimulant) to Strattera (a non-stimulant), and that this was the first time he took a test with the non-stimulant medication, which did not suppress his fidgeting or movements caused by distractions. Defendant Emerick requested that Plaintiff provide a letter from his doctor regarding the medication change.

66.     This brief meeting on October 7, 2015 was also the only meeting Defendant Emerick or any NEOMED faculty or staff had had with Plaintiff to notify him of the matter, and to discuss the accusation and conclusion that would result in the CAPP decision to dismiss Plaintiff from NEOMEND.

67.     Defendant Emerick was aware that Plaintiff was scheduled to take his first major exam two days later, on October 9th, in the HDS class. Despite this knowledge, Defendant Emerick chose to inform Plaintiff of the serious allegations against him less than 48 hours before the exam.

68.     Understandably, Plaintiff was immediately concerned for his upcoming exam. Throughout his education, while Plaintiff was on Ritalin, he did not need any kind of academic accommodation, special treatments, or considerations. Plaintiff was fully aware that Strattera helped him concentrate, but it did not suppress the fidgeting or movements caused by distraction, of which he was not consciously aware.

69.     In anticipation of his upcoming HDS test and in order to avoid any further confusion or misinterpretation of his fidgeting and movements caused by distraction, Plaintiff emailed Ms. Hricko on October 8, 2015, requesting temporary accommodations for his October 9, 2015 HDS test, namely to be seated separately where he would not experience any distractions. Additionally, Plaintiff was switched back to Ritalin. The last day he took Strattera

was on October 7, 2015. Ms. Hricko responded to J. Endres, letting him know that such a temporary accommodation would not be a problem. However, Defendant Emerick would later claim that Plaintiff did not apply for the accommodation via formal channels, relying on that claim as proof Plaintiff was using it just as an excuse and false defense to the claims.

70.     On October 8, 2015, Plaintiff received a letter from CAPP (the "CAPP Notification Letter"), informing him that he was required to attend a meeting / hearing on October 21, 2015, wherein "the committee will discuss the professionalism concern, [Plaintiff 's] overall educational performance and record and decide how best to proceed." The CAPP Notification Letter did not explain to Plaintiff why there was a professionalism concern, as up until this point, he was merely informed that the video recording showed he was fidgeting, which Defendant Emerick had said made Plaintiff look as though he was attempting to glance at another student's computer screen. The letter did not specify what exactly he was being accused of except a vague term of "alleged academic misconduct." The CAPP Notification Letter further instructed Plaintiff to review his student file and then complete and submit a student interview to Defendant Emerick by October 15, 2015, which would then become part of his student file.

71.     On October 9, 2015, Plaintiff sat for the HDS Module 1 Test, after having switched back to Ritalin. Despite being emotionally distraught and in shock while taking the test, Plaintiff still scored at the class average.

72.     On or about October 11, 2015, after Plaintiff calmed down from the initial shock of the information he had received from Defendant Emerick, Plaintiff sent Defendant Emerick an email, stating "It's not even feasible that just by glancing to my right I could get any meaningful information from the screen of the person on my right." Plaintiff also requested information and evidence regarding the claim against him. Plaintiff reiterated that his new medication Strattera, a

17

non-stimulant, did not suppress his fidgeting and movements when he was distracted, as the previous medication Ritalin had done.

73.     In the same email, Plaintiff suggested the CAPP Committee could recreate the setting and do the same body movements that Plaintiff 's in the video, as a field test to see that it was impossible to see any meaningful information on the student's computer screen on his right at seat 30. Such a field test would conclusively prove whether Plaintiff had committed any misconduct.

74.     Defendant Emerick responded via email on October 12, 2015, stating that "it is the university's responsibility to present and demonstrate a preponderance of evidence in order to prove a violation of the conduct code occurred" and that the CAPP Committee "will be provided everything that currently exists, video tests, etc. and it will be up to the members of the committee to identify what they want beyond what is presented to them in your file." Defendant Emerick did not address the field test that Plaintiff suggested. Upon information and believe, Defendant Emerick, who is the sole investigator of the case, had no intention to conduct a simple, less than 5-minute field test, that can prove the validity of her accusation as she had already concluded her minimal fact-finding efforts.

75.     On October 13, 2015, Plaintiff 's doctor, Dr. Ramos, sent Defendant Emerick a letter explaining Plaintiff 's ADHD, along with medical records that contained the details of his medication adjustment between April 2015 and August 2015. Dr. Ramos also explained that, after viewing the video recording of the Exam, Dr. Ramos observed that Plaintiff 's behavior during the Exam matched the fidgeting Plaintiff had described to her at his April 13, 2015 appointment with her. Dr. Ramos stated in the letter that she "did observe some behaviors that he initially described to me as symptoms of his ADHD ("fidgeting, boredom/yawning, needing to

shift positions, trouble sitting still for long periods of time."). Dr. Ramos further noted that "I did note that his eyes were shifting every few seconds and at times he seemed to be staring into space" and that Plaintiff "definitely seemed to look when a student behind him was leaving the exam suggesting his distractibility."

76.     Based upon the foregoing, Dr. Ramos requested that "please take into account he had just started a new medication within 2 months of the exam in question," and "while he is adjusting to medication, it may be helpful to make accommodations for exam so that his fidgeting and movements are not misinterpreted as academic misconduct." Dr. Ramos also highlighted portions of Plaintiff 's medical record that were relevant to her assessment of the situation.

77.     As Defendant Emerick had stated in her October 12, 2015 response email, all information from the investigation that would be presented to the hearing would be available in his official student file. When Plaintiff arrived at the Student Enrollment Office to review his student file on October 14, 2015, he found a manila folder that contained copies of all the Plaintiff 's records since he applied to the BS/MD program while still in high school. There were hundreds of pages in the folder, lacking page numbers, and in no specific order. There was no way to track when the documents were added. Plaintiff was asked to sign the form "Documentation of Student Review of NEOMED Official Student File" after he finished the review.

78.     Despite Defendant Emerick's assurance that all information from the investigation that would be presented to the hearing would be available in his official student file, which were Plaintiff only found copies of the email chain that Defendant Emerick sent on October, 2 2015, referring the case to CAPP, along with the Plaintiff and Student B's Exam digital answer keys.

79.     The Proctor's Report was not in the official student file that was reviewed by Plaintiff on October 14, 2015. Plaintiff sent an email to Defendant Emerick on the same day to request to see that report, and had to go back to Student Enrollment Office the next day on October 15, 2015 to finally view it. This was the first time Plaintiff saw the Proctor's Report, almost two weeks after Defendant Emerick concluded her investigation.

## VIII.    Defendants Withhold Misleading Evidence Prior Plaintiff 's First Hearing

80.     Absent from Plaintiff's student file was Mr. Thewissen's statistics regarding probability of two students answering certain questions identically, which would later become a document relied on by Defendants in their case against Plaintiff (the "Thewissen Analysis"). The Thewissen Analysis claimed that there would be a 0.000036% chance that two students could have 6 identical wrongs, but this information was misleading.

81.     On October 16, 2015 at 3:38 PM, the day after the October 15, 2015 deadline for Plaintiff to review his official student file, Jessica Green, a staff member from the Enrollment Services Office sent an email to the CAPP committee, instructing them that at Plaintiff 's first hearing, they are to focus solely on Plaintiff 's eye movements during the four-timestamped portion of the video. The four timestamps were: 4:50, 14:35, 20:25, and 26:50. This information was not disclosed to Plaintiff before his first hearing. The timestamps were excluded from Plaintiff 's file, and Plaintiff was also not privy to the fact that CAPP Committee members were instructed as to where they should focus their attention.

82.     In fact, the video timestamps could not be reconciled up with the timestamps of the on-line Exam as provided by ExamSoft. The video time stamp showed that Student B finished his test and passed behind Plaintiff at 29:15; however, the ExamSoft timestamp showed Student B signed-off from ExamSoft at 34:42.

83.     Thewissen's probability and the time stamps were used as evidence against Plaintiff at his first hearing, and yet none of the information was disclosed to him prior to the hearing or in the official student file that Plaintiff reviewed on October 14, and October 15, 2015.

84.     Before the first hearing**,** Plaintiff believed the CAPP hearing would clear him from the alleged misconduct, particularly based on the field test. He had no knowledge of the misleading and false data that were going to be used against him.

85.     On October 15, 2015, Defendant Emerick met with Plaintiff at 4:30p.m. for approximately 15 minutes to go over the Student Interview Form filled out by Plaintiff beforehand. Emerick did not discuss any information regarding Plaintiff's case, nor explain to him the "evidence" that would be presented at the upcoming hearing, but was excluded from his student file.

86.     The interview form "Phase 2 Committee on Academic and Professional Progress (CAPP) Student Interview Form" was commonly used for all CAPP hearings. It asked Plaintiff to explain why he believe he "experienced difficulty," what he proposed "as a result of this meeting with CAPP," why CAPP should "alter the enrollment standard to meet [his] proposal," and why he would be successful in the future with this proposal.

87.     As requested by the CAPP, Plaintiff submitted the Student Interview Form together with his personal statement, Dr. Ramos's letter, and his medical records after the meeting with Defendant Emerick.

**IX.     <u>Plaintiff Was Barred from Hearing Defendants' Misleading Evidence</u>**

88.     On October 21, 2015, Plaintiff attended the scheduled meeting with the CAPP Committee (the "First Hearing"). The CAPP Procedures do not allow an accused student to be in

21

the room when the committee members reviewed documents of the case, and only after concluding their review of the documents would the student be called in. Therefore, Defendant Emerick presented her case against Plaintiff and held a discussion with the CAPP members behind closed doors. Plaintiff was instructed to wait in a lobby that was two aisles down from where the hearing was held.

89.     Of paramount importance to Plaintiff's case, Defendant Emerick presented "evidence" to the CAPP Committee in the form of a misleading Thewissen Analysis, which had not been shared with Plaintiff before or during the First Hearing. The Thewissen Analysis was later debunked as completely flawed, based on the actual data from the entire class who took the Exam at the same time. There were more than 120 students out of 160 who had 6 or more identical wrong answers with at least one other student in the class

90.     The CAPP Committee did not question Plaintiff about the analysis, nor mention it in any form during their questioning of Endres. In fact, the CAPP Committee did not inform nor ask Plaintiff about anything pertaining to Defendant Emerick's presentation to them.

91.     After Defendant Emerick finished her presentation, Plaintiff was invited into the room to present his own evidence and answer the CAPP committee's questions.

92.     To prove that it is physically impossible to commit the alleged misconduct, Plaintiff showed the field test he conducted that was: a reenactment at the same location, with three randomly selected NEOMED students from the nearby library.

93.      All three students, who provided their names and signatures, attested to the fact that it was physically impossible to view any information on the laptop by glancing over to the right. In fact, the three students could not clearly see the screen of the neighboring computer

22

screen, even by turning their heads directly towards that computer screen and staring for longer periods of time than Plaintiff had during the Exam.

94.    With regard to the split-second sideways glances that initiated the allegations against Endres, Plaintiff explained that there was a new feature of the ExamSoft, allowing students to zoom-in the pictures and diagrams. His quick side-glances to the right were initially due to Student B rapidly zooming in and out of the diagrams, which caused a color change on the screen and creating a flash to appear in the corner of Plaintiff 's eyes. It would distract him, and therefore he would glance over during those distractions.

95.    Plaintiff also explained his recent ADHD medication change from Ritalin to Strattera, and how Strattera helps him concentrate but does not suppress his fidgeting or any movements caused by distractions.

96.    Since Plaintiff did not have the access to the answer key of the entire class, he demonstrated that for multiple choice questions, the percent of similarity is purely driven by the correlations between the score and the number of correctly or incorrectly answered questions. In this case, to compare any students who scored 64 or 72, the normal distribution range of similarity would be between 64% - 92%.   The 84% similarity with Student B is in the middle of the range, which is by no means unique but instead quite common.

97.    It was later discovered, once Plaintiff was able to review the actual exam data of the entire class, that more than 80 out of 160 students had 85% similarity with at least one other student, proving that the sole information used to support Defendant Emerick's accusation and conclusion was meaningless. Based on Defendant Emerick's logic, half of the class might also have committed such alleged misconduct.

98.     The CAPP hearing panel questioned Plaintiff after he spoke for 30 minutes, but did not question him about the Thewissen Analysis, nor make mention of it. In fact, the CAPP committee did not inform nor ask Plaintiff about anything pertaining to Defendant Emerick's presentation to them. Instead the questions the CAPP committee asked Plaintiff pertained to why he did not apply for accommodation beforehand. Plaintiff explained that he never had the need to any type of academic accommodation throughout his education while on Ritalin, which had helped him concentrate and suppress his hyperactivity.

99.     Plaintiff explained that the accommodation that he requested on October 7, 2015, after he was notified by Defendant Emerick of the video recording of his glances and movements, was in order to be seated separately for future exams and avoid any future misinterpretation. The accommodation was not asking for any special treatment. Further, it was also stated in the interview form that NEOMED did not need to modify any rules, standards, or equipment for this request. This accommodation request was just in case he could not tolerate Ritalin and had to stay on Strattera until he could find a nearby physician for his medication adjustment.  He also stated that he had switched back to Ritalin for the October 9, 2015 exam.

100.    Plaintiff also stated he was fully aware Strattera did not suppress his fidgeting or movements caused by distraction, but because he had never taken a test without Ritalin before, there was no reason for him to think his fidgeting or any movements caused by distraction would be an issue during an exam or would be misinterpreted in such a way.

101.    Defendant Emerick did not speak during the time that Plaintiff was allowed in the Hearing. There was absolutely no indication of what information or evidence was presented by Defendant Emerick before Plaintiff was called in.

102.   Defendant Emerick remained present throughout all parts of the hearing, including the deliberation and the voting that occurred after Plaintiff had left the room. The CAPP committee deliberated and voted immediately after Plaintiff had concluded his presentation and left the room.

103.   Defendant Emerick called Plaintiff later that day to inform him that the CAPP committee found him "Responsible" of misconduct (the "First Hearing Decision")

104.   Plaintiff was deprived of an independent and impartial adjudication at the First Hearing. Instead, the CAPP Committee took at face value Defendant Emerick's verbal interpretation of the video recording, the instruction to only focus on the four timestamps that singled out Plaintiff 's eye-movements, and the Thewissen Analysis, which was not disclosed to Plaintiff before or during the hearing. In doing so, the CAPP Committee ignored and disregarded evidence provided by Endres, in reaching an erroneous decision that Plaintiff was "Responsible" (the "First Decision").

## X.     Defendants Deprived Plaintiff of a Basis for Their Decision and Sanction

105.   On or about October 22, 2015, Plaintiff received an email from NEOMED containing the official First Hearing Decision, which stated "After a thorough review of your overall academic record, student file, and our discussion with you, the Committee voted to dismiss you."

106.   The "Student Progress Report," the only document of the First Hearing notes, was placed into Plaintiff 's student file without any notice.  There was only one line listed under the section regarding CAPP Final Vote and Decision: "Preponderance of evidence indicates dishonesty / academic misconduct," followed by the word "Dismiss". (The "NEOMED Hearing Result," attached hereto as **Exhibit E**)

25

107.   The CAPP's dismissal of Plaintiff 's first hearing was *ultra vires*. The NEOMED Student Handbook provides that "[a] majority of the voting membership (pp. 62 (A)(3) shall constitute a quorum." (pp. 62 (4)(a). There are eleven voting members of CAPP-therefore requiring the presence of at least six voting members for a quorum. Based on the Student Progress Report of the first hearing, there were only five voting members of CAPP at the October 21, 2015 hearing, however, since Mr. Thewissen had disqualified himself from voting because of his role as Director of the HDS course, there were only four CAPP voting members at the first hearing.

108.   In the First Decision Letter, Plaintiff  was given several options: (i) Plaintiff  could withdraw within four working days, and his academic transcript would indicated withdrawal; (ii) Plaintiff  could accept the decision for dismissal and his academic transcript would indicate dismissal; or (iii) Plaintiff  could request an appeal if there is significant and compelling new information that was not available for presentation to the CAPP Committee, or if Plaintiff  had evidence that there was a defect or irregularity in the CAPP Committee proceedings.

109.   Despite the fact that the first option gave Plaintiff "four working days" to withdraw from NEOMED's College of Medicine, a deadline was set for Tuesday, October 27, 2015, which gave Plaintiff less than three working days to make the decision.

110.   Furthermore, the October 22, 2015 email also listed the violation as "academic misconduct" which was a grave mischaracterization of the alleged offence. The violation should have been designated "disciplinary misconduct," which would have held Defendants to a different standard and afforded Plaintiff more rights.

111.   Because Defendants documented Plaintiff's case as "academic misconduct," the very bare minimum evidentiary standard of "preponderance of the evidence" was applied. Had

26

the designation been "disciplinary misconduct," Defendants would have had to apply a "substantial evidence" standard instead. Courts have traditionally treated situations wherein a student is expelled for an alleged infraction such as viewing a classmate's answers as a "disciplinary misconduct" matter, and acknowledged that in such cases due process is owed to the students involved.

112.   There was no mention of what evidence the expulsion was based on in the first hearing result that was sent to Plaintiff on October 22, 2015.

## XI.   The Misleading Evidence Used at The First Hearing Was Disclosed to Plaintiff Two Days After the First Decision Was Reached

113.   On October 23, 2015, two days after the First Hearing, Plaintiff and his parents met with Defendant Emerick. At this meeting, Plaintiff was first made aware of the Thewissen Analysis, which was the main evidence and deciding factor for the First Decision.

114.   Defendant Emerick disclosed that the evidence the CAPP Committee had relied on in reaching a decision was (i) the Thewissen Analysis, and (ii) Defendant Emerick's verbal interpretation of the Exam's video recording. Defendant Emerick also told Plaintiff that the CAPP committee did not believe Plaintiff 's saccadic eye movements were manifestations of his ADHD, despite the fact that neither Defendant Emerick, nor any CAPP member at the First Hearing was a physician, psychiatrist, psychologist, or certified counselor specializing in ADHD.

115.   Defendant Emerick asked Plaintiff why he did not stop glancing over to Student B's computer screen if he could not see the answers.  Defendant Emerick also stated it was the opinion of the CAPP committee that when people got distracted, they would look over initially but would stop and not "continue" to look over to a neighboring student's computer screen. She

also reasoned that if Plaintiff continued to look over at a neighboring screen due to a bothersome distraction, Plaintiff should have used his right hand to shield his eyes from the distraction.

116.   There was no Manifestation Determination Review ("MDR") held by NEOMED in the adjudication of the allegation. There were three reports of Plaintiff 's MDR completed with regarding to Plaintiff 's behaviors as seen in the video recording. Besides the two reports from Dr. Ramos, who was Plaintiff's Primary care physician, and Dr. Andrew A. Trauben, M.D., a board-certified psychiatrist who specializes in teenager and adult ADHD, there was also a MDR report from Dr. Scott Kollins, the Duke ADHD Program Director and Professor of Duke Psychiatry & Behavioral Science Department of Duke University, School of Medicine. In his report, it addressed all the doubts that Defendant Emerick expressed above.

117.   In Dr. Kollins's report, he stated:

"Mr. (Endres 's) behavior during the exam as reviewed on the video is also consistent with someone with ADHD. His motor behavior and frequent visual distractions are common for patients with ADHD, especially under conditions that are cognitively demanding. One of the hallmark features of ADHD is difficulty in managing the "signal: noise" ratio in one's environment. It can be very difficult to filter out visual and auditory stimuli that are not relevant to the task at hand. Thus, the movement in one's peripheral field of vision, a clock ticking, or the creaking of a classmates' chair might all take on the same attention value as the exam in which a student is presently engaged.

Moreover, patients with ADHD also have significant difficulty inhibiting responses to these stimuli. Whereas non-ADHD individuals might notice the extraneous stimuli, they are able to withhold the urge to move or otherwise disengage their attention from a task at hand. The neurobiological basis of these difficulties is fairly well established, which has led to the development of several effective pharmacological treatments.

Mr. [Endres 's] report that the stimuli on the computer screen of his classmate were frequently changing and thus drawing his gaze is highly consistent with the kind of distractibility often noted in patients with ADHD.

His symptoms and impairment seem to have been managed well over time, though a number of symptoms were evident even in the relatively short video clip

28

reviewed. As noted previously, it is not all unusual – even for those patients who are well managed on medication – to exhibit symptoms of ADHD under certain conditions. As such, based on my review of the available data, as well as my own clinical experience with hundreds of patients, it is entirely plausible that all of the behavior observed in the video can be accounted for by ADHD."

118.   Plaintiff and his parents could not believe that NEOMED, a medical school that prides itself as a leading mental health research center in the Northeast region of Ohio, could be oblivious of common conditions such as ADHD. Not only did the Defendants violate ADA section 504 by not conducting an MDR, but it also allowed people, who were not qualified professionals, to provide biased judgement solely based on a social stigma. The opinions expressed by the Defendants demonstrated the complete lack of understanding of and grave negligence to people with mental disability.

### XII.   Plaintiff Was Denied Access to Pertinent Records

119.   On October 23, 2015, Plaintiff also made a request for public records pertaining to the Exam, for which Plaintiff could rely upon in his appeal. Specifically, Plaintiff requested (I) the Student Performance Report for the entire HDS class showing each individual score and digital answer key data, (ii)Thewissen's Probability Analysis) time stamp reports associate with student test responses, in order to show the time in which Plaintiff and Student B, each completed the identically and incorrectly answered questions.

120.   On October 26, 2015, Plaintiff received a response from Ms. Furey-Ligan that his request to access specific public records was denied, because records such as the answer key of the students who took the same quiz at issue do not exist. Ms. Furey-Ligan further claimed that the University does not create any time stamp reports associated with student test responses. That non-existent information was the information used by Defendant Emerick to support her accusation and conclusion.

121. Plaintiff also reiterated his request via email on October 26, 2015 to conduct an open field test in order to conclusively prove that it was physically impossible to commit the misconduct he was accused of by doing the same quick side-glances seen in the video toward Student B's computer screen. The director of the Media Department, Mr. Rey Notareschi, who was also Plaintiff 's boss, was ready and willing to set up and record the field test, participate as a tester and to operate the video camera using the exact same angles that the proctor used.

122. Ms. Furey-Ligan responded on the same day that NEOMED staff is not to participate in the open field test conducted by Endres. If Endres wanted to conduct a field test himself, he could only use the location, but he was not allowed to use the same video equipment and camera at Olson Hall, and the Media Department was prohibited from setting up and recording the field test.

123. Also in response to Plaintiff 's request of Thewissen's probability that was used at the first hearing, Ms. Furey-Ligan replied on October 26, 2015: All discussions of the CAPP hearings were verbal only, and Mr. Thewissen presented his probability verbally, there was no record in any format, like written document, transcript, audio or video recording. The students are not allowed to make any recording of the CAPP hearing.

124. On October 26, 2015, Plaintiff realized that there was no possible way he could meet the requirements in providing "substantial" evidence for an Appeal by the deadline, because he was being denied access to the information and evidence used against him at the First Hearing, the same information used by Defendant Emerick, and that he was prohibited to use the same video equipment to conduct an open field test with NEOMED staff's participation and willingness to oblige.

125.   On the afternoon of October 26, 2015, Plaintiff met with Dr. Elizabeth Young, the Vice Dean of NEOMED School of Medicine to discuss the situation. Dr. Young agreed to extend the deadline for one day to 12:00pm, Wednesday, October 28, 2017. Even with this extension, Plaintiff was still short of the 5 days defined in the Student Handbook for the disciplinary hearing procedure, or the four days for the CAPP hearing procedure.

126.   Plaintiff finally received the answer key and score of the HDS's class for the Exam, the timestamps of his answer key and Student B's, and Thewissen's Probability Analysis, on October 27, 2015 at 3:21pm. Plaintiff 's deadline to submit his Appeal was October 28, 2015 at 12:00pm. Therefore, Plaintiff did not receive the full evidence important to his case and Appeal until 5 business hours before his Appeal deadline and was denied a meaningful time to review and address the evidence.

127.   On October 28, 2015, at 12:00pm, Plaintiff submitted his Petition for CAPP Executive Review Form – CAPP 2 (the "Petition Form") to the Executive Review Committee (the "ERC"). In the Petition Form, Plaintiff presented new information that he felt should affect the outcome of the Decision. The newly presented information included:

(1) Hundreds of cases based on the actual class data prove Thewissen's probability was flawed and Emerick's similarity was meaningless.Signatures collected from a survey that it is not possible to get answers from the computer screen of next seat by simply glancing-over. The survey was conducted during the 5 minutes break in between classes of that morning. All students who took the survey also took the same HDS quiz, at the same time, and location.

(2) A psychological evaluation completed by a psychiatrist who specializes in ADHD, Dr. Andrew A. Trauben, M.D., wherein Dr. Trauben reviewed the video and met with Plaintiff Do in person to evaluate his ADHD symptoms (the "Psychological Evaluation"). The psychologist attested to the fact that the video recording was consistent with the symptoms and manifestations of ADHD.

128.   It would later become apparent that the October 28, 2015 deadline was also the last time that Defendants would allow Plaintiff s to submit *any* evidence for his case. Defendant refused to accept any information he later submitted before his Appeal and final hearing

### XIII.   Plaintiff Was Deprived of a Meaningful Opportunity to Appeal the Decision

129.   The appeal hearing before the CAPP ERC (Executive Review Committee) was held On November 2, 2015, at 2:00pm (the "Appeal Hearing").

130.   Just four hours prior to the Appeal Hearing, Defendant Emerick sent Plaintiff an email rejecting Plaintiff 's Statistical Analysis, which had proven that the Thewissen Probability Analysis was misleading and deceiving. Plaintiff was also prohibited to distribute hard copies of the report to the ERC members when he spoke at the Appeal Hearing. Defendant Emerick cited a rule from the CAPP Procedures that no evidence from Plaintiff would be accepted and allowed to be on record after October 28, 2015.

131.   Instead, Plaintiff was only permitted to verbally speak about the report that prove Thewissen's Probability was flawed.   However, the report that Plaintiff stated about the Statistical Analysis would not be on the record and would be excluded from his student file. Therefore, the crucial information was never seen or heard by the CAPP for the final hearing on November 18, 2015.

132.   At the Appeal Hearing, the procedures were the same as the First Hearing: Plaintiff was not allowed to be present when Defendant Emerick presented the case and engaged in discussion with the ERC members behind closed doors. After Defendant Emerick concluded her private presentation to the ERC, Plaintiff was called in to the room to present his new information and answers questions from the ERC. Plaintiff was unable to distribute copies of his Statistical Analysis, and was only able to explain it verbally to the ERC.

133.   Plaintiff explained that Defendant Emerick's 84% similarity was based on a single comparison of his answer keys to Student B's answer keys, but that to compare any two students who took the Exam, more than 80 out of 160 students in the class had 85% similarity with at least one other student in the class. He also stated that based on the actual Exam data of the entire class, two thirds of the class, that more than 120 out of 160 students had 6 or more identical wrong answers as at least one other student in the class. This undisputable hard data debunked the Thewissen Analysis's conclusion that "probability for all 6 questions to be identical and wrong is the product of these: 0.000036". In other words, Thewissen's probability indicates there was less than 0.1% chance two students could have 6 identical wrongs, unless the alleged misconduct occurs.

134.   Plaintiff also brought up the fact that the video timestamps did not sync up with the ExamSoft timestamps. The video timestamps show student B finished his test and passed behind him at 29:15, however, the timestamp of the ExamSoft shows student B signed-off from ExamSoft at 34:42.

135.   Defendant Emerick remained in the room during deliberations and during voting after Plaintiff left the room

136.   On November 3, 2015, Plaintiff received a letter informing him that the ERC granted him a rehearing (the "Final Hearing"), but was restricting the information Plaintiff was allowed to use for the Final Hearing to Dr. Trauben's evaluation report (the "New Information") of his behavior as seen in the video recording of the Exam. Plaintiff would not be allowed to submit any evidence for the final hearing (the "ERC Decision Letter").

137.   The ERC Decision Letter also stated that material Plaintiff had submitted on October 28, 2015, countering the Thewissen Analysis, would not be considered as substantial or

new evidence, and therefore Plaintiff could not use any of that information at his Final Hearing.

138.  The ERC deemed Plaintiff 's report – which contained hundreds of cases based on the actual Exam data – as unsubstantial. In contrast, the Thewissen Analysis was based on only *one* comparison, but was used as the key evidenced to support the accusation and the Decision.

139.  Insofar as the Statistical Analysis was precluded from being presented in the upcoming Final Hearing, Plaintiff sent the list of hard data of actual cases to Mr. Thewissen, in order to explain his findings and for him to validate the results. Mr. Thewissen declined to review the Statistical Analysis, instructing Plaintiff that "all correspondence regarding CAPP issues should flow through the school's legal office."

140.  However, the Code expressly provides that information that could be considered by CAPP, of which Mr. Thewissen was co-chair, included "[a]ll other relevant information." *See* Code, p. 66.

141.  Upon information and belief, Mr. Thewissen was aware that Plaintiff 's Statistical Analysis debunked the analysis that CAPP was relying on in dismissing Plaintiff from NEOMED, and for that reason, refused to accept it as additional evidence, and due to Mr. Thewissen's refusal to accept the Statistical Analysis as additional evidence, as well as the issuing of the Limiting Instruction, the members of CAPP were precluded from viewing or considering that evidence in the Final Hearing.

142.  On November 11, 2015, NEOMED's legal counsel notified Plaintiff via email that "regarding [Endres]'s request to include a statement that Mr. Thewissen's analysis contained errors was misleading. He was not open to making such a statement".

143.  On November 17, 2015, Plaintiff requested through his legal counsel that Dr. Trauben to be invited to attend his final hearing.  Since Dr. Trauben's report was the only

34

information that the ERC Appeal determined would be allowed at the Final Hearing, then it would be beneficial to all parties for Dr. Trauben to explain the report instead of Endres. NEOMED's legal counsel stated in an email sent on November 17th that the CAPP hearing panel agreed the request, and that they would also have some questions for Dr. Trauben. NEOMED's legal counsel also stated that Mr. Thewissen, the co-chair of CAPP, will call Dr. Trauben around 2:00pm on November 18, 2015.

144. The day before the final hearing, on November 17, 2015, NEOMED legal counsel spoke to Endres 's counsel that even if NEOMED let Plaintiff stay, according to Mr. Thewissen, it would be "mathematically impossible" for Plaintiff to pass the HDS class. NEOMED does not use letter grades, the final grade of courses is "Pass" or "Fail".  According to the 2015 HDS course syllabus, the final passing score of the 2015 HDS class is 62%. Plaintiff would only need to get a 58.5% on the module 3 test that was to be held on December 11, 2015 and 63.5% for the NBME test on December 17, 2015 in order to pass the course. He was dismissed on November 18, 2015, and never had an opportunity to take the Module 3 and the NBME test.

145. For the NEOMED defendant to predict that it was "mathematically impossible" for Plaintiff to pass the class even if NEOMED let him stay, was yet another statement that was proved by facts to be completely false.

### XIV.    The Final Hearing Deprived Plaintiff Of an Opportunity to Defend Himself

146. The Final Hearing was held on November 18, 2015, at 2:00pm. Approximately four hours prior to the Final Hearing, a limiting instruction was issued to CAPP (the "Limiting Instruction") by NEOMED's legal counsel, regarding Plaintiff 's new evidence, stating:

> Please be advised that during our deliberations today, the Committee should accord no weight to any statement made or documents presented during the initial hearing in [Plaintiff 's] CAPP case that recounted any statistical

analysis performed on his test answers. Consistent with disregarding any *statements* made or documents presented about any statistical analysis, the committee is to likewise accord no weight to any *documents* set forth by [J. Endres] throughout his appeal that include any statistical analysis of his test answers. While these documents were included in the record received by the Committee in advance of today's meeting, they should not be considered during our review of this matter today, or in making a decision.

147.   Despite the fact that the Limiting Instruction claimed that the documents at issue "were included in the record received by the Committee in advance of today's meeting," the document – "*Appeal Substantial Evidences*" of the Statistical Analysis – was only seen by Defendant Emerick and Mr. Thewissen.

148.   Upon information and belief, Defendants were aware that they erroneous issued the Decision and Sanction against Plaintiff after the First Hearing, based largely on misleading Thewissen Analysis, and issued the Limiting Instruction to ensure that their wrongful conduct remained hidden.

149.   At 12:07pm, less than two hours before the Final Hearing, Plaintiff received an email from Ms. Mary Beth Seith, stating she was not permitted to accept and distribute any material to the CAPP hearing panel that Plaintiff had submitted. This included undisputable cases that prove Thewissen's probability data is flawed as well as a recorded field test video proving the accused conduct is physically impossible.

150.   The Final Hearing was conducted in the same manner as the previous hearing, Plaintiff was not allowed in the room while Defendant Emerick presented her case and engaged in discussion with the CAPP members. Plaintiff was instructed to wait in a separate room while waiting to be called. He was not allowed to hear the evidence presented against him, and was only called in after Defendant Emerick finished discussing her case against Plaintiff with the CAPP members.

151.   Thereafter, Plaintiff was only allowed to speak generally. He was not allowed to present, distribute, or discuss any material that would have proven that he did not engaged in the alleged misconduct.

152.   Dr. Trauben was also called in by telephone at the same time as Endres, at approximately 2:55pm, not at 2:00pm as NEOMED requested. He reconfirmed his evaluation, as stated in his report, that Plaintiff 's behavior seen in the video was a manifestation of his ADHD. The CAPP members did not ask Plaintiff or Dr. Trauben any questions related to the memo that Defendant Emerick had presented before they were called in. Rather, they only questioned Dr. Trauben's credentials and why Dr. Trauben was qualified to write the report he had submitted.

153.    At the Final Hearing, Defendant Emerick did not speak or ask any questions during the time Plaintiff and Dr. Trauben were in the room.  Defendant Emerick stayed throughout all parts of the final hearings, including the deliberation and voting, after Plaintiff and Dr. Trauben had left the room.

154.   On November 19, 2015, Plaintiff received a letter that reiterated his dismissal from NEOMED There was only one word under the section CAPP Final Vote and Decision of the Student Progress Report: "Dismiss." There was no information regarding the evidence relied on in determining the sanction of. (The "NEOMED Hearing Result" attached hereto as **Exhibit E)**

### XV.    **Defendants Included False Information in Plaintiff 's Student Progress Report**

155.    The Final Decision Letter included a Student Progress Report summarizing the Final Decision (the "Final Report"). The Final Report stated the hearing started at 2:30 p.m. it also stated that "Dr. Andrew Trauben participated via phone for early part of meeting." Both statements were false. The Final hearing started around 2:00 PM.

156.   Dr. Trauben stated in his affidavit "I was asked to be available by phone to testify

during Mr. (Endres 's) second hearing, which occurred on November 18, 2015. I was told that that hearing would start at 2:00 pm. I was not called to testify until approximately 2:55 pm". Dr. Trauben attended the Final Hearing via phone at the same time Plaintiff was called into the room. Neither Dr. Trauben nor Plaintiff were allowed to partake or listen in to the early part of the discussion, when Defendant Emerick discussed her memo and the Thewissen Analysis with the CAPP hearing panel. Instead, the early part of the meeting was held behind closed doors.

157.   On November 20, 2015, two days after the Final Hearing, Plaintiff obtained a hard copy of hisstudent file. At this time, Plaintiff first became aware of a memo allegedly drafted by Defendant Emerick on November 2, 2015 (the "Emerick Memo"). The Emerick Memo was placed as the first page of the student file, and was not in the electronic copy of the official student file Plaintiff had received on November 11, 2015 from NEOMED's legal counsel, which was supposed to include all information and evidence from Defendant Emerick in support of her accusation and conclusion.

158.   The Emerick Memo alleged and summarized her conversations with Dr. Ramos and Dr. Trauben. In the memo, Defendant Emerick made false and misleading statements in order to discredit the two doctors' reports that Plaintiff's behaviors seen in the video were a manifestation of his ADHD. Although the Emerick Memo was a summarization of her conversation and discussion with Dr. Ramos and Dr. Trauben, it was never disclosed or shared the memo with either Dr. Ramos or Dr. Trauben.

159.   Dr. Ramos and Dr. Trauben's, each stated in their affidavits that "(Defendant Emerick's) November 2nd memo did not faithfully memorialize the contents of our telephone call" in regarding their conversation with defendant Emerick, were either completely false, misleading, or taken out of context.

160.   For instance, the Emerick Memo stated with regards to Dr. Trauben's report: "He understood that he needed a quick turn around on documentation in order to submit a CAPP appeal letter." However, in an affidavit with regards to the Emerick Memo, Dr. Trauben's stated: "That sentence appears to suggest that my analysis of Mr. [Endres], or the opinion I rendered, was compromised because of the timeframe in which it was completed. That is not so, and it is not something I ever conveyed to [Defendant Emerick]."

161.   The Emerick Memo further stated "Dr. Trauben believed we were acting under the 'beyond a reasonable doubt' level of evidence, I explained that our level of evidence in these types of hearings is a 'preponderance of evidence.'" In his affidavit, Dr. Trauben took issue with Defendant Emerick's statement, explaining: "That sentence suggests that my opinion that Mr. [Endres's] behavior could be explained as well by his ADHD as by an attempt to cheat somehow depended on the evidentiary standard being used in the disciplinary proceeding. That is not the case, and that is not something I ever said to [Defendant] Emerick. I never suggested that my opinion would be different under a 'preponderance of evidence' standard."

162.   The Emerick Memo also claimed that Dr. Trauben suggested: "Perhaps was unaware of his HD behaviors (fidgeting)." Dr. Trauben's affidavit argues this notion, stating: "That sentence suggests that fidgeting was the only behavior of Mr. [Endres's] that I thought he may have been unaware of due to his ADHD. That is not something I conveyed to Dr. Emerick. It was, and is, my opinion that Mr. [Endres], due to his ADHD, may have been unaware of the full range of behavior exhibited in the test video." Dr. Trauben summarized his feelings, stating: "In my opinion, [the Emerick Memo] Endres did not faithfully memorialize the contents of our telephone call."

163.   The Emerick Memo also attack's Dr. Ramos' credibility in submitting her report,

writing: "Dr. Ramos only met with [J. Endres] three times in total." The Emerick Memo then contradicts itself, stating that Dr. Ramos did not meeting with Plaintiff before writing the report: "She did not meet with him or speak with him before writing the letter submitted to CAPP phase 2." Dr. Ramos responded to that claim in her own affidavit, stating: "That passage appears to attack the basis on which I rendered the opinion in my October 13th letter. The passage contains several false or misleading representations." Dr. Ramos goes on to explain: "The passage states I 'only' met with Mr. [Endres] three times. Those meetings, however, occurred in a span of just over four months. Three meetings in a four-month span exceeds the rate at which I meet with most of my patients."

164.   Dr. Ramos also explains: "The passage then states that 'I did not meet with Mr. [Endres] prior to submitting my October 13th letter. But as noted above, I met with Mr. [Endres] three times in 2015. The most recent occurring on August 27, just one month before the incident at issue. My statement that I did not meet with Mr. [Endres] prior to writing the letter was not a caveat intended to qualify the opinion I was rendering; its import was to convey that I had chosen to view the video before speaking to Mr. [Endres] so that my view of the video would not be tainted by his explanation of his actions."

165.   The Emerick Report further attempted to discredit Dr. Ramos' report, stating: "She simply prepared the letter based upon the materials [Plaintiff 's] parents sent her via jump drive regarding [Plaintiff 's] case." Dr. Ramos refused that information, affirming that "[t]he final sentence of the passage concludes my stating that I "simply prepared the letter based upon the materials [Plaintiff 's] parents sent [me] via jump drive." That is false, and it is not something I ever conveyed to Defendant Emerick," and further continuing "[t]his final sentence of the passage suggests that the views I expressed in my letter were somehow biased by information I

received from Mr. [Endres 's] parents. That, too, is false"

166.  In addition, the Emerick Memo quoted Dr. Ramos as stating: "I could see how the constant viewing of the peer's computer to his right might be viewed as cheating." Dr. Ramos clarified that this statement was mischaracterized, explaining that "[t]he November 2 memo later states that I mentioned that 'I could see how the constant viewing of the peer's computer to his right might be viewed as cheating.' It takes that statement of mine out of context. What I told [Defendant Emerick] is that, while the video might appear to be evidence of cheating, it is also consistent with the behavior of someone with ADHD." Dr. Ramos concluded: "In my opinion, [Defendant Emerick's] November 2 memo does not faithfully memorialize the contents of our telephone call."

167.  Defendant Emerick also lied to Dr. Ramos, telling her that Plaintiff blamed Dr. Ramos for switching the medication. Defendant Emerick's motive for making such false statement to Dr. Ramos was to elicit a response from Dr. Ramos that would damage Plaintiff 's credibility. The Emerick Memo stated that Dr. Ramos "did not advise him to switch medications or to go off Strattera." However, Plaintiff had always stated – in his CAPP Interview Form and Personal Statement – that *he* was the one who wanted to try a non-stimulating medication, and therefore was switched from Ritalin to Strattera. Plaintiff had never told Defendant Emerick that Dr. Ramos was responsible for the decision for the medication change. However, upon information and belief, Dr. Emerick told the CAPP Committee that Plaintiff had lied about whose decision it had been to switch his medication.

168.  Defendant Emerick also purposely misled Dr. Ramos in their conversation, claiming that Plaintiff ignored Dr. Ramos's recommendation to request a seating accommodation to avoid future misinterpretation of his fidgeting and movements. The Emerick Memo stated that

41

Dr. Ramos "was surprised that he never registered his ADHD as a disability to seek accommodations." However, Plaintiff had in fact requested a temporary accommodation via an email sent to Ms. Hricks on October 8, 2015, the day after he was first notified of the allegation by Defendant Emerick on October 7, 2015, before Dr. Ramos had even heard of the incident. The sole purpose of that accommodation was to be seated away from other students for his October 9, 2015 HDS midterm, to avoid any future misinterpretation. The accommodation was not seeking any special academic treatment.

169.   By inserting a falsified memorandum into Plaintiff 's Student file, after the Student File was provided to Plaintiff in preparation for the Final Hearing, Defendants attempted to cover their own mistakes and misconduct. Defendants reached an erroneous decision with regards to the misconduct claims against Endres. Instead of righting those wrongs, Defendants falsified records in an attempt to bolster their Decision that Plaintiff should be dismissed from NEOMED.

170.   Due to the fact that Plaintiff was unaware of the Emerick Report or Defendant Emerick's phone conferences with Dr. Trauben and Dr. Ramos, Plaintiff was denied the full and complete file of evidence the CAPP committee would rely on in reaching their Final Decision. Furthermore, Plaintiff was denied the opportunity to sufficiently and meaningfully defend himself against allegations of misconduct.

171.   Defendant Emerick knowingly made-up false statements in her November 2, 2015 memo. The discussion of the memo was held behind closed doors at the final hearing.  Dr. Trauben was purposely excluded from the discussion of the memo, followed by the false statement in the Student Progress Report of the final hearing to imply that Dr. Trauben attended the discussion of the memo, all indicating Defendants NEOMED's unfair and dishonest dealing in this case.

172.   Defendant Emerick accused Plaintiff of misconduct, but according to NEOMED's own guideline, Defendant Emerick was the one who committed the behavioral misconduct by "Knowingly furnishing false or misleading information to University officials", (pp 109[f])

173.   Defendants forced Plaintiff to defend himself without knowledge of the evidence to be used against him. Defendants also failed to provide Plaintiff with a basis for their decisions throughout the adjudication process. To date, Plaintiff is unaware of any facts or evidence relied on by the CAPP committee in deciding to dismiss Plaintiff from NEOMED.

174.   All evidences and information used by Defendant Emerick to support her accusation and conclusion are proved to be either meaningless, or false. All evidences, that were used as the deciding factors of CAPP's decision of Plaintiff's dismissal, are proved by facts, that were to be either misleading or false.

175.   Instead, Defendants refused to accept, review, or consider Plaintiff 's evidence that the allegations of misconduct were wrong. In doing so, Defendants deprived Plaintiff of his due process rights and acted in direct violation of state laws and the ADA.

## AS AND FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)

176.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

177.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case, Defendants are state actors subject to the Fourteenth Amendment.

178.   Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or

43

causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . ..

179.   A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

180.   A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

181.   Plaintiff constitutionally protected property interest in his continued enrollment at Defendant NEOMED, a public university, and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by Defendant NEOMED.

182.   Plaintiff constitutionally protected property interest further arises from the express and implied contractual relationship between Defendant NEOMED and Endres.

183.   It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

184.   A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

185.   As a result, if Plaintiff as a NEOMED student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution

44

applied to the disciplinary process that Defendants used.

186.   Defendant NEOMED, as a public university established by the State of Ohio, and the individual Defendants, as agents of Defendant NEOMED, have a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

187.   Plaintiff had obeyed all institutional rules when he was wrongly expelled from Defendant NEOMED.

188.   Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at Defendant NEOMED.

189.   Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Endres.

190.   Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged misconduct.

191.   In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff 's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness.

192.   Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair investigation and adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to challenge the credibility of any adverse witnesses; his right to access evidence presented against him; his right to present evidence and witnesses in support of his defense, and his right to know the evidence relied upon in reaching a

determination, and his right to be present at all proceedings.

193.   As a result, Defendant NEOMED failed to provide Plaintiff with the basic due process protections that they are required to provide to students, in violation of the 14th Amendment.

194.   Defendants, as well as other agents, representatives, and employees of Defendant NEOMED, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff 's constitutional rights.

195.   Defendants all agreed to, approved, and ratified this unconstitutional conduct.

196.   As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, expulsion from Defendant NEOMED denied him the benefits of education at his chosen school and also damaged Plaintiff 's academic and professional reputation.  Plaintiff 's lifelong goal of becoming a surgeon has been shattered.

197.   Accordingly, Defendant Sandra Emerick  is  liable to Plaintiff in violation of 42 U.S.C. § 1983 for  violations  of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

198.   As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

199.   Accordingly, Defendants  are liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment.

200.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

201.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial from Defendant Sandra Emerick, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to the declaratory and injunctive relief against all Defendants hereafter demanded.

## AS AND FOR A SECOND CAUSE OF ACTION
## Discrimination Based on Disability Under Title II of the ADA)

202.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

203.   Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

204.   The ADA and its implementing regulations require entities such as NEOMED to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities.

205.   Plaintiff has been denied the modifications in NEOMED's practices, namely its investigation and hearing processes, as evidence of Plaintiff's ADHD symptoms and effects of mediation were disputed, mischaracterized, or excluded from consideration.

206.   Despite being informed of Plaintiff's disability, documented ADHD medicine history since childhood, and reports provided by doctors who specialize in the field, Defendants completely dismissed and expressly doubted the fact that Plaintiff 's glances were caused by symptoms associated with ADHD. Plaintiff has been denied the modifications in NEOMED's practices, namely its investigation and hearing processes, as the MDR reports and evidence of Plaintiff 's ADHD symptoms and effects of mediation were disputed, mischaracterized, or excluded from consideration. According to section 504 NEOMED should have a process, which

in sum and substance is a Manifestation Determination Review to determine whether Endres 's behavior seen in the video is a manifestation of his disability.

207.  As a direct and proximate result of the above conduct, Plaintiff suffered tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries, reputational harm, and other direct and consequential damages.

208.  As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Permanent Injunction and Declaratory Judgment)

209.  Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

210.  Defendants have ended Endres 's medical education and his career-path to becoming a physician. Defendants impugned his reputation for honesty and integrity without giving him a fair hearing destroying out his opportunities to enroll in another medical school and to realize his goal of becoming a doctor

211.  Defendants conducted the proceedings against Plaintiff in secrecy, presenting their case against Endres while he was outside the meeting room, concealing evidence against him, restricting his opportunity to present exculpatory evidence, and failing to memorialize the hearing. In short, Defendants deprived Endres of any meaningful to defend himself against false allegations.

212.  Plaintiff had had absolutely no complaints about his conduct or his character, prior to the accusation at issue in this action. His reinstatement as a medical student would cause no

harm, much less substantial harm, to anyone.

213.   By reason of the foregoing Endress has and continues to suffer irreparable harm for which he has no adequate remedy at law.

214.   Plaintiff's future has been severely compromised and damaged due to Defendants' actions.  Without appropriate redress, the Sanction imposed as a result of Defendants' wrongdoings will continue to cause irreversible damage to Plaintiff 's educational, career, and future employment prospects.

215.   As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of Plaintiff 's formal student record at NEOMED.

216.   By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C.§2201, a declaration that: (i) the outcome and findings made by Defendants be reversed; (ii) the Sanction be reversed; (iii) Plaintiff be reinstated as a student at NEOMED; (iv) Plaintiff 's reputation be restored; (v) Plaintiff's disciplinary record be expunged; (vi) the record of Plaintiff 's dismissal be removed from his education file; and (vii) any and all records pertaining to the investigation be destroyed.  He also requests that the Defendants be permanently enjoined to implement the foregoing and permanently enjoined from continuing to enforce their expulsion order and to reinstate him as a student in good standing.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands the following relief from Defendants:

(i)     on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial as against Defendant Sandra Emerick , including, without

limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at NEOMED, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(ii)    on the second count for discrimination based on disability under Title II of the ADA, a judgment awarding Plaintiff damages in an amount to be determined at trial against Defendants, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff  for the inability to complete his studies at NEOMED, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)    on the third count for a permanent injunction and  a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that (i) the outcome and findings made by Defendants NEOMED Board of Trustees be reversed; (ii) the Sanction be reversed; (iii) Plaintiff  be reinstated as a student at NEOMED; (iv) Plaintiff 's reputation be restored; (v) Plaintiff 's disciplinary record be expunged; (vi) the record of Plaintiff's dismissal be removed from his education file; and (vii) any and all records pertaining to the investigation be destroyed.  Further that the Defendants be permanently enjoined to implement the foregoing and permanently enjoined from continuing to enforce their expulsion order and to reinstate him as a student in good standing.;

(iv)    An award of prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(v)    Such other and further relief as the Court deems just, equitable and proper.

**Dated:   New York, New York**
**November 16, 2017**

                    **Respectfully submitted,**

                    **NESENOFF & MILTENBERG, LLP**
                    *Attorneys for Plaintiff*

                    **By: /s/ Andrew T. Miltenberg_____**
                    **Andrew T. Miltenberg, Esq.**
                    **(subject to admission *pro hac vice*)**
                    **Diana R. Warshow, Esq.**
                    **(subject to admission *pro hac vice*)**
                    **363 Seventh Avenue, Fifth Floor**
                    **New York, New York 10001**
                    **(212) 736-4500**
                    **amiltenberg@nmllplaw.com**
                    **dwarshow@nmllplaw.com**

-and-

**Berkman, Gordon, Murray & DeVan**
*Local Counsel for Plaintiff*

**By: /s/ J. Michael Murray**
**J. Michael Murray, Esq. (0019626)**
**55 Public Square, Suite 2200**
**Cleveland, Ohio 44113**
**(216) 781-5245**
**(216) 781-8207 (facsimile)**
**jmmurray@bgmdlaw.com**

## JURY DEMAND

Plaintiff demands a trial by jury on all issues within this Complaint.

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

**By: /s/ Andrew T. Miltenberg_____**
**Andrew T. Miltenberg, Esq.**
**(subject to admission** *pro hac vice***)**
**Diana R. Warshow, Esq.**
**(subject to admission** *pro hac vice***)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**dwarshow@nmllplaw.com**

-and-

**Berkman, Gordon, Murray & DeVan**
*Local Counsel for Plaintiff*

**By: /s/ J. Michael Murray**
**J. Michael Murray, Esq. (0019626)**
**55 Public Square, Suite 2200**
**Cleveland, Ohio 44113**
**(216) 781-5245**
**(216) 781-8207 (facsimile)**
**jmmurray@bgmdlaw.com**