IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION (AKRON)

| | | |
|---|---|---|
| J. ENDRES, | . | **Civ. No. 5:17−cv−02408−SL** |
| | . | |
| Plaintiff, | : | JUDGE LIOI |
| | : | |
| v. | : | MAGISTRATE JUDGE LIMBERT |
| | : | |
| NORTHEAST OHIO MEDICAL | : | |
| UNIVERSITY, *et al.,* | : | **FIRST AMENDED COMPLAINT** |
| | : | |
| Defendants. | : | JURY DEMANDED |

## I.    <u>Preliminary Statement</u>

1.      This case arises out of the dismissal by Defendants Northeast Ohio Medical University ("NEOMED" or the "University"), Northeast Ohio Medical University Board of Trustees ("Defendant Board"), Sandra Emerick ("Defendant Emerick"), and Jay A. Gershen ("Defendant Gershen") (collectively, "Defendants"), of Plaintiff from his medical studies on or about November 18, 2015, due to (a) false allegations, improperly processed as academic misconduct rather than a disciplinary matter, that he cheated on an examination by viewing a nearby student's computer screen when notice and a meaningful opportunity guaranteed by the Due Process Clause of the Fourteenth Amendment to defend himself would have exposed the allegations as (i) equating symptoms of his ADHD and reaction to its prescribed medication with cheating; (ii) relying initially on a thoroughly impeached and unreliable expert statistical analysis that purported to compare his answers to those of a nearby student and later on other demonstrably false information instead of an accurate and probative statistical analysis and a true rendition of conversations with

experts; and (iii) ignoring the physical impossibility of securing information from the nearby student's screen; and (b) disability discrimination in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 by their (i) justifying dismissal of a student with a disability whom they did not want to complete his medical education through willfully ignoring the symptoms of his ADHD and reaction to prescribed medication, irrationally relying on a discredited statistical analysis, and ignoring the physical impossibility of cheating, and/or (ii) failing to make reasonable accommodations of his known disability, even when the accommodations would not have imposed an undue hardship, by evaluating his movements in the context of his known disability and prescribed medications, which would have established he never cheated, and ensuring future testing conditions that would prevent any appearance of cheating based on his symptoms.

2.    Defendants were informed by Plaintiff that it is physically impossible to commit the misconduct of which he was accused and that a simple, less than five-minute field test at Olson Hall which replicates the exact quick side-glances of the alleged misconduct would have conclusively demonstrated that it was physically impossible to get any legible information from the computer screen he was allegedly glancing at.  There was no known record of any kind from Defendants that such fact-finding was conducted. Instead, Defendants conducted a ruthless and improper investigation and adjudication process, which in bad faith chose the academic misconduct process rather than the appropriate disciplinary process, doctored records, refused to conduct field tests, and prohibited Plaintiff from submitting relevant evidence, and the University's Committee on Academic and Professional Progress ("CAPP") ultimately found Plaintiff "Responsible"

for academic misconduct. Plaintiff was notified by letter received on November 19, 2015, that NEOMED had expelled him the day before.

3.      Throughout the investigative process, Defendants demonstrated substantial procedural errors in violation of the Fourteenth Amendment. When Defendants subjected Plaintiff to disciplinary action, they did so in an arbitrary and capricious way, deprived him of due process, and failed to adhere to NEOMED's own guidelines and regulations.

4.      Throughout the entire process, Defendants ignored the most basic tenets of due process: they concealed *ex parte* evidence from Plaintiff, foreclosing him from significant  portions of his hearings and learning the evidence presented against him, precluding him from presenting relevant and material factual evidence refuting the accusations against him, failing to make a record of the proceedings, providing no explanation of material relied upon in reaching the decision, and depriving Plaintiff of any meaningful opportunity to tell "his side of the story in order to make sure that an injustice is not done."  *Goss v. Lopez,* 419 U.S. 1. 565, 581 (1975).

5.      Plaintiff has been greatly damaged by Defendants' arbitrary and capricious actions: Plaintiff 's educational and academic experience was derailed and halted by his dismissal from the University; his reputation tarnished; his medical career prospects severely damaged, if not terminated; and the monies spent on obtaining an education at NEOMED squandered.

6.      Plaintiff seeks redress against Defendants due to the actions, omissions, errors, flawed procedures, and overall failure to provide Plaintiff with a meaningful standard of due process and equity concerning the wrongful allegations of academic misconduct made against him.

7.     Plaintiff therefore brings this action to obtain relief based on 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act (the "ADA"), and the Rehabilitation Act of 1973.

**II.**        **Parties**

8.     Plaintiff is a natural person, citizen of the United States, and resident of the State of Ohio. During the events described herein, Plaintiff was a student at NEOMED.

9.     Defendant NEOMED is a public, state, coeducational university located in Cleveland and Rootstown, Ohio. It is the recipient of state and federal grants and contracts and thus subject to the Rehabilitation Act of 1973.  NEOMED is also subject to the ADA because Congress expressly reached state entities to remedy in a congruent and proportionate fashion intentional discrimination, including a failure to make reasonable accommodations absent undue hardship, which irrationally discriminated against students with disabilities in violation of the Fourteenth Amendment.

10.     Defendant NEOMED Board of Trustees is the corporate body that controls Northeast Ohio Medical University, a public university incorporated in and with its principal place of business in the State of Ohio, has sue-or-be-sued capacity, and each member is a state actor and sued in his or her official capacity.

11.     At all times pertinent to this action, Defendant Emerick resided in the State of Ohio, served as the Chief Officer of Student Affairs at NEOMED, was a state actor, and is being sued in both her individual and official capacities.

12.     At all times pertinent to this action, Defendant Gershen resided in the State of Ohio, served as President of NEOMED, was a state actor, had the ultimate responsibility and authority for the discipline of all students of NEOMED, and is being sued in his

official capacity.

**III.      Jurisdiction and Venue**

13.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under federal law, including 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the ADA, and the Rehabilitation Act of 1973; under the ADA, 42 U.S.C. § 12133; and the Rehabilitation Act, 29 U.S.C. § 794a(a)(2).  This Court has personal jurisdiction over Defendant NEOMED and its Board of Trustees because it is conducting business within the State of Ohio in this district and over Defendants Emerick and Gershen because they reside in this district and were acting as officials of NEOMED at all relevant times.

14.     Venue in this action properly lies in this district pursuant to 28 U.S.C. §1391 because the Defendants are either residents of this district or a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**IV.     Facts**

A.      Plaintiff's Educational and Medical Background

15.     Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), a neurodevelopment condition with a complex etiology that, unless mitigated by prescribed medication, substantially limits his major life activities, including concentrating, thinking, and test-taking, when he was six (6) years old, as evidenced by Plaintiff's medical records from Northwest Pediatric. Since he was first diagnosed, Plaintiff received effective treatment and was medicated correctly by Ritalin. From grades 1 through 12 of his education, Plaintiff went to his school's nurse's office at noon each day to take his afternoon dosage of Ritalin.

16.     Ritalin helped Plaintiff concentrate, suppress his hyperactivity, and allowed him to overcome his ADHD and excel personally and academically. Although he needs the ADHD medication to help him concentrate for the daily routines, for the subjects he is passionate about, he has laser focus. Plaintiff had never requested any kind of academic accommodation throughout his school years. He was in the gifted program of Dublin, Ohio schools from third grade to middle school. He graduated from Dublin Scioto high school as valedictorian and was a National Merit semi-finalist and finalist. He won scholarships to Ohio State University, Case Western Reserve University, and was accepted to the competitive accelerated BS/MD program offered by NEOMED.

17.     Plaintiff received his B.S. Degree with Magna Cum Laude from Kent State University - NEOMED's BS/MD undergraduate portion in two years. After meeting all of the NEOMED "Phase 1" requirements, including GPA and MCAT scores, Plaintiff matriculated to the Medical School ("Phase 2") at NEOMED in August 2014, at the age of 20.

B.     NEOMED's Agreements with Plaintiff

18.     Upon enrolling at NEOMED, Plaintiff relied on the representations and assurances made by NEOMED and its representatives. Upon his acceptance, NEOMED provided Plaintiff with copies of its school policies, including its Student Handbook (the "Code").

19.     The Code states in relevant part:

> Northeast Ohio Medical University (NEOMED) students are expected to read, understand, sign and abide by the "Expectations of Student Conduct and Professional Commitment" while enrolled and involved in NEOMED, its partner institutions and hospitals, and NEOMED-sponsored activities. Failure to do so may result in

> referral and review by either the Committee on Academic and Professional Progress (CAPP) or Student Conduct procedures. Student conduct or professional behavior concerns should be reported by faculty, staff or students using the "Conduct Concern Notes" available through the Office of Student Affairs.

*See* Code, (**Exhibit A to Complaint**) p. 104-106.

20.    NEOMED's Code sets forth the procedures by which NEOMED students who have been accused of violating one or more of the enumerated academic policies are investigated, heard, and disciplined. *See* Code (**Exhibit A to Complaint**), pp. 104-106.

21.    NEOMED's Code delineates that the President of the University has the ultimate responsibility and authority for the discipline of all students, however, all complaints of alleged misconduct are received by the Chief Student Affairs Officer who works in collaboration with  the Director of Enrollment Services and Registrar. Further, if necessary, the associate dean for Academic Affairs of the student's college makes the initial determination as to whether the matters alleged in the Complaint are best resolved through the formal disciplinary process or by way of referral to the Committee on Academic and Professional Progress (CAPP) or some other mechanism such as counseling or mediation.  *See* Code, pp. 105 (B)(4)(5).

22.    The "Complaint" is defined in the Student Handbook as "Complaint includes a written document or verbal report setting forth the facts and reasons that a party or parties believe are sufficient to support a claim against a student or students for a violation of the expectations for Student Conduct and Professional Behavior." *See* Code, pp. 103 (A)(2).

23.    NEOMED's Code expressly covenants to provide the following procedure and rights to the accused student in an alleged complaint investigation:

Hearing Procedure:

☐ The hearing shall be adversarial in nature and shall be conducted fairly and impartially. (pp. 105, [8])

Student's right of hearing:

- To know the nature and source of evidence used to support the Complaint; to cross-examine witnesses against the student; to testify; and to present the testimony of witnesses and other evidence in the student's behalf;

- All hearing shall be closed to protect the student's rights of confidentiality.

*See* Code (**Exhibit A to Complaint**), p. 106.

    C.     <u>Plaintiff's Change in Medication</u>

24.     During his second semester in NEOMED's Medical Program, in or around March 2015, after 14 years on Ritalin Plaintiff began experiencing new problematic side effects of his ADHD medication. Plaintiff felt that Ritalin over-sedated him and made him feel lethargic.

25.     In or about May 2015, Plaintiff was accepted to be a neurological research assistant for the summer of 2015. By that point, Plaintiff had already passed 14 classes out of 15 classes for the first-year requirements of NEOMED's medical school.

26.     By late May 2015, Plaintiff began to experience over-sedation side effects of Ritalin, and therefore ceased taking Ritalin on a regular basis. Thereafter, Plaintiff failed BMB (Brain Mind and Behavior), his very last course of the first year at medical school, which had commenced in April 2015, shortly after his decreased Ritalin intake. Because he failed the BMB course, Plaintiff also lost the research assistant position of the summer of 2015.

27.     Plaintiff went to see his doctor, Dr. Caroline Ramos, M.D. on April 13,

2015. He did not want to change his ADHD medication in the middle of the semester, so, despite the new side effects, after an hour-long consultation with Dr. Ramos, he asked Dr. Ramos to continue on his Ritalin prescription.

28.     Between June 2015 and August 2015, Plaintiff went through an ADHD medication adjustment effort to find one he could tolerate and be able to take on the regular basis.

29.     On July 13, 2015, Plaintiff failed the BMB remediation exam. Based on the Code, all students of NEOMED's School of Medicine who failed any courses were subject to the Phase 2 CAPP Review for academic action. In the Phase 2 CAPP Student Interview Form, Plaintiff disclosed that one of the reasons for his failure of the BMB course was due to issues with his ADHD medication. However, he did not ask for any academic accommodations. The Phase 2 CAPP Review concluded with the decision to require Plaintiff to repeat the M1 year. That decision was expected and was the usual result for M1 students in similar situations.

30.     Plaintiff returned to NEOMED for the fall semester of 2015 to repeat the first year of the medical program. Plaintiff was looking forward to the school year and was determined to do well in his studies.

31.     Plaintiff also switched to a new ADHD medication, Strattera, in or about August 2015. Strattera was a non-stimulant and would not sedate him as Ritalin had: while Strattera would help him concentrate without the side effects of Ritalin, it would not suppress his fidgeting.

D.     The HDS (Human Development & Structure) Quiz

32.     In the fall semester of 2015, Plaintiff enrolled in Human Development &

Structure ("HDS"), in which Hans Thewissen was the course director. HDS was considered to be the most difficult course in the first year of NEOMED's medical program, and the course was weighted the most heavily for first-year medical students. Plaintiff had taken the course during the fall of 2014 and had passed.

33.     NEOMED records class lectures and exams on video through a video camera installed openly in the corner of the classroom. All students were aware of the camera. Plaintiff was especially familiar with the recording equipment located at Olson Hall as he had a part- time job as a student tech assistant, helping NEOMED professors in setting up the video camera recording for the lectures.

34.     NEOMED employs a computerized testing system that students take online via "ExamSoft". All online exams are taken on NEOMED's computers/laptops. Students were handed the laptops when they entered the testing room along with a piece of 8 ½" x 11" paper (the answer sheet). The brightness of the computers used for the tests was locked at near the lowest level. Students could not adjust the brightness. Further, students were only aware of their seat assignments approximately 15 to 20 minutes prior to the commencement of the Exam.

35.     For multiple choice questions, students were to answer the questions directly from the computer, and it was optional to write their answers on the answer sheet. For exams that only had multiple-choice questions, the score can be immediately shown when students sign-off from the exam. Students were to return the laptops along with the answer sheet when they exited the testing room.

36.     On September 28, 2015, in a video recorded for the HDS quiz (the "Exam") at Olson Hall, Plaintiff displayed behavior that appeared as fidgety, looking around the

room, restless, and distracted by something to his right. Unknown to Plaintiff, his saccadic eye-movements to the right due to distractions made him suspicious. There were 160 Students who took the Exam at the same time. There were 25 multiple choice questions in the Exam which counted as 5% of the final grade. It was also the first exam for the M1 Students (the first-year medical students) in the fall 2015 semester.

37.     Four proctors oversaw the Exam at Olson Hall, while the room was recorded by a video camera openly installed in the corner of the room. Three of the proctors walked around the room during the Exam, while the fourth proctor sat in the video equipment booth and operated the video camera.

38.     Plaintiff sat at seat number 29. He was right in front of the camera. Throughout the Exam, Plaintiff was distracted at times by the light of another person's screen or movement by another student. He would frequently look around the room and fidget throughout the prolonged exam.

39.     Furthermore, a new feature had been introduced to the ExamSoft software used at the HDS quiz, which allowed students to zoom in and out of photos and diagrams. The student to Plaintiff's right, at seat 30, "Student B," who Plaintiff did not know, frequently zoomed in and out of photos and diagrams on his computer screen, causing flashes of colors at the corner of Plaintiff's eye, and he would briefly glance over. It was physically impossible to discover any legible information from the computer screen of seat 30 by doing the same eye-movements due to the distance between them and the low-level of brightness that the computer screens in the Exam were set to (and could not be altered by any of the students).

40.     Plaintiff was unaware that his fidgeting and sideway glances, which lasted

no more than one second each, made him appear suspicious to the proctors. Plaintiff was similarly unaware that the camera was zoomed in and focused on him by the proctor, from approximately five minutes into the Exam until the moment when the Student to his right at seat 30 completed the Exam and exited the room.

41.    The Exam was the first examination Plaintiff had ever taken while on Strattera, a non-stimulant medication that he had just switched to a month before from Ritalin (stimulant).  He was fully aware Strattera did not suppress his fidgeting, but it never occurred to him that his fidgeting could be an issue during the exam.

42.    After the conclusion of the Exam, one of the Exam's proctor, Suzanne Hricks, filled out an Irregularity Report, a report that allows the proctor to list a student's names and check off any "irregular behavior" they observed of that student. The irregular behaviors listed on the Irregularity Report form include:

(i)    Unauthorized use of books, papers, calculators, PDA;

(ii)    Failure to stop working when time is called at the end of the exam;

(iii)    Bringing unauthorized electronic devices into the testing room;

(iv)    Copying answers; and

(v)    Other.

43.    Below the list of irregular behaviors was a section marked "Details" with blank space for the proctor to fill in information. Ms. Hricks did not check off any of the five options printed as irregular behaviors and instead wrote in the "Details" section that "[s]tudent appeared to be repeatedly looking at the computer of the student in Seat #30" and further noted in her email of the Irregularity Report that "perhaps the student is simply nervous." *See* Proctor's Report, attached as **Exhibit B to Complaint**.

44.     The computer screen that Ms. Hricks alleged that Plaintiff was glancing over at was seat 30. Seat 30 was located approximately five feet away from Plaintiff's seat 29. There was an empty seat between seat 29 and seat 30 (*See* **Exhibit C to Complaint**). Plaintiff did not know the student who was seated at seat 30 ("Student B").

45.     Ms. Hricks sent the Irregularity Report to Defendant Emerick the same day.  Plaintiff was not aware that an Irregularity Report had been filled out, nor that it was sent to Defendant Emerick.

E.     Defendant Emerick's Improper Investigation

46.     Unbeknownst to Plaintiff, Defendant Emerick launched a "superficial investigation" prior to speaking to him (the "Investigation"), which Defendant Emerick conducted from September 30 to October 2, 2015. The three-day investigation consisted solely of Defendant Emerick requesting the answer key for Plaintiff and Student B's submitted exams, as well as her own viewing of the video recording of the Exams. Defendant Emerick concluded the Investigation without notifying Plaintiff or obtaining a statement or information from him.

47.     Defendant Emerick mischaracterized Plaintiff's split-second glances towards seat 30, which she saw in the video recording, as "clearly showing him viewing peer's computer screen repeatedly during the exam." (*See* Emerick Investigation & Conclusion, attached as **Exhibit D to Complaint**).

48.     In an email to Mr. Thewissen on October 2, 2015, Defendant Emerick stated that 84% of Plaintiff's and student B's test answers were identical. This calculation included both identical correct and wrong answers. This data was later proved misleading. Of the 84% of identical answers, six questions were answered incorrectly by both

students and 15 questions were answered correctly by both students. Four questions were answered incorrectly but differently by both students.

49.     Based on the actual exam data of the entire class who completed the Exam at the same time, over half of the students – more than 80 out of 160 students – had 85% identical answers with at least one other student in the class. Defendant Emerick did only one comparison. Applying her assumptions would mean that half of the class committed the same misconduct as she alleged Plaintiff did.

50.     Additionally, Plaintiff scored a 72, which was in the top 15% of the class. Student B scored a 64. The average score of the class for the HDS quiz was 56.5.

51.     On October 2, 2015, Defendant Emerick sent (i) her "findings" along with a link to the video (attached hereto as **Exhibit D to Complaint**); and (ii) the breakdown of correctly/incorrectly answered questions to Mr. Thewissen, CAPP Co-Chair, Heidi Terry, Director of Student Enrollment Service, and Elisabeth Young, Vice Dean of the School of Medicine. In her email, without hearing any explanation from Plaintiff, Defendant Emerick reported in boldface that "84%" of the tests were identical," a fact that, untethered from the entire class data, was essentially meaningless. There was no investigative record of any kind to indicate any fact-finding efforts employed, nor that a field test was conducted to support her accusations and conclusion.

52.     Furthermore, at some point between September 30 and October 2, 2015, the Student Handbook's "Irregular Behavior Section" was apparently altered in order to add additional items that would match Defendant Emerick's accusations against Plaintiff. The item added to the list was "looking at a peer's examination."

F.     Unjust Disciplinary Process

53.     Defendant Emerick decided the matter should be referred to CAPP, whose purpose is to review issues for Academic Performance and Professionalism, rather than for alleged disciplinary misconduct. Her improper referral for the "Procedures of CAPP review" (*See* Code, pp. 63 (A)(6)) instead of the "Disciplinary Hearing Procedures" (*See* Code, p. 105) was significant.

54.     The CAPP Procedures for Hearing, (the "CAPP Procedures," *See* Code, p. 63 (A)(6)), provides:

> (a) Students are notified in writing by Enrollment Services that they will be discussed or required to attend a CAPP meeting in person.
>
> (b) The CAPP Interview Form, which accompanies the communication sent to students required to attend the meeting, must be completed and returned to the CAPP administrative secretary no less than two days before the meeting.
>
> (c) At the meeting, students will be given the opportunity to speak to the unsatisfactory performance issue and may be questioned by the CAPP members.
>
> (d) CAPP members will discuss and vote on the case in closed session with a majority vote required for action.

55.     The CAPP Procedures do not provide any of the minimum requirements that guarantee fundamental fairness and due process. For instance, a CAPP hearing notice does not afford the accused student the right to know the explanation of the evidence behind the charges and the evidence to be presented against the accused student in advance of the hearing.

56.     In the CAPP hearing notice that Plaintiff received for his first hearing on October 8, 2015, it stated that "As a result of professional development concern (the alleged academic misconduct)", the committee will "discuss the professionalism concern,

your overall educational performance and record and decide how to best to proceed.". The notice did not specify what exactly he was being accused of, except for a vague term of "alleged academic misconduct."

57.     Furthermore, the CAPP Procedures do not afford the accused students the right to be present when the case is presented to the CAPP hearing panel or to know what evidence or information was presented to the CAPP hearing panel. The case presentation and pre-discussion are to be held behind closed doors. The student can speak to the academic performance issue:  "At the meeting, students will be given the opportunity to speak to the unsatisfactory performance issue and may be questioned by the CAPP members" (*See* Code, p. 63 (A)(6)(c)).

58.     As such, in all the CAPP hearings, Plaintiff was barred from the hearing portion wherein Defendant Emerick discussed her evidence and was denied the knowledge of what evidence Defendant Emerick used against him. After Defendant Emerick finished her discussion with the CAPP hearing panel, Plaintiff was then called into the room to speak and answer questions from the CAPP hearing panel.

59.     Further, the CAPP procedures do not include the opportunity for the accused student to question the evidence of the charges against them or the information just presented to the CAPP hearing panel behind closed doors.

60.     The CAPP hearing panel questioned Plaintiff after he spoke for 25 minutes. None of the questions the CAPP hearing panel asked was related to the information just presented by Defendant Emerick. Plaintiff was not to ask Defendant Emerick or the CAPP hearing panel about what evidence she just presented.

61.     Defendant Emerick purposely and improperly used the CAPP procedure in

order to avoid having to provide Plaintiff the procedure Defendants afforded for disciplinary matters.

62. At all times pertinent to this action Plaintiff was accused of engaging in academic misconduct by cheating on the Exam.

63. Defendant Emerick knew that Plaintiff was accused of engaging in academic misconduct by cheating on the Exam and should have triggered the procedure Defendants afforded for disciplinary matters.

64. Cheating or attempting to cheat on an examination fits the category of disciplinary matters.

65. Defendants have customarily subjected to the CAPP procedure conduct that does not involve a student's intentional effort to gain an advantage over other students by engaging in irregular behavior at an exam.

66. When an Irregularity Report is submitted on a student's behavior at an exam the appropriate way of investigating and considering discipline according to Defendants' policies is in the disciplinary, rather than professionalism and fitness for studies, process.

67. To the extent Defendants deemed Plaintiff unprofessional and unfit to continue his studies based on his actions at the Exam, their knowledge of his ADHD before the Exam and his corroborated explanation about his prescribed medications and the effect of the new medication on his ADHD symptoms after the Exam rendered any unprofessionalism and unfitness directly connected to his disability.

68. By mischaracterizing Plaintiff's actions at the Exam as related to professionalism and fitness to continue his studies, Defendants equated his disability and its symptoms with that professionalism and fitness.

69.     Plaintiff is qualified with reasonable accommodation, such as test-taking conditions that eliminate suspicion if his ADHD symptoms are exhibited, that would not impose an undue hardship on Defendants to continue his medical studies and meet Defendants' professionalism standards.

70.     But for his disability and its symptoms Defendants would not have concluded Plaintiff was unprofessional and unfit to continue his studies.

F.     Plaintiff Is Denied an Explanation of the Evidence Relied on by Defendants.

71.     On October 7, 2015, five days after Defendant Emerick concluded her investigation and referred the case to CAPP for academic action, Plaintiff was called in for a brief meeting with her. The meeting lasted approximately 15 minutes. During this meeting, Plaintiff was first notified of the allegations against him and informed of the irregularity report.

72.     In the same meeting, Defendant Emerick showed Plaintiff the video recording of the Exam for the first time and told him that she had brought the case to CAPP. She did not disclose or share any other information of fact-finding or evidence she felt supported her accusations and conclusions with regard to Plaintiff's conduct. Plaintiff was completely stunned to hear of this accusation and was shell-shocked to see how "bad" his fidgeting and side-glances caused by distractions looked. It was the first time he saw how his fidgeting movements were seen by a third party.

73.     Plaintiff informed Defendant Emerick that he had just switched the medication for his ADHD from Ritalin (a stimulant) to Strattera (a non-stimulant), and that this was the first time he took a test with the non-stimulant medication, which did not suppress his fidgeting or movements caused by distractions. Defendant Emerick requested

that Plaintiff provide a letter from his doctor regarding the medication change, and Plaintiff readily agreed.

74.     This brief meeting on October 7, 2015, was also the only meeting Defendant Emerick or any NEOMED faculty or staff had with Plaintiff to notify him of the matter and to discuss the accusation and conclusion that would result in the CAPP decision to dismiss Plaintiff from NEOMED.

75.     Defendant Emerick was aware that Plaintiff was scheduled to take his first major exam two days later, on October 9th, in the HDS class. Despite this knowledge, Defendant Emerick chose to inform Plaintiff of the serious allegations against him less than 48 hours before the exam.

76.     Understandably, Plaintiff was immediately concerned for his upcoming exam.

77.     Throughout his education, while Plaintiff was on Ritalin, he did not need any kind of academic accommodation, special treatments, or considerations. Plaintiff was fully aware that Strattera helped him concentrate, but it did not suppress the fidgeting or movements caused by distraction, of which he was not consciously aware.

78.     In anticipation of his upcoming HDS test and in order to avoid any further confusion or misinterpretation of his fidgeting and movements caused by distraction, Plaintiff emailed Ms. Hricko on October 8, 2015, requesting temporary accommodations for his October 9, 2015 HDS test, namely to be seated separately where he would not experience any distractions. Additionally, Plaintiff switched back to Ritalin. The last day he took Strattera was on October 7, 2015.

79.     Ms. Hricko responded to Plaintiff, letting him know that such a temporary

accommodation would not be a problem. However, Defendant Emerick would later claim that Plaintiff did not apply for the accommodation via formal channels, relying on that claim as proof Plaintiff was using it just as an excuse and false defense to the claims.

80.     On October 8, 2015, Plaintiff received a letter from CAPP (the "CAPP Notification Letter"), informing him that he was required to attend a meeting/hearing on October 21, 2015, wherein "the committee will discuss the professionalism concern, [Plaintiff's] overall educational performance and record and decide how best to proceed." The CAPP Notification Letter did not explain to Plaintiff why there was a professionalism concern, as up until this point, he was merely informed that the video recording showed he was fidgeting, which Defendant Emerick had said made Plaintiff look as though he was attempting to glance at another student's computer screen.  The letter did not specify what exactly he was being accused of except a vague term of "alleged academic misconduct." The CAPP Notification Letter further instructed Plaintiff to review his student file and then complete and submit a student interview to Defendant Emerick by October 15, 2015, which would then become part of his student file.

81.     On October 9, 2015, Plaintiff sat for the HDS Module 1 Test, after having switched back to Ritalin. Despite being emotionally distraught and in shock while taking the test, Plaintiff still scored at the class average.

82.     On or about October 11, 2015, after Plaintiff calmed down from the initial shock of the information he had received from Defendant Emerick, he sent her an email, stating "It's not even feasible that just by glancing to my right I could get any meaningful information from the screen of the person on my right." Plaintiff also requested information and evidence regarding the claim against him. Plaintiff reiterated that his new

medication Strattera, a non-stimulant, did not suppress his fidgeting and movements when he was distracted, as the previous medication Ritalin had done.

83.     In the same email, Plaintiff suggested that the CAPP Committee could recreate the setting and do the same body movements that were reflected in the video as a field test to see that it was impossible to secure any meaningful information on the student's computer screen on his right at seat 30. Such a field test would conclusively prove whether Plaintiff had committed any misconduct.

84.     Defendant Emerick responded via email on October 12, 2015, stating that "it is the university's responsibility to present and demonstrate a preponderance of evidence in order to prove a violation of the conduct code occurred" and that the CAPP Committee "will be provided everything that currently exists, video tests, etc. and it will be up to the members of the committee to identify what they want beyond what is presented to them in your file." Defendant Emerick did not address the field test that Plaintiff suggested. Defendant Emerick, who is the sole investigator of the case, had no intention of conducting a  simple, less than five-minute field test, that could disprove the validity of her accusation as she had already concluded her minimal fact-finding efforts and did not recommend to the CAPP Committee that a field test be conducted.

85.     On October 13, 2015, Plaintiff's doctor, Dr. Ramos, sent Defendant Emerick a letter explaining Plaintiff's ADHD, along with medical records that contained the details of his medication adjustment between April 2015 and August 2015. Dr. Ramos also explained that, after viewing the video recording of the Exam, Dr. Ramos observed that Plaintiff's behavior during the Exam matched the fidgeting Plaintiff had described to her at his April 13, 2015 appointment with her. Dr. Ramos stated in the letter that she "did

observe some behaviors that he initially described to me as symptoms of his ADHD ("fidgeting, boredom/yawning, needing to shift positions, trouble sitting still for long periods of time."). Dr. Ramos further noted that "I did note that his eyes were shifting every few seconds and at times he seemed to be staring into space" and that Plaintiff "definitely seemed to look when a student behind him was leaving the exam suggesting his distractibility."

86.     Based upon the foregoing, Dr. Ramos requested that "please take into account he had just started a new medication within 2 months of the exam in question," and "while he is adjusting to medication, it may be helpful to make accommodations for exam so that his fidgeting and movements are not misinterpreted as academic misconduct." Dr. Ramos also highlighted portions of Plaintiff's medical record that were relevant to her assessment of the situation.

87.     As Defendant Emerick had stated in her October 12, 2015 response email, all information from the investigation that would be presented to the hearing would be available in Plaintiff's official student file. When Plaintiff arrived at the Student Enrollment Office to review his student file on October 14, 2015, he found a manila folder that contained copies of all his records since he applied to the BS/MD program while still in high school. There were hundreds of pages in the folder, lacking page numbers, and in no specific order. There was no way to track when the documents were added. Plaintiff was asked to sign the form, "Documentation of Student Review of NEOMED Official Student File" after he finished the review.

88.     Despite Defendant Emerick's assurance that all information from the investigation that would be presented to the hearing would be available in his official

student file, Plaintiff only found copies of the email chain that Defendant Emerick sent on October 2, 2015, referring the case to CAPP, along with the Plaintiff and Student B's Exam digital answer keys.

89.    The Proctor's Report was not in the official student file that was reviewed by Plaintiff on October 14, 2015. Plaintiff sent an email to Defendant Emerick on the same day to request to see that report and had to go back to Student Enrollment Office the next day on October 15, 2015, to finally view it. This was the first time Plaintiff saw the Proctor's Report, almost two weeks after Defendant Emerick concluded her investigation.

G.    Defendants Withhold Misleading Evidence Prior to Plaintiff's First Hearing

90.    Absent from Plaintiff's student file was Mr. Thewissen's statistical analysis regarding the probability of two students answering certain questions identically, which would later become a document relied on by Defendants in their case against Plaintiff (the "Thewissen Analysis"). The Thewissen Analysis claimed that there would be a 0.000036% chance that two students could have six identical wrongs, but this information was misleading.

91.    On October 16, 2015 at 3:38 p.m., the day after the October 15, 2015 deadline for Plaintiff to review his official student file, Jessica Green, a staff member from the Enrollment Services Office sent an email to the CAPP committee, instructing them that at Plaintiff's first hearing, they are to focus solely on Plaintiff's eye movements during the four-timestamped portions of the video. The four timestamps were: 4:50, 14:35, 20:25, and 26:50. This information was not disclosed to Plaintiff before his first hearing. The timestamps were excluded from Plaintiff's file, and he was also not privy to the fact that CAPP Committee members were instructed as to where they should focus their attention.

92.    In fact, the video timestamps could not be reconciled with the timestamps of the on-line Exam as provided by ExamSoft. The video timestamp showed that Student B finished his test and passed behind Plaintiff at 29:15; however, the ExamSoft timestamp showed Student B signed-off from ExamSoft at 34:42.

93.    The Thewissen Analysis and timestamps were used as evidence against Plaintiff at his first hearing, and yet none of the information was disclosed to him prior to the hearing or in the official student file that Plaintiff reviewed on October 14 and 15, 2015.

94.    Before the first hearing, Plaintiff believed the CAPP hearing would clear him from the alleged misconduct, particularly based on the field test. He had no knowledge of the misleading and false data that were going to be used against him.

95.    On October 15, 2015, Defendant Emerick met with Plaintiff at 4:30 p.m. for approximately 15 minutes to go over the Student Interview Form filled out by Plaintiff beforehand. Emerick did not discuss any information regarding Plaintiff's case, nor explain to him the "evidence" that would be presented at the upcoming hearing and had been excluded from his student file.

96.    The interview form "Phase 2 Committee on Academic and Professional Progress (CAPP) Student Interview Form" was commonly used for all CAPP hearings. It asked Plaintiff  to explain why he believe he "experienced difficulty," what he proposed "as a result of this meeting with CAPP," why CAPP should "alter the enrollment standard to meet [his] proposal," and why he would be successful in the future with this proposal.

97.    As requested by the CAPP, Plaintiff submitted the Student Interview Form together with his personal statement, Dr. Ramos's letter, and his medical records after the

meeting with Defendant Emerick.

      H.     <u>Plaintiff Was Barred from Hearing Defendants' Misleading Evidence</u>

98.     On October 21, 2015, Plaintiff attended the scheduled meeting with the CAPP Committee (the "First Hearing"). The CAPP Procedures do not allow an accused student to be in the room when the committee members reviewed documents of the case, and only after concluding their review of the documents is the student called in. Therefore, Defendant Emerick presented her case against Plaintiff and held a discussion with the CAPP members behind closed doors. Plaintiff was instructed to wait in a lobby that was two aisles down from where the hearing was held.

99.     Of paramount importance to Plaintiff's case, Defendant Emerick presented "evidence" to the CAPP Committee in the form of the misleading Thewissen Analysis, which had not been shared with Plaintiff before or during the First Hearing. The Thewissen Analysis was later debunked as completely flawed, based on the actual data from the entire class who took the Exam at the same time. There were more than 120 students out of 160 who had six or more identical wrong answers with at least one other student in the class.

100.    After Defendant Emerick finished her presentation, Plaintiff was invited into the room to present his own evidence and answer the CAPP committee's questions.

101.    The CAPP Committee did not question Plaintiff about the analysis, nor mention it in any form during their questioning of him. In fact, the CAPP Committee did not inform or ask Plaintiff about anything pertaining to Defendant Emerick's presentation to them.

102.    To prove that it is physically impossible to commit the alleged misconduct, Plaintiff showed the field test he conducted that was a reenactment at the same location

with three randomly selected NEOMED students from the nearby library.

103.    All three students, who provided their names and signatures, attested to the fact that it was physically impossible to view any information on the laptop by glancing over to the right. In fact, the three students could not clearly see the screen of the neighboring computer screen, even by turning their heads directly towards that computer screen and staring for longer periods of time than Plaintiff had during the Exam.

104.    With regard to the split-second sideways glances that initiated the allegations against him, Plaintiff explained that there was a new feature of the ExamSoft, allowing students to zoom-in and out the pictures and diagrams. His quick side-glances to the right were initially due to Student B rapidly zooming in and out of the diagrams, which caused a color change on the screen and creating a flash to appear in the corner of Plaintiff's eyes. It would distract him, and therefore he would glance over during those distractions.

105.    Plaintiff also explained his recent ADHD medication change from Ritalin to Strattera, and how Strattera helps him concentrate but does not suppress his fidgeting or any movements caused by distractions.

106.    Since Plaintiff did not have the access to the answer key of the entire class, he demonstrated that, for multiple choice questions, the percent of similarity is purely driven by the correlations between the score and the number of correctly or incorrectly answered questions. In this case, to compare any students who scored 64 or 72, the normal distribution range of similarity would be between 64% - 92%. The 84% similarity with Student B is in the middle of the range, which is by no means unique but instead quite common.

107.    It was later discovered, once Plaintiff was able to review the actual exam data of the entire class, that more than 80 out of 160 students had 85% similarity with at least one other student, proving that the sole information used to support Defendant Emerick's accusation and conclusion was meaningless. Based on Defendant Emerick's logic, half of the class might also have committed such alleged misconduct.

108.    The CAPP hearing panel questioned Plaintiff after he spoke for 30 minutes, but did not question him about the Thewissen Analysis, nor make mention of it. In fact, the CAPP committee did not inform or ask Plaintiff about anything pertaining to Defendant Emerick's presentation to them. Instead the questions the CAPP committee asked Plaintiff pertained to why he did not apply for accommodation beforehand. Plaintiff explained that he never had the need to any type of academic accommodation throughout his education while on Ritalin, which had helped him concentrate and suppress his hyperactivity.

109.    Plaintiff explained that the accommodation that he requested on October 7, 2015, after he was notified by Defendant Emerick of the video recording of his glances and movements, was in order to be seated separately for future exams and avoid any future misinterpretation. The accommodation was not asking for any special academic treatment. Further, it was also stated in the interview form that NEOMED did not need to modify any rules, standards, or equipment for this request. This accommodation request was just in case he could not tolerate Ritalin and had to stay on Strattera until he could find a nearby physician for his medication adjustment.  He also stated that he had switched back to Ritalin for the October 9, 2015 exam.

110.    Plaintiff also stated he was fully aware Strattera did not suppress his fidgeting or movements caused by distraction, but because he had never taken a test

without Ritalin before, there was no reason for him to think his fidgeting or any movements caused by distraction would be an issue during an exam or would be misinterpreted in such a way.

111.    Defendant Emerick did not speak during the time that Plaintiff was allowed in the Hearing. There was absolutely no indication of what information or evidence was presented by Defendant Emerick before Plaintiff was called in.

112.    Defendant Emerick remained present throughout all parts of the hearing, including the deliberation and the voting that occurred after Plaintiff had left the room. The CAPP committee deliberated and voted immediately after Plaintiff had concluded his presentation and left the room.

113.    Defendant Emerick called Plaintiff later that day to inform him that the CAPP committee found him "Responsible" of misconduct (the "First Hearing Decision").

114.    Plaintiff was deprived of an independent and impartial adjudication at the First Hearing. Instead, the CAPP Committee took at face value Defendant Emerick's verbal interpretation of the video recording, the instruction to only focus on the four timestamps that singled out Plaintiff's eye-movements, and the Thewissen Analysis, which was not disclosed to Plaintiff before or during the hearing. In doing so, the CAPP Committee ignored and disregarded evidence provided by Plaintiff in reaching an erroneous decision that Plaintiff was "Responsible" (the "First Decision").

I.    Defendants Deprived Plaintiff of the Basis for Their Decision and Sanction

115.    On or about October 22, 2015, Plaintiff received an email from NEOMED containing the official First Hearing Decision, which stated "After a thorough review of your overall academic record, student file, and our discussion with you, the Committee

voted to dismiss you."

116.    The "Student Progress Report," the only document of the First Hearing notes, was placed into Plaintiff's student file without any notice. There was only one line listed under the section regarding CAPP Final Vote and Decision: "Preponderance of evidence indicates dishonesty / academic misconduct," followed by the word "Dismiss". (The "NEOMED Hearing Result," attached hereto as **Exhibit E to Complaint**)

117.    The CAPP's dismissal at Plaintiff's first hearing was *ultra vires*. The NEOMED Student Handbook provides that "[a] majority of the voting membership (pp. 62 (A)(3) shall constitute a quorum." (pp. 62 (4)(a)). There are eleven voting members of CAPP -- therefore requiring the presence of at least six voting members for a quorum. Based on the Student Progress Report of the first hearing, there were only five voting members of CAPP at the October 21, 2015 hearing, however, since Mr. Thewissen had disqualified himself from voting because of his role as Director of the HDS course, there were only four CAPP voting members at the first hearing.

118.    In the First Decision Letter, Plaintiff was given several options: (i) Plaintiff could withdraw within four working days, and his academic transcript would indicate withdrawal; (ii) Plaintiff could accept the decision for dismissal, and his academic transcript would indicate dismissal; or (iii) Plaintiff could request an appeal if there is significant and compelling new information that was not available for presentation to the CAPP Committee, or if Plaintiff had evidence that there was a defect or irregularity in the CAPP Committee proceedings.

119.    Despite the fact that the first option gave Plaintiff "four working days" to withdraw from NEOMED's College of Medicine, a deadline was set for Tuesday, October

27, 2015, which gave Plaintiff less than three working days to make the decision.

120.    Furthermore, the October 22, 2015 email also listed the violation as "academic misconduct" which was a grave mischaracterization of the alleged offence. The violation should have been designated "disciplinary misconduct," which would have held Defendants to a different standard and afforded Plaintiff more rights.

121.    Because Defendants documented Plaintiff's case as "academic misconduct," the very bare minimum evidentiary standard of "preponderance of the evidence" was applied. Had the designation been "disciplinary misconduct," Defendants would have had to apply a "substantial evidence" standard instead. Courts have traditionally treated situations wherein a student is expelled for an alleged infraction such as viewing a classmate's answers as a "disciplinary misconduct" matter and acknowledged that in such cases due process is owed to the students involved.

122.    There was no mention of what evidence the expulsion was based on in the first hearing result that was sent to Plaintiff on October 22, 2015.

J.    The Misleading Evidence Used at the First Hearing Was Disclosed to Plaintiff Two Days after the First Decision Was Reached.

123.    On October 23, 2015, two days after the First Hearing, Plaintiff and his parents met with Defendant Emerick. At this meeting, Plaintiff was first made aware of the Thewissen Analysis, which was the main evidence and deciding factor for the First Decision.

124.    Defendant Emerick disclosed that the evidence the CAPP Committee had relied on in reaching a decision was (i) the Thewissen Analysis, and (ii) Defendant Emerick's verbal interpretation of the Exam's video recording. Defendant Emerick also

told Plaintiff that the CAPP committee did not believe Plaintiff's saccadic eye movements were manifestations of his ADHD, despite the fact that neither Defendant Emerick, nor any CAPP member at the First Hearing, was a physician, psychiatrist, psychologist, or certified counselor specializing in ADHD.

125.    Defendant Emerick asked Plaintiff why he did not stop glancing over to Student B's computer screen if he could not see the answers. Defendant Emerick also stated it was the opinion of the CAPP committee that when people got distracted, they would look over initially but would stop and not "continue" to look over to a neighboring student's computer screen.   She also reasoned that if Plaintiff continued to look over at a neighboring screen due to a bothersome distraction, he should have used his right hand to shield his eyes from the distraction.

126.    There was no Manifestation Determination Review ("MDR") by NEOMED in the adjudication of the allegation that Plaintiff's symptoms were attributable to ADHD and his medication. There were three reports of Plaintiff's MDR completed regarding Plaintiff's behaviors seen in the video recording. Besides the two reports from Dr. Ramos, who was Plaintiff's Primary care physician, and Dr. Andrew A. Trauben, M.D., a board-certified psychiatrist who specializes in teenager and adult ADHD, there was also a  MDR report from Dr. Scott Kollins, the Duke ADHD Program Director and Professor of Duke Psychiatry & Behavioral Science Department of Duke University, School of Medicine. In his report, it addressed all the doubts that Defendant Emerick expressed above.

127.    Dr. Kollins stated in his report:

> Mr. (Endres's) behavior during the exam as reviewed on the video
> is also consistent with someone with ADHD. His motor behavior
> and frequent visual distractions are common for patients with

ADHD, especially under conditions that are cognitively demanding. One of the hallmark features of ADHD is difficulty in managing the "signal: noise" ratio in one's environment. It can be very difficult to filter out visual and auditory stimuli that are not relevant to the task at hand. Thus, the movement in one's peripheral field of vision, a clock ticking, or the creaking of a classmates' chair might all take on the same attention value as the exam in which a student is presently engaged.

Moreover, patients with ADHD also have significant difficulty inhibiting responses to these stimuli. Whereas non-ADHD individuals might notice the extraneous stimuli, they are able to withhold the urge to move or otherwise disengage their attention from a task at hand. The neurobiological basis of these difficulties is fairly well established, which has led to the development of several effective pharmacological treatments.

Mr. [Endres's] report that the stimuli on the computer screen of his classmate were frequently changing and thus drawing his gaze is highly consistent with the kind of distractibility often noted in patients with ADHD.

His symptoms and impairment seem to have been managed well over time, though a number of symptoms were evident even in the relatively short video clip reviewed. As noted previously, it is not all unusual – even for those patients who are well managed on medication – to exhibit symptoms of ADHD under certain conditions. As such, based on my review of the available data, as well as my own clinical experience with hundreds of patients, it is entirely plausible that all of the behavior observed in the video can be accounted for by ADHD.

128. Plaintiff and his parents could not believe that NEOMED, a medical school which prides itself as a leading mental health research center in the northeast region of Ohio, could be oblivious of common conditions such as ADHD. Not only did the Defendants violate the ADA and the Rehabilitation Act by not conducting an MDR, but it also allowed people, who were not qualified professionals, to provide biased judgement solely based on a social stigma. The opinions expressed by the Defendants demonstrated the complete lack of understanding of and grave negligence toward people with a mental

disability.

K.      <u>Plaintiff Was Denied Access to Pertinent Public Records</u>

129.    On October 23, 2015, Plaintiff also made a request for public records pertaining to the Exam, for which Plaintiff could rely upon in his appeal. Specifically, Plaintiff requested (I) the Student Performance Report for the entire HDS class showing each individual score and digital answer key data, (ii) Thewissen's Probability Analysis; and (iii) timestamp reports associated with student test responses, in order to show the time in which Plaintiff and Student B, each completed the identically and incorrectly answered questions.

130.    On October 26, 2015, Plaintiff received a response from Ms. Furey-Ligan that his request to access specific public records was denied, because records such as the answer key of the students who took the same quiz at issue do not exist. Ms. Furey-Ligan further claimed that the University does not create any timestamp reports associated with student test responses. That non-existent information was the information used by Defendant Emerick to support her accusation and conclusion.

131.    Plaintiff also reiterated his request via email on October 26, 2015, to conduct an open field test in order to conclusively prove that it was physically impossible to commit the misconduct he was accused of by doing the same quick side-glances seen in the video toward Student B's computer screen. The director of the Media Department, Mr. Rey Notareschi, who was also Plaintiff's boss, was ready and willing to set up and record the field test, participate as a tester, and operate the video camera using the exact same angles that the proctor used.

132.    Ms. Furey-Ligan responded on the same day that NEOMED staff is not to

participate in the open field test conducted by Plaintiff. If Plaintiff wanted to conduct a field test himself, he could only use the location, but he was not allowed to use the same video equipment and camera at Olson Hall, and the Media Department was prohibited from setting up and recording the field test.

133.    Also in response to Plaintiff 's request for the Thewissen Analysis which was used at the first hearing, Ms. Furey-Ligan replied on October 26, 2015: All discussions of the CAPP hearings were verbal only, and Mr. Thewissen presented his probability verbally, there was no record in any format, such as a written document, transcript, audio or video recording. The students are not allowed to make any recording of the CAPP hearing.

134.    On October 26, 2015, Plaintiff realized that there was no possible way he could meet the requirement of providing "substantial" evidence for an Appeal by the deadline because he was being denied access to the information and evidence used against him at the First Hearing, the same information used by Defendant Emerick, and he was prohibited from using the same video equipment to conduct an open field test despite the willingness of qualified NEOMED staff to participate.

135.    On the afternoon of October 26, 2015, Plaintiff met with Dr. Elizabeth Young, the Vice Dean of NEOMED School of Medicine, to discuss the situation. Dr. Young agreed to extend the deadline for one day to 12:00 p.m., Wednesday, October 28, 2017. Even with this extension, Plaintiff was still short of the five days defined in the Student Handbook for the disciplinary hearing procedure or the four days for the CAPP hearing procedure.

136.    Plaintiff finally received the answer key and score of the HDS's class for

the Exam, the timestamps of his answer key and Student B's, and the Thewissen Analysis,

on October 27, 2015 at 3:21 p.m. Plaintiff 's deadline to submit his Appeal was October

28, 2015, at 12:00pm. Therefore, Plaintiff did not receive the full evidence important to his

case and Appeal until five business hours before his Appeal deadline and was denied a

meaningful time to review and address the evidence.

137.    On October 28, 2015, at 12:00 p.m., Plaintiff submitted his Petition for

CAPP Executive Review Form – CAPP 2 (the "Petition Form") to the Executive Review

Committee (the "ERC"). In the Petition Form, Plaintiff presented new information that he

felt should affect the outcome of the Decision. The newly presented information included:

   (1) Hundreds of cases based on the actual class data prove
       Thewissen's probability analysis was flawed and Emerick's
       similarity was meaningless.

   (2) Signatures collected from a survey that it is not possible to get
       answers from the computer screen of next seat by simply glancing-
       over. The survey was conducted during the five minutes break in
       between classes of that morning. All students who took the survey
       also took the same HDS quiz, at the same time and location.

   (3) A psychological evaluation completed by a psychiatrist who
       specializes in ADHD, Dr. Andrew A. Trauben, M.D., wherein Dr.
       Trauben reviewed the video and met with Plaintiff in person to
       evaluate his ADHD symptoms (the "Psychological Evaluation").
       The psychologist attested to the fact that the video recording was
       consistent with the symptoms and manifestations of ADHD.

138.    It would later become apparent that the October 28, 2015 deadline was also

the last time that Defendants would allow Plaintiff s to submit *any* evidence for his case.

Defendant refused to accept any information he later submitted before his Appeal and final

hearing.

   L.      Plaintiff Was Deprived of a Meaningful Opportunity to Appeal

139.    The appeal hearing before the CAPP ERC (Executive Review Committee) was held on November 2, 2015, at 2:00pm (the "Appeal Hearing").

140.    Just four hours prior to the Appeal Hearing, Defendant Emerick sent Plaintiff an email rejecting Plaintiff's Statistical Analysis, which had proven that the Thewissen Analysis was misleading. Plaintiff was also prohibited from distributing hard copies of the report to the ERC members when he spoke at the Appeal Hearing. Defendant Emerick cited a rule from the CAPP Procedures that no evidence from Plaintiff would be accepted and allowed to be on record after October 28, 2015.

141.    Instead, Plaintiff was only permitted to verbally speak about the report that proved Thewissen Analysis was flawed. However, the report that Plaintiff gave about the Statistical Analysis would not be on the record and would be excluded from his student file. Therefore, the crucial information was never seen nor heard by the CAPP for the final hearing on November 18, 2015.

142.    At the Appeal Hearing, the procedures were the same as the First Hearing: Plaintiff was not allowed to be present when Defendant Emerick presented the case and engaged in discussion with the ERC members behind closed doors. After Defendant Emerick concluded her private presentation to the ERC, Plaintiff was called to the room to present his new information and answers questions from the ERC. Plaintiff was unable to distribute copies of his Statistical Analysis and was only able to explain it verbally to the ERC.

143.    Plaintiff explained that Defendant Emerick's 84% similarity was based on a single comparison of his answer keys to Student B's answer keys, but in comparing any two students who took the Exam, more than 80 out of 160 students in the class had 85%

similarity with at least one other student in the class. He also stated that based on the actual Exam data of the entire class, two thirds of the class, more than 120 out of 160 students, had six or more identical wrong answers as at least one other student in the class. This undisputable hard data debunked the Thewissen Analysis conclusion that "probability for all 6 questions to be identical and wrong is the product of these: 0.000036". In other words, Thewissen's probability analysis erroneously indicates there was less than 0.1% chance two students could have six identical wrongs, unless the alleged misconduct occurs.

144. Plaintiff also brought up the fact that the video timestamps did not sync up with the ExamSoft timestamps. The video timestamps show student B finished his test and passed behind him at 29:15, however, the timestamp of the ExamSoft shows student B signed-off from ExamSoft at 34:42.

145. Defendant Emerick remained in the room during deliberations and during voting after Plaintiff left the room

146. On November 3, 2015, Plaintiff received a letter informing him that the ERC granted him a rehearing (the "Final Hearing"), but was restricting the information Plaintiff was allowed to use for the Final Hearing to Dr. Trauben's evaluation report (the "New Information") of his behavior as seen in the video recording of the Exam. Plaintiff would not be allowed to submit any evidence for the final hearing (the "ERC Decision Letter").

147. The ERC Decision Letter also stated that material Plaintiff had submitted on October 28, 2015, countering the Thewissen Analysis, would not be considered as substantial or new evidence, and therefore Plaintiff could not use any of that information at his Final Hearing.

148.    The ERC deemed Plaintiff's report – which contained hundreds of cases based on the actual Exam data – as unsubstantial. In contrast, the Thewissen Analysis was based on only *one* comparison, but was used as the key evidence to support the accusation and the Decision.

149.    Insofar as the Statistical Analysis was precluded from being presented in the upcoming Final Hearing, Plaintiff sent the list of hard data of actual cases to Mr. Thewissen, in order to explain his findings and for him to validate the results. Mr. Thewissen declined to review the Statistical Analysis, instructing Plaintiff that "all correspondence regarding CAPP issues should flow through the school's legal office."

150.    However, the Code expressly provides that the information which could be considered by CAPP, of which Mr. Thewissen was co-chair, included "[a]ll other relevant information." *See* Code, p. 66.

151.    Mr. Thewissen must have realized that Plaintiff's Statistical Analysis debunked the analysis that CAPP was relying on in dismissing Plaintiff from NEOMED.

152.    Mr. Thewissen knew that CAPP had refused to accept Plaintiff's Statistical Analysis as additional evidence and his own refusal to review Plaintiff's Statistical Analysis and make that review additional evidence that could be considered resulted in precluding the members of CAPP from viewing or considering that evidence in the Final Hearing.

153.    On November 11, 2015, NEOMED's legal counsel notified Plaintiff via email that "regarding [Endres]'s request to include a statement that Mr. Thewissen's analysis contained errors was misleading. He was not open to making such a statement".

154.    On November 17, 2015, Plaintiff requested through his legal counsel

that Dr. Trauben to be invited to attend his final hearing.  Since Dr. Trauben's report was the only information that the ERC Appeal determined would be allowed at the Final Hearing, then it would be beneficial to all parties for Dr. Trauben to explain the report instead of Plaintiff.  NEOMED's legal counsel stated in an email sent on November 17th that the CAPP hearing panel agreed to the request and that they would also have some questions for Dr. Trauben.    NEOMED's legal counsel also stated that Mr. Thewissen, the co-chair of CAPP, will call Dr. Trauben around 2:00 p.m. on November 18, 2015.

155.    The day before the final hearing, on November 17, 2015, NEOMED legal counsel told Plaintiff's counsel that, even if NEOMED let Plaintiff stay, according to Mr. Thewissen, it would be "mathematically impossible" for Plaintiff to pass the HDS class. NEOMED does not use letter grades, the final grade of courses is "Pass" or "Fail." According to the 2015 HDS course syllabus, the final passing score of the 2015 HDS class is 62%. Plaintiff would only need to get a 58.5% on the module 3 test that was to be held on December 11, 2015, and 63.5% for the NBME test on December 17, 2015, in order to pass the course. He was dismissed on November 18, 2015, and never had an opportunity to take the Module 3 and the NBME test.

156.    Defendants' prediction that it was "mathematically impossible" for Plaintiff to pass the class even if NEOMED let him stay was yet another statement that was proved by facts to be completely false.

M.    At the Final Hearing Defendants Deprived Plaintiff a Meaningful Opportunity to Defend Himself.

157.    The Final Hearing was held on November 18, 2015, at 2:00 p.m. Approximately four hours prior to the Final Hearing, a limiting instruction was issued to CAPP (the "Limiting Instruction") by NEOMED's legal counsel, regarding Plaintiff's new

evidence, stating:  "Please be advised that during our deliberations today, the Committee should accord no weight to any statement made or documents presented during the initial hearing in [Plaintiff's] CAPP case that recounted any statistical analysis performed on his test answers. Consistent with disregarding any *statements* made or documents presented about any statistical analysis, the committee is to likewise accord no weight to any *documents* set forth by [J. Endres] throughout his appeal that include any statistical analysis of his test answers. While these documents were included in the record received by the Committee in advance of today's meeting, they should not be considered during our review of this matter today, or in making a decision."

158.    Despite the fact that the Limiting Instruction claimed that the documents at issue "were included in the record received by the Committee in advance of today's meeting," the document – "*Appeal Substantial Evidences*" of the Statistical Analysis – was only seen by Defendant Emerick and Mr. Thewissen.

159.    Defendants must have known that they erroneously issued the Decision and Sanction against Plaintiff after the First Hearing, based largely on the misleading Thewissen Analysis and ignorance about how Plaintiff's ADHD and his prescribed medication affected his behavior, and issued the Limiting Instruction to ensure that their wrongful conduct remained hidden.

160.    At 12:07 p.m., less than two hours before the Final Hearing, Plaintiff received an email from Ms. Mary Beth Seith, stating she was not permitted to accept and distribute any material to the CAPP hearing panel that Plaintiff had submitted. This included undisputable pairings that proved the Thewissen Analysis was flawed and a recorded field test video proving the accused conduct is physically impossible.

161.    The Final Hearing was conducted in the same manner as the previous hearing: Plaintiff was not allowed in the room while Defendant Emerick presented her case and engaged in discussion with the CAPP members. Plaintiff was instructed to wait in a separate room while waiting to be called. He was not allowed to hear the evidence presented against him and was only called in after Defendant Emerick finished discussing her case against Plaintiff with the CAPP members.

162.    Thereafter, Plaintiff was only allowed to speak generally. He was not allowed to present, distribute, or discuss any material that would have proven that he had not engaged in the alleged misconduct.

163.    Dr. Trauben was also called in by telephone at the same time as Plaintiff, at approximately 2:55 p.m., not at 2:00 p.m. as NEOMED requested. He reconfirmed his evaluation, as stated in his report, that Plaintiff's behavior seen in the video was a manifestation of his ADHD. The CAPP members did not ask Plaintiff or Dr. Trauben any questions related to the memo that Defendant Emerick had presented before they were called in. Rather, they only questioned Dr. Trauben's credentials and why Dr. Trauben was qualified to write the report he had submitted.

164.    At the Final Hearing, Defendant Emerick did not speak or ask any questions during the time Plaintiff and Dr. Trauben were in the room or listening on the telephone. Defendant Emerick stayed throughout all parts of the final hearings, including the deliberation and voting, after Plaintiff and Dr. Trauben had left the room or completed the call.

165.    On November 19, 2015, Plaintiff received a letter that reiterated his dismissal from NEOMED. There was only one word under the section CAPP Final Vote

and Decision of the Student Progress Report: "Dismiss." There was no information regarding the evidence relied on in determining the sanction of. (The "NEOMED Hearing Result" attached as **Exhibit E to the Complaint)**

      N.    Defendants Included False Information in Plaintiff's Student Progress Report

166.    The Final Decision Letter included a Student Progress Report summarizing the Final Decision (the "Final Report"). The Final Report stated the hearing started at 2:30 p.m. and that "Dr. Andrew Trauben participated via phone for early part of meeting." Both statements were false. The Final hearing started around 2:00 p.m.

167.    Dr. Trauben stated in his affidavit, "I was asked to be available by phone to testify during Mr. (Endres's) second hearing, which occurred on November 18, 2015. I was told that that hearing would start at 2:00 pm. I was not called to testify until approximately 2:55 pm." Dr. Trauben attended the Final Hearing via phone at the same time Plaintiff was called into the room. Neither Dr. Trauben nor Plaintiff was allowed to partake in or listen to the early part of the discussion, when Defendant Emerick discussed her memo and the Thewissen Analysis with the CAPP hearing panel. Instead, the early part of the meeting was held behind closed doors.

168.    On November 20, 2015, two days after the Final Hearing, Plaintiff obtained a hard copy of his student file. At this time, Plaintiff first became aware of a memo allegedly drafted by Defendant Emerick on November 2, 2015 (the "Emerick Memo"). The Emerick Memo was placed as the first page of the student file and was not in the electronic copy of the official student file Plaintiff had received on November 11, 2015, from NEOMED's legal counsel, which was supposed to include all information and evidence

from Defendant Emerick in support of her accusation and conclusion.

169.     The Emerick Memo alleged and summarized her conversations with Dr. Ramos and Dr. Trauben. In the memo, Defendant Emerick made false and misleading statements in order to discredit the two doctors' reports that Plaintiff's behaviors seen in the video were a manifestation of his ADHD. Although the Emerick Memo was purportedly a summarization of her conversation and discussion with Dr. Ramos and Dr. Trauben, it was never disclosed or shared with either Dr. Ramos or Dr. Trauben.

170.     Dr. Ramos and Dr. Trauben's each stated in affidavits that "(Defendant Emerick's) November 2nd memo did not faithfully memorialize the contents of our telephone call" regarding their conversation with Defendant Emerick and were either completely false, misleading, or taken out of context.

171.     For instance, the Emerick Memo stated with regard to Dr. Trauben's report: "He understood that he needed a quick turn around on documentation in order to submit a CAPP appeal letter." However, in an affidavit, Dr. Trauben's stated: "That sentence appears to suggest that my analysis of Mr. [Endres], or the opinion I rendered, was compromised because of the timeframe in which it was completed. That is not so, and it is not something I ever conveyed to [Defendant Emerick]."

172.     The Emerick Memo further stated "Dr. Trauben believed we were acting under the 'beyond a reasonable doubt' level of evidence, I explained that our level of evidence in these types of hearings is a 'preponderance of evidence.'" In his affidavit, Dr. Trauben took issue with Defendant Emerick's statement, explaining: "That sentence suggests that my opinion that Mr. [Endres's] behavior could be explained as well by his ADHD as by an attempt to cheat somehow depended on the evidentiary standard being

used in the disciplinary proceeding. That is not the case, and that is not something I ever said to [Defendant] Emerick. I never suggested that my opinion would be different under a 'preponderance of evidence' standard."

173. The Emerick Memo also claimed that Dr. Trauben suggested: "Perhaps was unaware of his HD behaviors (fidgeting)." Dr. Trauben's affidavit refutes this notion, stating: "That sentence suggests that fidgeting was the only behavior of Mr. [Endres's] that I thought he may have been unaware of due to his ADHD. That is not something I conveyed to Dr. Emerick. It was, and is, my opinion that Mr. [Endres], due to his ADHD, may have been unaware of the full range of behavior exhibited in the test video." Dr. Trauben summarized his feelings, stating: "In my opinion, [the Emerick Memo] Endres did not faithfully memorialize the contents of our telephone call."

174. The Emerick Memo also attacks Dr. Ramos' credibility in submitting her report, writing: "Dr. Ramos only met with [J. Endres] three times in total." The Emerick Memo then contradicts itself, stating that Dr. Ramos did not meet with Plaintiff before writing the report: "She did not meet with him or speak with him before writing the letter submitted to CAPP phase 2." Dr. Ramos responded to that claim in her own affidavit, stating: "That passage appears to attack the basis on which I rendered the opinion in my October 13th letter. The passage contains several false or misleading representations." Dr. Ramos goes on to explain: "The passage states I 'only' met with Mr. [Endres] three times. Those meetings, however, occurred in a span of just over four months. Three meetings in a four-month span exceeds the rate at which I meet with most of my patients."

175. Dr. Ramos also explained: "The passage then states that 'I did not meet with Mr. [Endres] prior to submitting my October 13th letter. But as noted above, I met with Mr.

[Endres] three times in 2015. The most recent occurring on August 27, just one month before the incident at issue. My statement that I did not meet with Mr. [Endres] prior to writing the letter was not a caveat intended to qualify the opinion I was rendering; its import was to convey that I had chosen to view the video before speaking to Mr. [Endres] so that my view of the video would not be tainted by his explanation of his actions."

176.    The Emerick Report further attempted to discredit Dr. Ramos' report, stating: "She simply prepared the letter based upon the materials [Plaintiff's] parents sent her via jump drive regarding [Plaintiff's] case." Dr. Ramos rejected that statement, affirming that "[t]he final sentence of the passage concludes my stating that I 'simply prepared the letter based upon the materials [Plaintiff's] parents sent [me] via jump drive.' That is false, and it is not something I ever conveyed to Defendant Emerick," and further continuing "[t]his final sentence of the passage suggests that the views I expressed in my letter were somehow biased by information I received from Mr. [Endres 's] parents. That, too, is false."

177.    In addition, the Emerick Memo quoted Dr. Ramos as stating: "I could see how the constant viewing of the peer's computer to his right might be viewed as cheating." Dr. Ramos clarified that this statement was mischaracterized, explaining that "[t]he November 2 memo later states that I mentioned that 'I could see how the constant viewing of the peer's computer to his right might be viewed as cheating.' It takes that statement of mine out of context. What I told [Defendant Emerick] is that, while the video might appear to be evidence of cheating, it is also consistent with the behavior of someone with ADHD." Dr. Ramos concluded: "In my opinion, [Defendant Emerick's] November 2 memo does not

faithfully memorialize the contents of our telephone call."

178.    Defendant Emerick also lied to Dr. Ramos, telling her that Plaintiff blamed Dr. Ramos for switching the medication. Defendant Emerick's motive for making such false statement to Dr. Ramos was to elicit a response from Dr. Ramos that would damage Plaintiff's credibility. The Emerick Memo stated that Dr. Ramos "did not advise him to switch medications or to go off Strattera." However, Plaintiff had always stated – in his CAPP Interview Form and Personal Statement – that *he* was the one who wanted to try a non-stimulating medication, and therefore was switched from Ritalin to Strattera. Plaintiff had never told Defendant Emerick that Dr. Ramos was responsible for the decision for the medication change. Defendant Emerick probably conveyed to the CAPP Committee that Plaintiff had lied about whose decision it had been to switch his medication.

179.    Defendant Emerick also purposely misled Dr. Ramos in their conversation, claiming that Plaintiff ignored Dr. Ramos's recommendation to request a seating accommodation to avoid future misinterpretation of his fidgeting and movements. The Emerick Memo stated that Dr. Ramos "was surprised that he never registered his ADHD as a disability to seek accommodations." However, Plaintiff had in fact requested a temporary accommodation via an email sent to Ms. Hricks on October 8, 2015, the day after he was first notified of the allegation by Defendant Emerick on October 7, 2015, before Dr. Ramos had even heard of the incident.  The sole purpose of that accommodation was to be seated away from other students for his October 9, 2015 HDS midterm, to avoid any future misinterpretation. The accommodation was not seeking any special academic treatment.

180.    By inserting a false memorandum in Plaintiff's Student file, after the

Student File was provided to Plaintiff in preparation for the Final Hearing, Defendants attempted to cover their own mistakes and misconduct. Defendants reached an erroneous decision on the misconduct claim against Plaintiff. Instead of righting those wrongs, Defendants falsified records in an attempt to bolster their Decision that Plaintiff should be dismissed from NEOMED.

181.    Due to the fact that Plaintiff was unaware of the Emerick Report or Defendant Emerick's phone conferences with Dr. Trauben and Dr. Ramos, Plaintiff was denied the full and complete file of evidence the CAPP committee would rely on in reaching its Final Decision. Furthermore, Plaintiff was denied the opportunity to sufficiently and meaningfully defend himself against allegations of misconduct.

182.    Defendant Emerick knowingly made-up false statements in her November 2, 2015 memo. Discussion of the memo was held behind closed doors at the final hearing. Dr. Trauben was purposely excluded from the discussion of the memo, followed by the false statement in the Student Progress Report of the final hearing to imply that Dr. Trauben attended the discussion of the memo, all indicating Defendants NEOMED's unfair and dishonest dealing in this case.

183.    Defendant Emerick accused Plaintiff of misconduct, but according to NEOMED's own guideline, Defendant Emerick was the one who committed the behavioral misconduct by "Knowingly furnishing false or misleading information to University officials", (pp 109[f])

184.    Defendants forced Plaintiff to defend himself without knowledge of the evidence to be used against him. Defendants also failed to provide Plaintiff with a basis for their decisions throughout the adjudication process. To date, Plaintiff is unaware of any

facts or evidence actually relied on by the CAPP committee in deciding to dismiss Plaintiff from NEOMED.

185.    All evidences and information used by Defendant Emerick to support her accusation and conclusion are either meaningless or false. All evidence apparently used as the deciding factors in CAPP's decision on Plaintiff's dismissal is either misleading or false.

186.    Instead, Defendants refused to accept, review, or consider Plaintiff's evidence that the allegations of misconduct were wrong. In doing so, Defendants deprived Plaintiff of his due process rights and committed disability discrimination.

187.    As a result of Defendants' denial of procedural due process and/or disability discrimination, Plaintiff has suffered injuries, including humiliation, frustration, emotional distress, loss of educational and career opportunities, economic injuries, reputational harm, and other direct and consequential damages.

## V.    Claims for Relief

### A.    Violation of Fourteenth Amendment Due Process Clause

188.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 187 above as if fully set forth herein.

189.    By depriving him of his liberty and property interest in continued enrollment at Defendant NEOMED without procedural due process, including, but not limited to, his right to a fair investigation and adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact-finder; his right to challenge the credibility of any adverse witnesses; his right to access evidence presented against him; his right to present evidence and witnesses in support of his defense and later

appeal, his right to know the evidence relied upon in reaching a determination; and his right to be present at all proceedings, Defendants Trustees, Emerick, and Gershen have violated and are violating the Fourteenth Amendment.

190.    Defendant Emerick committed that violation in an intentional and outrageous manner that recklessly disregarded Plaintiff's clearly-established constitutional rights.

191.    Absent declarative and injunctive relief Plaintiff's constitutional rights will continued to be denied by the ongoing failure to afford him a disciplinary process commensurate with the Due Process Clause of the Fourteenth Amendment.

B.    <u>Violation of the Americans with Disabilities Act and the Rehabilitation Act of 1973</u>

192.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 187 above as if fully set forth herein.

193.    By dismissing Plaintiff because it concluded that his ADHD precluded him from completing his medical studies and becoming a doctor and deciding on dismissal by willfully ignoring the symptoms of his ADHD and reaction to prescribed medication, irrationally relying on a discredited statistical analysis, and ignoring the physical impossibility of cheating, and/or failing to make reasonable accommodations of his known disability, even when the accommodations would not have imposed an undue hardship, by evaluating his actions in the context of his known disability, which would have established he never cheated, and prescribed medications and ensuring future testing conditions that would prevent any appearance of cheating based on his symptoms, Defendant NEOMED violated and is violating the ADA and the Rehabilitation Act.

## VI.     **Prayer for Relief**

**WHEREFORE,** Plaintiff demands the following:

A.     Declaratory judgment that Defendants Trustees, Emerick, and Gershen have violated and are violating the Fourteenth Amendment and Defendant NEOMED has violated and is violating the ADA and the Rehabilitation Act;

B.     Injunctive relief against Defendants Trustees, Emerick, and Gershen, that includes but is not limited to, reversal of Plaintiff's dismissal; expungement of the findings on his alleged misconduct and the dismissal; reinstatement as a first-year student in good standing with testing conditions that would prevent any appearance of cheating based on his ADHD symptoms; a public statement issued by Defendant Trustees and announced by Defendant Gershen exonerating him of misconduct; and release of that statement to any entity or individual whom Defendants told about the misconduct and/or dismissal;

C.     Compensatory and punitive damages in excess of $25,000 from Defendant Emerick for the injuries to Plaintiff caused by her deprivation of his right to procedural due process and such compensatory damages from Defendant NEOMED for the injuries to Plaintiff caused by its violations of the ADA and Rehabilitation Act;

D.     Prejudgment and postjudgment interest;

E.     Attorneys' fees and costs; and

F.     Such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted,

By:*/s/ John S. Marshall*_____
John S. Marshall (0015160)
*(jmarshall@marshallforman.com)*
Edward R. Forman (0076651)

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007

(*eforman@marshallforman.com*)
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

## JURY DEMAND

Plaintiff demands a trial by jury on all issues within this First Amended Complaint.

By:*/s/ John S. Marshall*
John S. Marshall (0015160)

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was filed with the Court on this 20th day of February, 2018 using the CM/ECF system, which will send notification of such filing to all counsel of record. Parties may access this filing through the court's filing system.

By: /s/ John S. Marshall
John S. Marshall (0015160)