**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **J. ENDRES** | : | **Case No. 5:17-cv-2408** |
| **Plaintiff** | : | **Judge Lioi** |
| **v.** | : | **Magistrate Judge Limbert** |
| **NORTHEAST OHIO** | : | |
| **MEDICAL UNIVERSITY, et al** | | |
| | : | |
| **Defendants** | | |
| | : | |


**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT THEREOF**


**MICHAEL DEWINE (0009181)**
**Ohio Attorney General**
TODD R. MARTI (0019280)
ANTHONY J. FARRIS (0055695)
Assistant Attorneys General
Office of the Ohio Attorney General
Education Section
30 E. Broad Street, 16th Floor
Columbus, OH 43215
Phone:  (614) 644-7250
Fax:  (614) 644-7634
todd.marti@ohioattorneygeneral.gov
anthony.farris@ohioattorneygeneral.gov
*Counsel for Defendants*

1

TABLE OF CONTENTS

MOTION..................................................................................................................................3

SUMMARY OF ARGUMENT ................................................................................................3

EXPLANATION OF SUPPORTING MATERIALS.....................................................................5

FACTS ....................................................................................................................................6

A. NEOMED identifies integrity as a core competence for medical professionals and prohibits cheating. Its Student Handbook classifies cheating as academic misconduct and gives NEOCOM discretion to address alleged violations through either the Committee on Academic and Professional Progress ("CAPP") or the Student Discipline Process.................6

B. Endres appears to be cheating during a test.  A preliminary investigation is conducted, and the matter is routed through the CAPP process ........................................................................8

C. The CAPP process thoroughly considers, but ultimately rejects, Endres' disability-based defense.  That process included detailed written submissions, a successful interlocutory appeal from Endres, and three hearings. Endres is dismissed from NEOMED ......................9

ARGUMENT ..........................................................................................................................11

A. Plaintiff's claims are time barred ......................................................................................11

B. Qualified immunity protects Dr. Emerick from liability on Endres' due process claim ........13

    1. Endres has not made out a due process violation: he received all the process due for an academic dismissal and his dismissal was academic ...........................................................14

        a. Endres' dismissal was academic because it was based on conduct related to professional success ...................................................................................................15

        b. The Student Handbook classified the dismissal as academic ...............................16

    2. Endres' right to have his conduct evaluated via disciplinary processes was not clearly established .....................................................................................................................17

        a. It was not clearly established that cases involving academic dishonesty must be handled via disciplinary processes .......................................................................18

        b. Dr. Emerick reasonably relied on Endres' agreement that she could route his proceedings through the CAPP process ...............................................................20

## MOTION

Defendants move the Court, pursuant to Fed. R. Civ. P. 12(b)(6), to either:

A.  Dismiss all claims set forth in *Plaintiff's First Amended Complaint*, Doc. No. 23, as time barred, or

B.  Dismiss Plaintiff's damage claims under 42 U.S.C. § 1983 based on qualified immunity.

## SUMMARY OF ARGUMENT

Plaintiff Endres was student at the Northeast Ohio Medical University's College of Medicine ("NEOMED").  Proctors observed him repeatedly looking in the direction of the student next to him during a test, and suspected cheating.

NEOMED has two separate processes for dealing with allegations of problematic student behavior: an academic track known as the Committee on Academic and Professional Progress ("CAPP") and a disciplinary track known as the Student Conduct Process. NEOMED's Student Handbook expressly gives NEOMED discretion to refer such matters to either process, and Endres expressly agreed to that discretion.

NEOMED chose to route the matter through the CAPP process. NEOMED's Chief Student Affairs officers met with Endres, explained the CAPP process, the concern prompting the proceedings, and the evidence underlying the concern.  Endres understood the situation and responded by stating that his actions were caused by medications for his Attention Deficit Hyperactivity Disorder. The matter was set for a hearing two weeks hence.

In the interim Endres made a written submission supporting his position. It contained a written statement from his doctor and a letter brief from his lawyer supporting his disability-based defense. Endres spoke at length at the hearing and answered CAPP members' questions. The CAPP found that he was cheating and ordered that he be dismissed from NEOMED. That occurred October 21, 2015.

Endres took an administrative appeal. It was backed by additional written submissions from Endres himself and additional supporting materials from medical and legal professionals. Another hearing was held, Endres presented his case, and answered questions. He partially succeeded; the reviewing body remanded the matter to the CAPP to consider additional medical evidence on his disability defense.

The remand hearing was held. Endres submitted additional supporting materials from medical and legal professionals, a letter from a purported expert on cheating, and one of his doctors testified via telephone. Endres was able to make his disability-based argument and answered CAPP members' questions. The CAPP stood by its original conclusion. Endres was dismissed from NEOMED shortly after that hearing.

Endres filed this case on November 16, 2017, asserting two claims. One is disability discrimination: that his dismissal violated the Rehabilitation Act ("Rehab Act") and Title II of the American's With Disabilities Act ("ADA"). The other is that he was denied procedural due process. That claim is brought via 42 U.S.C. §1983.  Defendants submit that they are entitled to dismissal in two respects.

*First, Endres' claims are time barred*. His Rehab Act, ADA, and §1983 claims are subject to two year statutes of limitation. Those claims accrued when NEOMED took the action that Endres claims discriminated against him based on disability: the October 21, 2015, decision that he should be dismissed in spite of his disability defense. That was when Endres "knew or had reason to know of the injury that is a basis for this lawsuit." *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475, 483 (N.D. Ohio 2007). That was more than two years before this case was filed on November 16, 2017. His case is therefore time barred. That is not changed by the fact that the appeals from that decision stretched into that two year period; "requests for further relief from a

4

prior act of discrimination will not set the time limitations running anew." *Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir. 1987).

*Second, qualified immunity protects Defendant Emerick from damage liability on Endres' due process claim.* The essence of Endres' due process claim is that his case should have been treated as disciplinary rather than academic, and that he therefore was not given all the procedural protections he claims were due. His right to that process was unclear in two independently dispositive respects. Initially, the distinction between academic and disciplinary dismissal is inherently murky, and precedent within this Circuit and District could lead a reasonable administrator to conclude that the matter was academic. Further, the contract between NEOMED and Endres explicitly allowed NEOMED to treat the matter as academic, and other courts—including the Sixth Circuit—have held that such contracts give rise to waivers that make universities' reliance on such contracts reasonable. Those matters preclude any conclusion that Endres' right to have the matter treated as disciplinary was "clearly established." That entitles Dr. Emerick to qualified immunity.

## EXPLANATION OF SUPPORTING MATERIALS

Defendants may support their motion with "any documents attached to, incorporated by" or "referred to in the complaint … even if not explicitly incorporated by reference[.]" *Embassy Realty Invs., LLC v. City of Cleveland*, 877 F. Supp. 2d 564, 570 (N.D. Ohio 2012). Defendants have collected such documents, and a link to a video referred to in the complaint, in the separately filed *Appendix to Motion to Dismiss* ("APX"). Defendants will cite to matters in that collection citing the APX, the pages where the materials are found, and the name of the document. (For example, "APX, pp. 202-224, *CAPP Student Interview Form*").

## FACTS

Three sets of facts are relevant to this motion: NEOMED's standards for student conduct and processes for addressing non-compliance, Endres' suspicious behavior during a test, and the process that lead to his dismissal from NEOMED.

**A.     NEOMED identifies integrity as a core competence for medical professionals and prohibits cheating. Its Student Handbook classifies cheating as academic misconduct and gives NEOMED discretion to address alleged violations through either the Committee on Academic and Professional Progress ("CAPP") or the Student Discipline Process.**

NEOMED students are expected to adhere to the standards of integrity and conduct set in its Student Handbook. They are set out in the "Expectations of Student Conduct and Professional Commitment." They are based, in part, on the fact that the "professional codes of the [medical] profession require honor and integrity."  The Student Handbook therefore prohibits cheating and categorizes it as "academic misconduct."  Doc. No. 23, pp. 6-7, ¶¶ 18-19; APX, pp. 111-115, *2015-2016 Student Handbook*.

NEOMED has two separate processes for addressing alleged violations of those expectations.

One is the Committee on Academic and Professional Progress ("CAPP"). That process deals with "unprofessional behavior concerns," "academic performance," and matters implicating "professional behavior." APX. at p. 65.  Such matters are brought before a committee of faculty, students, and administrators. The subject student is apprised of the matter at issue, invited to make written submissions, and to appear before the CAPP to discuss the matter. *Id*. at pp. 65-66.  The CAPP considers the student's written submissions and oral presentation, "all information that is part of the student file," "[a]ll other relevant information," and considers "each case on an individual and comprehensive basis." It issues a decision based

on what "is in the best interest of student, the University and the Community." *Id*. at p. 66. Its decision can include any sanction up to and including dismissal from NEOMED. Dismissal decisions can be appealed to the Executive Review Committee ("ERC") based on procedural error or newly discovered information. The appealing student makes written submissions setting out his appellate contentions, and a hearing is held where he can make a presentation and answer questions. The ERC then decides to either reject the appeal or remand the matter to the CAPP to address the procedural error or new information motivating the ERC's decision. *Id*. at pp. 67-68.

The alternative is the Student Conduct Process. It is an adversarial process where NEOMED makes an affirmative case against the student, the student is given certain procedural rights in making his response, a decision is issued, and a separate appellate channel is provided. APX. at pp. 106-111.

NEOMED's Student Handbook gives NEOMED discretion to route concerns regarding a student through either of those processes. As discussed above, the Handbook sets out the substantive standards students must adhere to (including the prohibition of cheating) in the "Expectations of Student Conduct and Professional Commitment." It further states that:

> [S]tudents are expected to … abide by the "Expectations of Student Conduct and Professional Commitment" … Failure to do so may result in referral and review *by either* the Committee on Academic and Professional Progress (CAPP) *or* Student Conduct procedures"[.] APX. at p. 111   (emphasis added).

The decision as to which process to use is made by NEOMED's Chief Student Affairs Officer. She "make[s] the initial determination as to *whether* the matters alleged … are best resolved through the formal disciplinary process contained in this policy *or* by way of a referral to the Committee on Academic and Professional Progress (CAPP)[.]" *Id*. at p. 107 (emphasis added).

**B.      Endres appears to be cheating during a test. A preliminary investigation is conducted, and the matter is routed through the CAPP process.**

Endres became a NEOMED student during the 2014-2015 term. Things did not go well for him academically, and he had to repeat that year's coursework during the 2015-2016 term. Doc. No. 23, pp. 8-9 ¶¶ 27-29. That included repeating the Human Development and Structure course. Endres describes that course as "the most difficult" of the courses he had to repeat. *Id*., pp. 9-10 ¶ 32.

An examination was held in that course on September 28, 2015.  It was supervised by several proctors in the examination room and videotaped by another proctor. Proctors observed Endres repeatedly looking at the student immediately to his right, apparently observing that student's answers. They alerted the proctor operating the video equipment and his behavior was videotaped until the student on his right finished the examination. That videotape captured numerous instances of Endres looking at his neighbor, apparently viewing his neighbor's responses to the test.  *Id*., pp. 10-12, ¶¶ 33-40; APX., p. 193, *Link to examination video*.[1]

After the test, one of the proctors reported the matter to Defendant Dr. Sandra Emerick, NEOMED's Chief Student Affairs Officer. An exam irregularity report was written, which described Endres' conduct and the existence of the videotape.  It was forwarded to Dr. Emerick in an email that contained a link to the videotape. Dr. Emerick gathered some additional information and presented the collected information to the co-chairs of the CAPP. They decided that the matter should be addressed via the CAPP process. Doc. No. 23, pp. 12-14 ¶¶ 42-48, p. 15

---

[1]  Instances of that conduct can be observed at the following parts of the  video: 5:50-6:30, 7:32-7:46, 8:11, 8:19, 8:27-8:38, 8:57, 9:12-9:15, 9:28, 9:34, 9:42, 9:50, 9:55-10:00, 10:03-10:09, 11:28-11:38, 11:52-11:57, 12:08, 12:14, 13:08, 13:26, 13:38, 13:47, 14:14, 14:36-14:38, 14:41, 14:48-14:56, 15:02, 15:13, 16:07, 16:28, 17:01-17:04, 17:22, 17:38-40, 17:48-18:10, 20:45, 21:00, 21:57-22:42,27:15-26, 28:49-53.

¶ 53; APX., pp. 194-196, *email chain ending Oct. 2, 2015 to Dr. Emerick*, pp. 197-198, *email chain ending Oct. 2, 2015, to Dr. Thewissen*.

**C.**    **The CAPP process thoroughly considers, but ultimately rejects, Endres' disability-based defense. That process included detailed written submissions, a successful interlocutory appeal from Endres, and three hearings. Endres was dismissed from NEOMED.**

Endres was given written notice of the CAPP proceedings on October 8, 2015. The notice indicated that the proceedings concerned "alleged academic misconduct."  It stated that a hearing would be held on October 21, 2015, in which the CAPP would consider his entire record and that he could make written submissions before the hearing. The notice advised Endres to meet with Dr. Emerick to discuss the underlying incident and CAPP procedures. Doc. No. 23, pp. 15-16 ¶ 56, p. 20, ¶ 80; APX., pp. 199-200, *Letter dated Oct. 8, 2015*.

Endres did in fact meet with Dr. Emerick. The allegations were discussed, as was proctor's initial report, and Endres was shown the videotape. He asserted that his conduct was the result of medication for his Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Emerick advised Endres that he could provide CAPP with information from his doctor if he so desired. Doc. No. 23, pp. 18-19 ¶¶ 71-74.

Endres sent Dr. Emerick an email several days later addressing the matters discussed in that meeting. It acknowledged that he faced an "academic dishonesty accusation" based on actions that were interpreted as "trying to look at other people's answers." That email indicated that he was aware of, and very familiar with, the video evidence; he referenced specific points in the video. It also indicated that he knew enough about the matter to proffer specific defenses and to request specific information.  That email was included in Endres' "student file for CAPP (Oct. 21)." Doc. No. 23, pp. 20-21 ¶¶ 82-83; APX., pp. 201-204, *email chain ending Oct. 12, 2015 to Dr. Emerick*.

Endres was able to meaningfully prepare for the hearing. He filed a thorough written response before the CAPP hearing. That response included his own narrative statement, and was supported by a letter/report from his doctor and a letter brief from his attorney. The response set forth a disability-based defense, suggesting that his conduct during the examination was caused by his ADHD and recent medication changes. Doc. No. 23, p. 24 ¶¶ 96-97; APX., pp. 205-224, *Student Interview Form*.

The matter was heard by the CAPP on October 21, 2015. Endres was able to present a number of specific defenses, to speak for 30 minutes without interruption, and to answer questions from the CAPP. The proceedings included express consideration of Endres' disability-based defense. The committee members deliberated, and ultimately concluded that Endres should be dismissed. That decision was based on "a thorough review of [Endres'] overall academic record, student file and [CAPP's] discussion with" Endres. Doc. No. 23, pp. 25-28, ¶¶ 98, 100-110, pp. 28-29 ¶¶ 113, 115-116; APX., p. 225, *Letter dated Oct. 22, 2015*.

Endres appealed to the Executive Review Committee ("ERC") on the basis of new information. That appeal was supported by a letter/report from another doctor and another letter brief from Endres' lawyer. A hearing was held on November 3, 2015, where Endres was able to make specific arguments. The ERC decided to remand the matter to the CAPP for further consideration of Endres' disability-based defense. A remand hearing was set for November 18, 2015. Doc. No. 23, p. 35 ¶ 137, pp. 36-37 ¶¶ 141-144, 146; APX., pp. 226-237, *Petition for Executive Review*.

Endres was actively assisted by counsel leading up to the remand hearing. That counsel submitted an additional letter brief making procedural arguments and discussing additional submissions from an optometrist and a purported cheating expert. Endres presented his

arguments and a medical witness testified via telephone. The CAPP deliberated, and ultimately voted to stand by its initial decision to dismiss Endres. Doc. No. 23, pp. 38-39 ¶¶ 153-155, pp. 39-40 ¶ 157, p. 41 ¶¶ 161-163; APX., pp. 238-249, *Additional Materials Submitted on Remand*.

## ARGUMENT

### A.    Plaintiff's claims are time barred.

Endres asserts two claims: disability discrimination under the Rehabilitation Act ("Rehab Act")  and Title II of the American's With Disabilities Act ("ADA") and  a denial of procedural due process via 42 U.S.C. §1983. Both are controlled by two year statutes of limitations. *McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012), (Rehab Act); *Frank v University of Toledo*, 621 F. Supp. 2d 475, 482 (N.D. Ohio 2007) (ADA); *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (§1983).

Federal law tells us when those statutes began running. *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984); *Frank*, 621 F. Supp. 2d at 482. "The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Sevier*, 742 F.2d at 272. "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id*.  Circuit precedent looks for "what event should have alerted the typical lay person to protect his or her rights." *Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1991).

The central injury Endres asserts is his dismissal because of what he claims was disability driven conduct. That is the core of his Rehab Act/ADA claims.  His §1983 claim is purely derivative of that; he asserts that the nature of the proceedings deprived him of the ability to prove that his conduct was an innocent manifestation of his disability driven conduct.

The decision to reject Endres' disability-based defense was made on October 21, 2015, and formally communicated to him on October 22, 2015. Doc. No. 23, pp 28-29 ¶¶ 113, 115-116; APX., p. 225, *Letter Dated October 22, 2015*. Endres' must have known that the decision constituted a rejection of his disability-based assertions. Those assertions were his core defense, he asserted it before and at the hearing, and the CAPP discussed it during the hearing.  Doc. No. 23, pp. 17-18 ¶¶ 67-70, pp. 18-19 ¶ 73, pp. 20-21 ¶ 82, pp. 21-22 ¶¶ 85-86, p. 26 ¶104-105, pp. 27-28 pp. 109-110, pp. 31-32 ¶¶ 126-127, p. 38-39 ¶ 154, p. 41 ¶163.  A decision dismissing him was necessarily a rejection of that assertion; the dismissal therefore put him on notice of the injury upon which he eventually sued. That injury occurred more than two years before he filed this case on November 16, 2017. His claims are therefore time barred.

That the injury was known to Endres on October of 2017 is not changed by the facts that Endres' appeals continued several days into the limitations period and that he was not actually separated from NEOMED until his appeals were exhausted.

The fact that the last of the multiple hearings occurred within the two year period is immaterial.  Supreme Court precedent establishes that "that the pendency of a grievance, or some other method of collateral review … does not toll the running of the limitations periods," and that "requests to reconsider … cannot extend the limitations periods applicable to the civil rights laws." *Delaware State College v. Ricks*, 449 U.S. 250, 261 and n. 14 (1980). Circuit precedent follows that same principle. *Janikowski v. Bendix Corp.,* 823 F.2d 945, 948 (6th Cir. 1987). ("Repeated requests for further relief from a prior act of discrimination will not set the time limitations running anew"). Endres' last hearing was simply a reexamination of the disability-based defense rejected on October 21. Indeed, that was the *only* issue allowed in the remand. The

November 18 hearing was nothing more than the resolution of a "request[] to reconsider" and therefore "cannot extend the limitations periods." *Ricks*, *supra*.[2]

The fact that Endres was allowed to stay at NEOMED during that time is also immaterial. The "proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." *Ricks*, 449 U.S. at 258; *Chardon v. Fernandez*, 454 U.S. 6, 8 (1983); *Janikowski*, 823 F.2d at 947. The allegedly discriminatory act was the October 21, 2015, rejection of Endres' disability-based defense. That occurred more than two years before this case was filed; Endres' claims are therefore time barred.

**B**.     **Qualified immunity protects Dr. Emerick from liability on Endres' due process claim.**

Qualified immunity protects an individual defendant from monetary liability unless the plaintiff *both* makes out a violation of a federal right *and* shows that the right was "clearly established" at the time of the violation. Officials "are presumed to be protected by qualified immunity … and the Supreme Court has characterized it as almost a guarantee of immunity. Furthermore, the Sixth Circuit has placed the burden of disproving qualified immunity on the plaintiff[.]" *Stevenson v. Owens State Cmty. College*, 562 F. Supp. 2d 965, 970 (N.D. Ohio 2008) (emphasis added, citations and internal punctuation omitted).

Dr. Emerik's qualified immunity remains intact because Endres has not pled a due process violation; his dismissal was based on academic considerations and he received more process than was due for such dismissals. Even if that the Court rejects that theory, the right that Endres asserts was not clearly established. He asserts the right to have his dismissal treated as a

---

[2] Nor can any argument be made that that narrowed scope of the November 18 hearing was itself a claim-saving violation. Endres acknowledges that the decision to limit the remand to disability issues was made on November 3, 2015. Doc. No. 23, p. 37 ¶¶ 146-147.  That too was outside the two-year limitation period.

disciplinary matter, rather than an academic one, but conflicting cases show that the distinction between academic and disciplinary dismissals is blurry. And in any event, Dr. Emerick could have reasonably concluded that Endres waived whatever right he had to disciplinary process by expressly agreeing that NEOMED could route cheating allegations through the CAPP process.

1. **Endres has not made out a due process violation: he received all the process due for an academic dismissal and his dismissal was academic.**

The process due a student facing dismissal varies depending on whether the dismissal is for academic or disciplinary reasons. No particular type of hearing is required if the dismissal is based on academic considerations; the student must simply be advised of the nature of the concerns, the consequences of the concerns must be explained and "the ultimate decision to dismiss" must be made in a "careful and deliberate" manner. *Bell v. Ohio State Univ*., 351 F.3d 240, 249 (6th Cir 2003); *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78 (1978). In contrast, a disciplinary dismissal must be considered via more structured procedures. See e.g. *Flaim v. Medical College of Ohio*, 418 F.3d. 629 (6th Cir. 2005).

There can be no doubt that Endres received at least as much process as was required for an academic dismissal. He was fully aware of the concerns underlying the proceedings. He was able to present his side of the story via multiple, detailed, written submissions supported by statements from doctors, lawyers, and a purported expert. He had two hearings and an appeal where he was able to present arguments and respond to the decision makers' questions. The decision makers deliberated.  *See* pp. 9-11 above. That was more than *Bell* and *Horowitz* required.

Endres' claim therefore turns on whether his dismissal was academic. It was. The precedents identify two indicia of academically based dismissals, and both are present here.

### a. Endres dismissal was academic because it was based on conduct related to professional success.

The first is whether the conduct prompting the proceedings is related to the student's prospects for success in the field he is studying.  As this Court put it, a dismissal proceeding is "academic in nature if there is a nexus between the … conduct and the prospects of success in a student's field of study." *Stevenson v. Owens State Cmty. College*, 562 F. Supp. 2d 965, 971 (N.D. Ohio 2008). See also *Id*. ("a direct link to her fitness to work in the medical field … supports the proposition that her dismissal was reasonably considered to be academic"). The Sixth Circuit has drawn similar conclusions, albeit in a slightly different context. It pointed to the relationship between the disputed conduct and a medical student's prospects for being a successful doctor as one of the reasons for concluding that his dismissal was academic.  *Al-Dabagh v. Case Western Reserve Univ*., 777 F.3d 355, 356, 359-360 (6th Cir. 2017). That is not changed by the fact that proceedings involve specific conduct; that was the case in both *Stevenson* and *Al-Dabagh*, yet both decisions found the dismissals to be academic.

There can be little doubt that one must possess integrity and honesty to be a good physician. On a general level, honesty is among the "core competencies" of the medical profession. *Al-Dabagh*, 777 F.3d at 356. Bringing the matter into clearer focus, Ohio law makes dishonesty grounds for permanently disqualifying a physician.  *Gaunzon v. State Medical Board*, 704 N.E. 2d 598, 602-603 (Ohio App. 1997).  And bringing matter into even higher resolution, Ohio Rev. Code § 4731.22(A) makes dishonesty related to an examination (albeit a different examination than the one involved here) grounds for denying licensure.  The conduct at issue in this case was cheating on an examination, so there was a clear link between that conduct and Endres' prospects as a doctor. It was therefore academic.

### b. The Student Handbook classified the dismissal as academic.

Another indicia of an academic dismissal is that the university classifies the conduct as academic in its standing procedures. That makes sense; those procedures control the execution of the university's academic mission, so they tell us a lot about what is relevant to that mission.

The precedents reflect that. *Ku v. Tennessee*, 322 F.3d 431 (6th Cir. 2003), involved a due process challenge to a medical student's suspension. The Sixth Circuit considered the student handbook's definition of academic matters along the way to holding that the process controlling academic dismissals applied. *Id*. at 436. The Sixth Circuit again had to determine whether conduct underlying a medical student's dismissal was academic in *Al-Dabagh v. Case Western Reserve Univ*., 777 F.3d 355 (6th Cir. 2017). It again considered the fact that the university's handbook classified the conduct as academic. *Id*. at. 359. The same question, mode of analysis, and outcome is seen in *Beauchene v. Mississippi College*, 986 F. Supp. 2d 755, 769 (S.D. Miss. 2013).[3]

NEOMED's standing procedures classify the conduct alleged here as academic. That conduct was cheating, a matter implicating a student's honesty and integrity. NEOMED treats that as academic on two levels. On a general level, NEOMED prepares its students for the practices they hope to undertake by requiring them to make "professional commitments" to the norms of the health professions. Those include norms "accountability … to the profession for adhering to the highest level of ethical precepts" and maintaining "honor and integrity." APX.,

---

[3] NEOMED acknowledges that *Al-Dabagh* and *Beauchene* involved contract claims, rather than due process claims, but that difference is immaterial. Like the law governing due process claims, the contract law governing those cases required the courts to give the universities greater deference when reviewing academic decisions, so those courts were conducting the same analysis involved in a due process case. Indeed, both courts expressly relied on due process precedents in conducting their analyses. *Al-Dabagh*, 777 F.3d at 359, 360, 361; *Beauchene*, 986 F. Supp. 2d at 768-769.

pp. 113, 114, *2015-2016 Student Handbook*. Cheating reflects that a student has not inculcated those norms, and hence is not progressing as he should. On a more specific level, and consistent with that focus on preparing students for those professional norms, NEOMED expressly includes "cheating" in the category of "Academic misconduct," rather than in the distinct category of "Behavioral misconduct." *Id*. at p. 112. That too supports the conclusion that the matter prompting Endres' dismissal was academic.

**2. Endres' right to have his conduct evaluated via disciplinary processes was not clearly established.**

A defendant is protected by qualified immunity unless the right she allegedly violated is "clearly established." In order for "a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015). That official need not be infallible because "qualified immunity gives ample room for mistaken judgments[.]" *Hall v. Sweet*, 666 Fed. Appx. 469, 477 (6th Cir. 2016). Further, "qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. at 477-478.

The process for determining whether a right is clearly established is itself well established. Courts are to examine "the asserted right in light of the specific context of the case, not as a broad general supposition." *Barber*, 809 F.3d at 845. Absent "extraordinary circumstances," a district court looks to "binding precedent by the Supreme Court, its court of appeals or itself" for evidence of the right's clear status. *Andrews v. Hickman County*, 700 F.3d 845, 862, n. 7 (6th Cir. 2012). Qualified immunity remains unless those precedents "have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741(2011).

17

Dr. Emerik's qualified immunity remains intact because the right Endres asserts—to have his dismissal considered in disciplinary rather that academic proceedings—was far from clear. That is true in two independently sufficient respects. First, the cases do not provide clear guidance on whether academic dishonesty issues should be handled via academic or disciplinary processes. Second, it was not clear that Endres' express consent to NEOMED choosing the track was anything other than a waiver of whatever right he had to disciplinary process.

> a.  **It was not clearly established that cases involving academic dishonesty must be handled via disciplinary processes**.

The distinction between what is properly classified as academic and what should be treated as disciplinary is inherently hazy. Many cases that give rise to possible dismissal involve some matters that could arguably classified as misconduct, and the justices deciding *Horowitz* struggled with how to distinguish the academic from the disciplinary. Compare, *Horowitz*, 435 U.S. at 93-94 (Powell, concurring) with *id*. 108, n. 18 (Marshall J. dissenting) (noting the "futility of trying to draw a workable distinction between 'academic' and 'disciplinary' dismissals"). Indeed, at least one of those justices seemingly had different views at different times on whether such a distinction is even possible. Compare *Goss v. Lopez*, 419 U.S. 565, 599 (1975) (Powell, J., dissenting) with *Horowitz*, 435 U.S. at 93-94 (Powell, concurring). That hardly gives us a bright line test.

These Supreme Court justices are not alone in noting fuzziness of this distinction; courts and commentators have repeatedly noted it.  See e.g. *Pflepsen v. University of Osteopathic Medicine, College of Podiatric Medicine*, 519 N.W.2d 390, 391 (Iowa 1994) ("The lines between academic performance and nonacademic misbehavior… often tend to blur… although it is up to the courts to draw the lines, the colleges sometimes try without success to do so");  *Nickerson v. University of Alaska Anchorage*, 975 P.2d 46, 53 (Alaska 1999)("there is no clearly identifiable

line between academic and disciplinary"); F. Dutile, *Disciplinary versus Academic Sanctions in Higher Education: A Doomed Dichotomy*, 29 J.C. & U.L. 619, 649-650 (2003)("Except in the purest of situations … the purported distinction between the disciplinary and the academic remains a largely muddled one. This murkiness can then lead to confusion concerning how to address the issue in the classroom and in the courtroom").

That lack of clarity persists in cases involving academic dishonesty.  Some cases classify such matters as academic. *Corso v. Creighton University*, 731 F.2d 529, 532 (8th Cir. 1984); *Fenje v. Feld*, 398 F.3d 620, 624-625 (7th Cir. 2005); *McCann v. University of Buffalo*, 2016 U.S. Dist. LEXIS 76829 (W.D.N.Y), **32-36. Others classify it as disciplinary. *University of Texas Medical School v. Than*, 674 S.W.2d 839, 844 (Tex. App. 1994); *M v. Clark*, 460 N.Y.S.2d 424, 425 (N.Y. Sup. Ct. 1983).

In short, the law is far from clear, with different judges reaching opposite results. "If … judges could reasonably disagree over the applicability of [a legal requirement], we do not believe that it can be fairly said that a reasonable official would know that [] conduct violated a clearly established right." *Key v. Grayson*, 179 F.3d 996, 1002 (6th Cir. 1999).  Dr. Emerick's qualified immunity therefore remains.

Defendants acknowledge that *Jaska v. Regents of University of Michigan*, 597 F. Supp. 1245, 1248, n. 2 (E.D. Mi. 1984), *aff'd* 787 F2d 590 (6th Cir. 1986) (table), held that cheating allegations should be resolved via disciplinary procedures. They also acknowledge that *Hall v. Medical College of Ohio*, 742 F.2d 299, 308-310 (6th Cir. 1984), analyzed specific disciplinary procedures in a cheating case. They nonetheless submit that neither case clearly established the law in this area.

The district court's decision in *Jaska* cannot clearly establish the law here because it comes from a different district. *Andrews v. Hickman County*, 700 F.3d 845, 862, n. 7 (6th Cir. 2012). The Sixth Circuit's unpublished affirmance does not do so either. Unreported decisions cannot clearly establish the law, *Shreve v. Franklin County*, 743 F.3d 126, 136 (6th Cir. 2014), and the one paragraph decision in *Jaska* was silent as to whether cheating cases must always be resolved via disciplinary procedures.

*Hall* did not clearly establish the law on this point because it did not decide the point. It considered several specific types of procedures that are sometimes used in disciplinary proceedings, but did so without addressing the more general question of whether the matter was properly considered as academic or disciplinary. And more to the point, *Hall* did not even hold that those specific procedures were required, but simply concluded that the law was unclear. Such a holding did not "place the constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741(2011).

### b. Dr. Emerick reasonably relied on Endres' agreement that she could route his proceedings through the CAPP process.

There is another reason why Dr. Emerik's immunity is intact. She could quite reasonably have concluded that Endres waived whatever right he had to disciplinary process by expressly agreeing that the matter could be addressed through the CAPP process.

It is axiomatic that constitutional rights can be waived via contract. That includes rights otherwise protected by the Due Process Clause. *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972) ("The due process rights to notice and hearing prior to a civil judgment are subject to waiver"); *National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-316 (1964)("it is settled, as the courts below recognized, that parties to a contract may agree in advance … to

waive notice altogether"). See also, *Boddie v. Connecticut*, 401 U.S. 371, 378-379 (1971) ("the hearing required by due process is subject to waiver").

The relationship between a university and its students is contractual. *Doherty v. Southern College of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988); *Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015). The terms of those contracts are set by the university's student handbook. *Id.*; *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 436 (Ohio App. 2014), ¶ 23. Those contracts have teeth. They are enforced against universities when they fail to comply, *Corso v. Creighton University*, 731 F.2d 529, 531(8th Cir. 1984); and against students when they fail to meet standards. *Al-Dabagh*, *supra*.  Of particular interest here, courts across the country enforce provisions in such contracts that limit students' constitutional rights. See e.g. *Medlock v. Trs. of Ind. Univ.*, 738 F.3d 867, 871 (7th Cir. 2013); *Commonwealth v. Neilson*, 666 N.E.2d 984, 987 (Mass. 1996); *Wagner v. Holtzapple*, 101 F. Supp. 3d 462, 473-474 (M.D. Pa. 2015). The Sixth Circuit has likewise held that a university may reasonably rely on provisions in its student handbook that would limit speech that might otherwise be protected by the First Amendment. *Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537, 546 (6th Cir. 2013).   These principles also preserve Dr. Emerick's qualified immunity.

NEOMED's student Handbook was a contract between it and Endres. *Al-Dabagh*, *supra*. That contract expressly set "Expectations of Student Conduct and Professional Commitment" that prohibited cheating. APX., pp. 111-112, *Student Handbook*. It expressly stated NEOMED and its Chief Student Affairs Officer had discretion to address violations via either the CAPP or the disciplinary processes.

-   It provided that a student's failure to abide by the expectations "may result in referral and review *by either* the Committee on Academic and Professional Progress (CAPP) *or* Student Conduct procedures." *Id.* at p. 111 (emphasis added).

21

- It also stated that NEOMED's Chief Student Affairs Officer would "make the initial determination as to *whether* the matters alleged … are best resolved through the formal disciplinary process contained in this policy *or* by way of a referral to the Committee on Academic and Professional Progress (CAPP)[.]" *Id.* at p. 107 (emphasis added).

Finally, that contract expressly required students to "read, understand, sign, and abide by" those provisions. *Id.*, pp. 111, 115.

Endres fulfilled that last requirement by signing off on NEOMED's stated expectations at the beginning of the 2015-2016 school year. APX. at pp. 190-192, *NEOMED Expectations of Student Conduct and Professional Commitment 2015-16*. All agree that he was accused of cheating, and that Dr. Emerick was NEOMED's Chief Student Affairs Officer. That brought this matter squarely within the provisions authorizing NEOMED, and Dr. Emerick in particular, to refer the matter to the CAPP.  In short, Endres expressly agreed to the very action at issue here. Given *Yoder v. Univ. of Louisville*, and the other cases cited above, it was less than clear that Dr. Emerick was wrong to rely on his consent to the CAPP process. That, too, preserves her qualified immunity.

Respectfully submitted,

**MICHAEL DEWINE (0009181)**
**Ohio Attorney General**
*/s/ Todd R. Marti*
TODD R. MARTI (0019280)
ANTHONY J. FARRIS (0055695)
Assistant Attorneys General
Office of the Ohio Attorney General
Education Section
30 E. Broad Street, 16th Floor
Columbus, OH 43215
Phone:  (614) 644-7250
Fax:  (614) 644-7634
todd.marti@ohioattorneygeneral.gov
anthony.farris@ohioattorneygeneral.gov

22

**Certificate of Service**

The undersigned hereby certifies that a copy of the forgoing was served upon all counsel of

record via the Court's ECF system this 22nd day of February, 2018.

*/s/ Todd R. Marti*
TODD R. MARTI (0019280)