# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION (AKRON)

| | | |
|---|---|---|
| J. ENDRES, | . | **Civ. No. 5:17−cv−02408−SL** |
| | : | |
| Plaintiff, | : | JUDGE LIOI |
| | : | |
| v. | : | MAGISTRATE JUDGE LIMBERT |
| | : | |
| NORTHEAST OHIO MEDICAL | : | |
| UNIVERSITY, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF JULIAN ENDRES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

Table of Contents .......................................................................... i

Table of Authorities   .................................................................. iv

I.   Statement of Issues to be Decided ..................................... 1

II.  Summary of Argument ……….......................................... 2

III. Statement of Facts………..…….........................................  9

A.  Before He Exhibited Symptoms of an Individual with ADHD
Who Had Changed Medications at the Quiz on September 28, 2015
Mr. Endres Was a Student in Good Standing at NEOMED …… 10

B. Mr. Endres Began Having Difficulties with His ADHD Medication. …… 11

C. At a Quiz, Mr. Endres Exhibits Classic Symptoms of ADHD. …… 12

D. Defendant Emerick Jumps to the Conclusion that Mr. Endres Had
Cheated. …… ................................................................... 13

E. NEOMED's Robust Procedures for Disciplinary Matters. ……  . 15

F. Defendant Emerick Chose the Anemic Process Used by CAPP. …… 15

G. Defendant Emerick Limited the Information Mr. Endress
Had Before His CAPP Hearing. ……............................................ 18

H. The Anemic CAPP Procedures, As Implemented in Bad Faith by
Defendant Emerick, Concealed Misleading Evidence and Robbed
Mr. Endress of An Opportunity to Refute that Evidence. …… ... 20

I. Following the CAPP Decision, Mr. Endress Exercised His Right
Under CAPP Procedures to Appeal. ……  .................................. 23

J. After the CAPP Hearing, Defendant Emerick Disclosed Some
Evidence CAPP Relied Upon, But NEOMED Stonewalled Public
Records Request about the Evidence ............................................. 25

K. At the ERC Hearing on His Appeal, Mr. Endres Was Denied
Sufficient Process, Including the Acceptance of a Reliable Statistical
Analysis........................................................................................ 27

L. At the ERC Appeal and CAPP Final Hearing, Mr. Endress Was
   Again Denied Sufficient Process, Including Disclosure of a Misleading
   Rendition by Defendant Emerick of Her Conversation with His Treating
   Physician and Expert....................................................................... 29

M. Mr. Endres' Treating Physician and Experts Corroborated His Changed
   Medication and ADHD Symptoms.............................................. 31

N. The NEOMED Expectations of Student Conduct and Professional
   Commitment 2015-16 Did Not Contain a Waiver of Mr. Endres'
   Constitutional Right to Procedural Due Process.......................... 32

IV  Argument  ......................................................................... 36

   A. Mr. Endres' Claims Accrued When a Final and Official Dismissal
      Decision Was Made and Communicated to Him.......................... 36

   B. By October 2015, the Law Was Clearly Established that the Fourteenth
      Amendment Due Process Clause Required a state Graduate Student
      Facing a Disciplinary Cheating Charge Be Afforded a Robust Process
      Before Being Dismissed ............................................. 41

        1.      NEOMAD's Procedures, Including its Choice to Use
                CAPP, Do No Establish the Process Due under the Fourteenth
                Amendment.............................................. 44

        2.      Labeling an Accusation of Cheating or Copying Answers
                An Academic or Professionalism Matter Does Not Convert
                The Accusation from a Disciplinary One ................. 45

        3.      The Requirements of the Due Process Clause Were Clearly
                Established Regardless of Defendant Emerick's Discretion
                Under the Student Handbook.................................... 51

   C. By October 2015, the Law Was Clearly Established that the Fourteenth
      Amendment Due Process Clause Required a state Graduate Student
      Facing a Disciplinary Cheating Charge Be Afforded at a Minimum, Fair
      Notice and an Opportunity to Mount a Meaningful Defense Before
      Being Dismissed. ....................................................... 53

   D. By October 2015, the Law Was Clearly Established that a Waiver of the
      Constitutional Right to Due Process Had to Be Knowing and Intentional

ii

By Signing Clear Language Waiver ............................................. 55

V.  Conclusion………..…….. ........................................................................ 57

# TABLE OF AUTHORITIES

## Cases

*Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937). ........................................................ 9, 56

*Albrecht v. Treon*, 617 F.3d 890, 894 (6ᵗʰ Cir. 2010) ................................................................ 43

*Al–Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 360 (6ᵗʰ Cir.), *cert. denied*, 135 S.Ct. 2817 (2015);................................................................................................................ 46, 47, 49

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987). ............................................................ 41, 42

*Arnett v. Kennedy*, 416 U.S. 134, 152-54 (1974):.................................................................... 44

*Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011)........................................................................ 41

*Banks v. City of Whitehall*, 344 F.3d 550, 553 (6ᵗʰ Cir. 2003).................................................. 40

*Bates v. Sponberg,* 547 F.2d 325, 329–30 (6ᵗʰ Cir. 1976) ........................................................ 51

*Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 87 n.4  (1978)........... 45, 46, 48, 50, 55

*Brookhart v. Janis*, 384 U.S. 1, 4 (1966) ............................................................................ 9, 56

*Brosseau v. Haugen,* 543 U.S. 194, 199 (2004) ....................................................................... 43

*Browning v. Pendleton,* 869 F.2d 989 (6ᵗʰ Cir. 1989) *(en banc)* ............................................ 40

*Carney v. Univ. of Akron*, No. 5:15CV2309, 2016 WL 4036726, at *7 n. 6 (N.D. Ohio July 28, 2016), *appeal dism.,* No. 16-3993, 2016 WL 9610018 (6th Cir. Dec. 1, 2016)................ 50, 53

*Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6ᵗʰ Cir. 2012) (Rule 12(b)(6)............................ 40

*Chardon v. Fernandez*, 454 U.S. 6, 8 (1981)...................................................................... 37, 38

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540 (1985), ........................................ 44, 45

*Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1419 (3ʳᵈ Cir. 1991) *(en banc)* ........................ 36

*Conlin v. Blanchard,* 890 F.2d 811, 815 (6ᵗʰ  Cir. 1989))......................................................... 36

*Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ................................................................... 47

*Datto v. Harrison*, 664 F. Supp. 2d 472, 485 (E.D. Pa. 2009)................................................... 40

*Delaware State College v. Ricks,* 449 U.S. 250, 261 (1980) ............................... 36, 37, 38, 39, 40

*Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6ᵗʰ Cir. 2007)). ..................................................... 10

*Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 158–59 (5ᵗʰ Cir. 1961.............................49

*Dixon v. Anderson,* 928 F.2d 212, 215 (6ᵗʰ Cir. 1991)............................................................. 36

*Doe v. Baum*, 227 F. Supp. 3d 784, 795–96 (E.D. Mich. 2017),............................................... 57

*Doe v. Cummins*, 662 Fed. Appx. 437, 447 (6ᵗʰ Cir. 2016) .......................................... 37,43,44

*Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at *14 (6ᵗʰ Cir. Feb. 9, 2018);..... 43, 52, 53

*Doe v. The College of Wooster*, No. 5:16-CV-979, 2018 WL 838630, at *5 (N.D. Ohio Feb. 13, 2018) ........................................................................................................................... 40

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601 (S.D. Ohio 2016) .................. 37, 43, 52, 55

*Doxey*, 833 F.3d at 702 ........................................................................................................... 55

*Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976)) .......................................... 39

*Farhat v. Jopke*, 370 F.3d 580, 596–97 (6ᵗʰ Cir. 2004) ........................................................... 56

*Fenje v. Feld*, 398 F.3d 620, 625 (7ᵗʰ Cir. 2005) ................................................................. 7, 49

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6ᵗʰ Cir. 2005) ............... 7, 43, 45, 50, 53, 54, 55

*Fuentes v. Shevin,* 407 U.S. 67, 95-96 (1972). .................................................................... 9, 56

*Goss v. Lopez,* 419 U.S. 565, 579 (1975); .............................................................................. 43

*Grawey v. Drury,* 567 F.3d 302, 313 (6th Cir. 2009). .................................................. 42

*Grayson v. K Mart Corp.,* 79 F.3d 1086, 1100 n. 19 (11th Cir. 1996). ............................ 36

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). ............................................... 41, 47

*Harris v. Ladner*, 127 F.3d 1121, 1125 (D.C. Cir. 1997) ......................................... 39

*Hennessy v. City of Melrose*, 194 F.3d 237, 251 (1st Cir. 1999).............................. 48

*Henson v. Honor Comm. of U. Va.*, 719 F.2d 69, 73–74 (4th Cir. 1983) ...................... 51

*Heyne v. Metropolitan Nashville Pub. Sch.*, 655 F.3d 556, 569 (6th Cir. 2011); ......... 51

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002). ....................................................... 42

*Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir. 1987)............................... 39

*JiQiang Xu*, 195 Fed.Appx. at 457 ........................................................... 38, 51

*Keefe v. Adams*, 840 F.3d 523, 534 (8th Cir. 2016), *cert. denied,* 137 S. Ct. 1448 (2017) .......... 46

*Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005). .............................................. 38

*Leary v. Daeschner*, 228 F.3d 729, 744 (6th Cir. 2000). ........................................ 56

*Leonard v. Robinson*, 477 F.3d 347, 354–55 (6th Cir. 2007 ................................... 42

*Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432 (1982) ................................... 45

*Mathews v. Eldridge*, 424 U.S. 319, 332 (1976 ....................................... 43,52, 53

*Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 14 (1978). ........................... 51

*Monroe v. Ark. State Univ.,* 495 F.3d 591, 595 (8th Cir. 2007) .............................. 50

*Morrison v. Warren,* 375 F.3d 468, 474 (6th Cir. 2004) ........................................ 56

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th
    Cir. 2012) .......................................................................................... 10

*Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 663–64 & n.4 (7th Cir. 2004),..................... 50

*Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 227 (1985)............................ 47

*Roach v. University of Utah,* 968 F.Supp. 1446, 1453 (D. Utah 1997) ...................... 51

*Sambo's Restaurants, Inc. v. City of Ann Arbor,* 663 F.2d 686, 690 (6th Cir. 1981 ............. 9, 56

*Sample v. Bailey,* 409 F.3d 689, 699 (6th Cir. 2005). ........................................... 43

*Saucier v. Katz,* 533 U.S. 194, 201 (2001)…………………………………………. 41,42

*Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir. 1984)) ........................................... 36

*United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 485 (6th Cir. 2014)......... 43

*United States v. Doxey,* 833 F.3d 692, 702 (6th Cir. 2016) .................................... 8

*United States v. Lanier,* 520 U.S. 259, 271 (1997)............................................... 42

*Vitek v. Jones,* 445 U.S. 480, 491 (1980),........................................................ 44

*Webb v. McCullough,* 828 F.2d 1151, 1159 (6th Cir. 1987)…………………………… 51

*Wheeler v. Miller,* 168 F.3d 241, 248 (5th Cir. 1999) ......................................... 51

*Wilson v. Layne,* 526 U.S. 603, 617 (1999)).................................................... 41

*Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1006-07 (E.D. Mich. 2017),..................... 46

*Yoder v. Univ. of Louisville,* 526 Fed.Appx. 537 (6th Cir. 2013).............................. 50

## I.     <u>Statement of Issues to Be Decided</u>

1.    When a Student Handbook policy ***explicitly*** renders an initial committee decision final only upon rejection of an appeal from that decision is the date legal claims accrue the date the initial decision became final or the earlier date on which the initial decision was made and communicated?

2.    Whether a remand to a committee for reconsideration of a dismissal renders the date the decision on the reconsideration is made and communicated to the student the accrual date?

3.    Whether the law was clearly established in October 2015 that, under the Due Process Clause of the Fourteenth Amendment, robust procedures had to be afforded a state graduate student facing a disciplinary cheating charge and dismissed upon being found to have cheated?

4.    Whether the law was clearly established in October 2015 that, under the Due Process Clause of the Fourteenth Amendment, the minimal notice and opportunity to be heard included (a) revealing to a state graduate student charged with cheating and dismissed upon being found to have cheated material documents providing guidance and evidence to the decisionmakers; and/or (b) admitting or pursuing exculpatory evidence, attached at Appendix A hereto, such as the simple field test reflected in video and photographs which demonstrated why cheating was a physical impossibility and a reliable statistical analysis which demonstrated that the overlapping answers were to be expected?

1

5.      Whether the law was clearly established in October 2015 that a state graduate student does not waive prospectively the constitutional right of due process by signing a general, brief, and vague notice that failure to abide by university expectations of student conduct and professional commitment may result in referral and review by either a committee on academic and professional progress or through disciplinary procedures?

## II.      <u>Summary of Argument</u>

Julian Endres did not cheat.  On September 28, 2015, in a video recorded for a quiz, Mr. Endres displayed behavior that appeared as fidgety, looking around the room, restless, and distracted by something to his right. Unknown to him, some of his saccadic eye-movements to the right due to distractions made him suspicious to the proctors. He was similarly unaware that the camera was zoomed in and focused on him by the proctor from approximately five minutes into the quiz.

After the quiz, a proctor filled out an Irregularity Report.  The proctor did not accuse him of cheating: "Copying Answers" and "Others" were in the list of the irregular behaviors,  but she did not check off any of the irregular behavior listed, and instead wrote in the "comment" section that: "The student appeared to be repeatedly looking at the computer of the student in Seat #30." The proctor submitted the report to Defendant Emerick and further noted in the email that "perhaps the student is simply nervous."

The computer screen the proctor alleged Mr. Endres was glancing toward was approximately five feet away from his seat at No. 29. Mr. Endress did not know the student at seat no. 29, and scored 72 on the exam, which is in the top 15% of the class.  The student at seat No. 30 scored 64.  The class average of that exam was 56.

2

Mr. Endres knew there was videotaping: one of his part-time job duties had been to ensure the cameras were ready to record classes.  Defendant Emerick was informed by Mr. Endres that it was physically impossible to commit the misconduct of which he was accused. Indeed, she was told that a simple, less than five-minute field test at Olson Hall which replicated the exact side-glances of the alleged misconduct, would conclusively demonstrate that it was physically impossible to get any legible information from the other computer screen. Not only did Defendants refuse to conduct a field test, but they also prohibited any NEOMED staff to participate in the open-field test Mr. Endres conducted.  Besides visual characterization, there was no known record of any kind from Defendant Emerick that any factual-finding was conducted to support her accusation that Mr. Endres had cheated on the exam.

The videotape shows what the fidgeting of ADHD looks like.  A robust process would have exonerated him of cheating.  Defendants would have combined their knowledge before the quiz of Mr. Endres' ADHD with his explanation, corroborated by his treating physician and experts, about the effects of changed medication.  They would not have relied on either their ignorance about ADHD or their lay opinion that what they saw on screen could only have been cheating.  The misrepresentations by Defendant Emerick about the content of her conversations with the experts would have been exposed and rebutted.

CAPP would have realized that a meaningless statistical analysis had been presented to it and, before being instructed to disregard all statistical evidence, not formed the concrete impression that he had cheated because the mistaken odds were a 0.000036% chance that two students could have six identical wrongs without cheating.  CAPP would have replaced that deeply flawed statistical analysis with the indisputable data Mr. Endres submitted showing  such

3

"statistically impossible" condition was found on two-thirds of the class with many students sharing six or even more identical wrongs.

They would have permitted a volunteer employee to conduct a field test demonstrating that it was physically impossible for a student in the same row to read anything legible from a computer screen five feet away and realized that Mr. Endres' own reconstruction, *see* Appendix A hereto, accurately reflected that impossibility.  The distance, angle, and visibility of the computer screens, all supplied by Defendants and under their control with permanently set low brightness, precluded the cheating they accused and "adjudicated" Mr. Endres of committing.

Instead, Defendants chose an anemic process, one appropriate for academic judgments on a student's suitability to continue his studies, but dreadfully insufficient for resolving a disciplinary charge of cheating.  The momentum for dismissing Mr. Endres survived even the stop-and-start of a remand.  Rather than full disclosure before a hearing and a meaningful opportunity to respond, Defendants consistently made partial, misleading disclosures or none at all, rendering a process anemic on paper fatal in practice.

Even the most anemic process must satisfy minimal due process requirements of notice and an opportunity to be heard.  Defendant Emerick, acting in bad faith, failed to disclose to Mr. Endres the deeply flawed statistical analysis that the CAPP's decision was based upon at the first hearing.  She not only provided misinformation that was used by the CAPP for its decision at the final hearing, but she also had a statement inserted in the final hearing report to create the false impression that her information was validated by Mr. Endres's own expert. She failed to disclose her hit-job misrepresentation of her conversations with both his treating physician and an expert that she reported to CAPP. She refused to pursue or submit exculpatory evidence, such as a simple field test that demonstrated the physical impossibility of any cheating (reflected in the

4

video and photographs attached as Appendix A) and a reliable statistical analysis (also provided in Appendix A).  Mr. Endres was purposely kept ignorant about material evidence and thwarted from mounting a meaningful defense or receiving a careful and deliberate adjudication.

Defendants have ended Mr. Endres' medical education and his career path to becoming a physician without giving him a meaningful hearing, thus snuffing out his opportunities to ever enroll in another medical school and to realize his goal of becoming a doctor.  Not only was Mr. Endres deprived of the opportunity to pursue his medical degree and fulfil the requirements necessary to become a licensed physician in his chosen area of specialty,, but he was also besmirched by a dismissal for cheating that will follow him throughout his career.  An official record now must be disclosed on any school, job, or professional licensing application. The damage to Mr. Endres has been and continues to be irreparable.

Defendants move to dismiss the entire First Amended Complaint as untimely.  While less than two years had lapsed between their final and official notification to Mr. Endres of their dismissal decision, they argue that an earlier event, communication of the results from a first hearing, established the accrual date for his claims.  Relying on inapposite precedent, they assert that his appeal, including one that remanded his case for reconsideration, did not change the accrual date.

Actually, their Student Handbook, under the heading of XI., entitled "CAPP ["Committee on Academic and Professional Process"] Procedures – Additional Information," states in Section (6)(e): "If the Executive Review Committee denies the appeal, *the original decision to dismiss becomes final* and is not subject to further appeal.  If the appeal is upheld, the decision is referred back to the CAPP Phase 2 Committee for reconsideration."  *Appendix to Memorandum in Support of Defendants' Motion to Dismiss* ("MtD Appx.") at 185 (emphasis added).  The

5

original decision was never final; instead, it was referred back for reconsideration.  Mr. Endres commenced his action within two years of Defendants' communication to him of the results of that reconsideration.

Invoking qualified immunity, Defendant Emerick moves to dismiss the damages claim against her for depriving Mr. Endres of the procedural due process guaranteed by the Fourteenth Amendment Due Process Clause.  She asserts that she had the right to choose the anemic process of an academic or professionalism track and is immune from damages for not choosing the robust process of the disciplinary track.  The law was not clearly established, she argues, that an administrator had to choose the latter track.

The issue, however, is what process was due and whether it was clearly established that the anemic process afforded Mr. Endres was insufficient under the DPC.  In determining what process is due, courts have divided the analysis between academic or professionalism and disciplinary tracks.  That division does not delegate to an administrator the judicial decision of what process is due.

What was clearly established is that, regardless of how a college administrator characterizes a process that culminates in dismissal of a student for cheating, a robust process is due.  Courts, not an administrator, determine whether the accusations which resulted in the dismissal warranted that robust process.  NEOMED had adopted a robust process for disciplinary matters, establishing the consistency of a robust process with its operations.  Convinced of Mr. Endres' guilt due to the videotape and a flawed statistical insight about some identical answers, though, it jettisoned the robust process and implemented the anemic process for academic and professionalism matters.

6

That determination depends not on the characterization by an administrator, but rather on the quintessential purpose of due process.  When a purely factual allegation of cheating – whether what the videotape depicted was cheating or symptoms of an individual with ADHD who had changed medication – is presented, the parallel to judicial process for adjudicating criminal guilt requires a robust process.  When a purely subjective and discretionary judgment about an individual's suitability for continued studies is presented, an anemic process suffices.  Robust procedures lead to a fair retrospective factual determination on cheating, while an opinion about academic suitability may readily be reached by anemic procedures because it speculates about the future.  *See, e.g., Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) ("Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians," require robust procedures).

Mr. Endres' First Amended Complaint alleges both that Defendant Emerick did not even satisfy an anemic process and that she purposely chose the academic or professional track in order to deprive him of robust procedures, grease the momentum toward a preordained dismissal, and avoid the burden a meaningful opportunity for him to defend himself would have imposed on Defendants.  Her state of mind or intent in making that choice goes to punitive damages, not the constitutional violation itself.

By October 2015, the law had been clearly established that disciplining a graduate school student for cheating required robust, not anemic, procedures.  *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) ("The hearing, whether formal, informal, live or not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.'").

Alternately, though, the law had also been clearly established by then that, however anemic a process on paper, the minimal due process is fair notice and an opportunity to be heard in a meaningful manner.  In hiding material evidence from Mr. Endres and refusing to pursue or accept exculpatory evidence, such as his field test and statistical analysis, Defendant Emerick deprived him of that minimal due process.

Defendant Emerick adds, alternatively, that Mr. Endres waived his constitutional rights by signing on August 31, 2015, the "NEOMED EXPECTATIONS OF STUDENT CONDUCT AND PROFESSIONAL COMMITMENT 2015-16," MtD Appx. at 190-92, which stated:

> Northeast Ohio Medical University (NEOMED) students are expected to read, understand, sign and abide by the "Expectations of Student Conduct and Professional Commitment" while enrolled and involved in NEOMED, its partner institutions and hospitals, and NEOMED-sponsored activities.  Failure to do so may result in referral and review by either the Committee on Academic and Professional Progress (CAPP) or Student Conduct procedures.

This is the language to which Defendant Emerick refers for her waiver argument.

Put gently, the argument is unpersuasive.  "[W]aiver is the intentional relinquishment or abandonment of a known right."  *United States v. Doxey*, 833 F.3d 692, 702 (6th Cir. 2016).  By agreeing in August that failing to meet NEOMED expectations "may result in referral and review by either" CAPP or Student Conduct procedures, Mr. Endres hardly waived his constitutional right to a robust process for determining whether he cheated in October.

No reasonable student would understand that, by agreeing that a failure to meet expectations "may result in referral and review" by "either" an academic and professionalism committee or a disciplinary process, s/he was waiving the constitutional right to procedural due process.  Under Defendant Emerick's view, a student could be charged by NEOMED with any crime or misconduct and dismissed after an anemic process before the academic and

8

professionalism committee.  Waiver is stronger medicine and must be reserved for situations where the constitutional right and its deprivation are spelled out.

NEOMED had students agree that misconduct "may" be handled by one of two processes.  That agreement is nowhere close to one that NEOMED reserved discretion, no matter what the crime or misconduct and the entitlement to robust process under the Due Process Clause of the Fourteenth Amendment, to use whichever process it chose.  The language does not even refer to NEOMED's discretion; it simply states that two tracks are available and misconduct "may" be handled by them.  When and why one or the other track will be used are not mentioned.

Moreover, contrary to Defendant Emerick's argument, waiver is not a matter of Ohio contract law.  "[T]he question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law." *Brookhart v. Janis*, 384 U.S. 1, 4 (1966).  Thus, in *Sambo's Restaurants, Inc. v. City of Ann Arbor,* 663 F.2d 686, 690 (6th Cir. 1981), Michigan contract law did not govern waiver of First Amendment rights.  In turn, federal courts must "indulge every reasonable presumption against a waiver." *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937).  Still, procedural due process rights may be waived, but the parties must be keenly aware of what they have signed: "A waiver of constitutional rights in any context must, at the very least, be clear." *Fuentes v. Shevin,* 407 U.S. 67, 95-96 (1972).  Defendant Emerick's waiver argument flunks that test.

## III.    <u>Statement of Facts</u>

The facts below are taken from the First Amended Complaint ("FAC") or the materials in the appendix to the memorandum in support of Defendants' motion to dismiss, attached to the original Complaint, or provided in Appendix A hereto.  In determining whether a complaint fails

to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).

Defendants predicate their motion to dismiss on three grounds: timeliness of the Complaint; clearly established law on due process; and waiver. Those grounds are informed by the facts alleged in the First Amended Complaint or reflected in the appendix materials or exhibits to the original Complaint.

      **A.**      **<u>Before He Exhibited Symptoms of an Individual with ADHD Who Had Changed Medications at the Quiz on September 28, 2015, Mr. Endres Was a Student in Good Standing at NEOMED.</u>**

Mr. Endres was first diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) at age six. FAC, ¶ 15. ADHD is "a neurodevelopment condition with a complex etiology that, unless mitigated by prescribed medication, substantially limits his major life activities, including concentrating, thinking, and test-taking[.]" *Id.*

Mr. Endres regularly took the prescription drug Ritalin throughout his primary, secondary, and post-secondary education. *Id.* at ¶¶ 15; 16. "Ritalin helped Plaintiff concentrate, suppress his hyperactivity, and allowed him to overcome his ADHD and excel personally and academically." *Id.* at ¶¶ 16; 17 (high school valedictorian; National Merit semi-finalist and finalist; Magna Cum Laude B.S. Degree from Kent State University).

Through the accelerated BS/MD program offered by NEOMED, he began his medical studies at age 20. *Id.* at ¶ 17. By May 2015, he "had already passed 14 classes out of 15 classes for the first-year requirements of NEOMED's medical school." *Id.* at ¶ 25. That month he "was

accepted to be a neurological research assistant for the summer of 2015." *Id.*  He did not, however, pass the last class in May and lost the research assistant position. *Id.* at ¶ 26.

Because he failed the remediation exam for the class he failed, his academic standing was reviewed by Phase 2 CAPP.  *Id.* at ¶ 29.  He explained on his CAPP Student Interview Form that one of the reasons for failing the class had been difficulties with his medication for ADHD.  *Id.* "The Phase 2 CAPP Review concluded with the decision to require Plaintiff to repeat the M1 year. Mr. Endres did not ask for any special treatment because of his ADHD. That decision was expected and was the usual result for M1 students in similar situations." *Id.*  Mr. Endres returned to NEOMED in the fall of 2015 to repeat his first year.  *Id.* at ¶ 30.

**B.**    **Mr. Endres Began Having Difficulties with His ADHD Medication.**

During his first year in or around March, 2015, Mr. Endres started feeling over-sedated by Ritalin and lethargic.  FAC, ¶ 24.  These complications continued for the next two months, and he stopped regularly taking Ritalin.  *Id.* at ¶ 26.  During the period he reduced Ritalin he failed the last course.  *Id.*

On April 13, 2015, he had visited his treating physician, Dr. Caroline Ramos, to discuss the complications.  *Id.* at ¶ 27.  Concerned about changing ADHD medication mid-semester, he continued on Ritalin "despite the new side effects." *Id.*  In the summer of 2015, Mr. Endres "went through an ADHD medication adjustment effort to find one he could tolerate and be able to take on the regular basis." *Id.* at ¶ 28.

In or about August 2015, he switched to Strattera, a new ADHD medication for him.  *Id.* at ¶ 31.  "Strattera was a non-stimulant and would not sedate him as Ritalin had: while Strattera would help him concentrate without the side effects of Ritalin, it would not suppress his fidgeting." *Id.*

11

C.      **At a Quiz Mr. Endres Exhibits Classic Symptoms of ADHD.**

On September 28, 2015, at a quiz for his Human Development and Structure ("HDS")

course, Mr. Endres displayed behavior that appeared as "fidgety, looking around the room,

restless, and distracted by something to his right."  FAC, ¶ 36.  He did not realize that he was

exhibiting such ADHD symptoms, including "saccadic eye-movements to the right due to

distractions [that] made him suspicious."  *Id.*  He had taken and passed the HDS course from the

same teacher, Hans Thewissen, the year before. The HDS class was considered to be the most

difficult class of the first-year medical students, not by Mr. Endres alone.  *Id.* at ¶ 32.

As announced and obvious to students, "NEOMED records class lectures and exams on

video through a video camera installed openly in the corner of the classroom."  *Id.* at ¶ 33.  Mr.

Endres "was especially familiar with the recording equipment located at Olson Hall as he had a

part-time job as a student tech assistant, helping NEOMED professors in setting up the video

camera recording for the lectures."  *Id.*

Exams at NEOMED are computerized, using the online "ExamSoft" program and

computers provided by NEOMED.  *Id.* at ¶ 34.  "***The brightness of the computers used for the***

***tests was locked at near the lowest level. Students could not adjust the brightness***. Further,

students were only aware of their seat assignments approximately 15 to 20 minutes prior to the

commencement of the Exam."  *Id.* (emphasis noted).

The quiz was multiple choice, and students answered on the computer, though they could

write answers on the answer sheet.  *Id.* at ¶ 35.  Grading was done on the computer.  *Id.*

The quiz was administered to 160 students and consisted of 25 multiple choice questions.

*Id.* at ¶ 36.  The quiz was the first examination in the first year and accounted for 5% of the final

12

course grade.  *Id.*  Four proctors monitored the quiz while the video camera openly recorded the room.  *Id.* at ¶ 37.

Mr. Endres sat at seat number 29.  *Id.* at ¶ 38.  "He was right in front of the camera."  *Id.* He was often distracted "by the light of another person's screen or movement by another student" and frequently looked or fidgeted.  *Id.*  ExamSoft permitted students to zoom in and out of photographs and diagrams, and the student to his right, whom he did not know, "frequently zoomed in and out of photos and diagrams on his computer screen, causing flashes of colors at the corner of Plaintiff's eye, and he would briefly glance over."  *Id.* at ¶ 39.  Mr. Endres' sideway glances "lasted no more than a second each."  *Id.* at ¶ 40.  The quiz was his first examination while being medicated by Strattera, and "it never occurred to him that his fidgeting could be an issue during the exam."  *Id.* at ¶ 41.

Mr. Endres and the student to his right were separated by an empty chair in the same row, approximately five feet away from each other.  *Id.* at ¶ 44.  "It was physically impossible to discover any legible information from the computer screen of seat 30 by doing the same eye-movements due to the distance between them and the low-level of brightness that the computer screens in the Exam were set to (and could not be altered by any of the students)."  *Id.* at ¶ 39.

One proctor, Suzanne Hricko, submitted an Irregularity Report that "[s]tudent appeared to be repeatedly looking at the computer of the student in Seat #30" and "perhaps the student is simply nervous."  *Id.* at ¶ 42; 43.  To clarify Defendants' rendition of the facts, the proctor purposely did not check on the Irregularity Report Form the preprinted line, "Copying answers." *Id.*  Without Mr. Endres' knowledge, the report was sent to Defendant Emerick that day.  *Id.* at ¶ 45.

### D.    Defendant Emerick Jumps to the Conclusion that Mr. Endres Had Cheated.

13

Defendant Emerick viewed the videotape and requested an answer key for the quizzes of Mr. Endres and the student to his right.  FAC, ¶ 46.  She did not immediately notify Mr. Endres or obtain any information from him.  *Id.*

Instead, she reported in an October 2, 2015 email, entitled "CAPP Referral Recommendation," to the CAPP chairs, one of whom was Professor Thewissen, with copies to administrators Heidi Terry, Director of Student Enrollment Service, and Elisabeth Young, Vice Dean of the School of Medicine, as well as the proctor who reported irregular behavior, that "[a] student was observed and video taped ***clearly showing him viewing a peer's computer screen repeatedly during the exam***."  MtD Appx. 197-98 (emphasis noted); FAC, ¶ 47.  Her email also reported: "**84% of the 2 tests were identical**[.] Of the 84% identical, 6 questions were answered wrong by both students (24%) and 15 questions were answered correctly by both students (60%)[.]  4 questions were answered wrong and differently by both students[.]"  *Id.* (emphases in original).

Her email was misleading about what the videotape actually showed and the data. "Based on the actual exam data of the entire class who completed the Exam at the same time, over half of the students – more than 80 out of 160 students – had 85% identical answers with at least one other student in the class."  FAC, ¶ 49.  Defendant Emerick had emphatically buttressed her conclusion that Mr. Endres had cheated by making only one comparison.  *Id.*  Had she realized that many student pairs had identical answers, she would have admitted on cross-examination or been rebutted by contradictory evidence that "her assumptions would mean that half of the class committed the same misconduct as she alleged Plaintiff did."  *Id.*

14

The average score on the quiz was 56.5.  *Id.* at ¶ 50.  Mr. Endres scored a 72, in the top 15% of the class, while the student whose computer screen he allegedly looked at scored a 64. *Id.*

Discovery will reveal exactly what happened to the Student Handbook, but it appears that Defendant Emerick secured an amendment at the same time she was investigating Mr. Endres and added to the Irregular Behavior Section a new item: "Looking at a peer's examination."  *Id.* at ¶ 52.  Of course, Mr. Endres was never charged with that item, and he was not guilty of looking at the examination, but rather of exhibiting symptoms of ADHD.

She concluded her email by asking for the CAPP Co-Chairs' "feedback regarding whether you believe this matter should be referred to CAPP as an academic dishonesty allegation."  MtD Appx. at 198.  She did not posit the option of referral to disciplinary procedures, nor did she seek the feedback of those copied with her email.

### E.    NEOMED's Robust Procedures for Disciplinary Matters.

The disciplinary track in the Student Handbook provided robust procedures to determine whether a student had engaged in misconduct.  FAC, ¶ 20.  An adversarial hearing conducted fairly and impartially is provided the student, and the student has the rights to know the nature and source of evidence used to support a complaint, to cross-examine witnesses, to testify, and to present the testimony of witnesses and other evidence.  *Id.* at ¶ 23.

Rather than the preponderance of evidence standard used under CAPP procedures, there must be "substantial evidence" of cheating.  *Id.* at 121.

### F.    Defendant Emerick Chose the Anemic Process Used by CAPP.

The entirety of CAPP Co-Chair Professor Thewissen's response to Defendant Emerick's email was: "Yes, refer to CAPP."  MtD Appx. at 197.  The documents before the Court or in Mr.

15

Endres' position do not reveal any response from the other CAPP Co-Chair or any administrators or the proctor.

As its name suggests, the purpose of CAPP "is to review issues for Academic Performance and Professionalism, rather than for alleged disciplinary misconduct."  FAC, ¶ 53. The CAPP Student Interview Form required a student to explain "why he believed he 'experienced difficulty,' what he proposed 'as a result of this meeting with CAPP,' why CAPP should 'alter the enrollment standard to meet [his] proposal,' and why he would be successful in the future with this proposal."  *Id.* at ¶ 96.  The disconnection with an accusation of cheating is palpable.

In stark contrast to the robust procedures of the disciplinary track, CAPP procedures are anemic: students are notified in writing that they will be required to attend a CAPP meeting; an Interview Form is provided and must be completed and returned no less than two days before the meeting; students may speak at the meeting about the unsatisfactory performance issue and will be questioned by CAPP members; and CAPP members then discuss and vote by a majority in closed session.  *Id.* at ¶ 54.

The CAPP hearing notice offers no explanation of the evidence supporting the charges, nor is the evidence provided to the student before the CAPP meeting.  *Id.* at ¶ 55.  A preponderance of evidence standard is used.  *Id.* at 121.

All Mr. Endres was told in the CAPP hearing notice was that, on October 8, 2015,  "As a result of professional development concern (the alleged academic misconduct) [CAPP will] "discuss the professionalism concern, your overall educational performance and record and decide how to best to proceed."  *Id.* at ¶ 56.  Apart from the vague term, "alleged academic misconduct," there was no specification that he had been accused of cheating on the quiz.  *Id.*

16

Unlike the robust disciplinary procedures, "the CAPP Procedures do not afford the accused students the right to be present when the case is presented to the CAPP hearing panel or to know what evidence or information was presented to the CAPP hearing panel." *Id.* at ¶ 57. The case presentation and discussion before the student enters is held behind closed doors. *Id.*

Consequently, at all CAPP and Executive Review Committee hearings, Mr. Endres "was barred from the hearing portion wherein Defendant Emerick discussed her evidence and was denied the knowledge of what evidence Defendant Emerick used against him." *Id.* at ¶ 58. The net result was that Mr. Endres never had the opportunity "to question the evidence of the charges against them or the information just presented to the CAPP hearing panel behind closed doors." *Id.* at ¶ 59.

At the initial CAPP hearing, Mr. Endres spoke for 25 minutes and was then questioned. *Id.* at ¶ 60. "None of the questions the CAPP hearing panel asked was related to the information just presented by Defendant Emerick [and he] was not to ask Defendant Emerick or the CAPP hearing panel about what evidence she just presented." *Id.*

"Defendant Emerick purposely and improperly used the CAPP procedure in order to avoid having to provide Plaintiff the procedure Defendants afforded for disciplinary matters." *Id.* at ¶ 61. She knew that the only allegation against Mr. Endres was "engaging in academic misconduct by cheating on the Exam." *Id.* at ¶ 62. She also knew that an accusation of cheating should have triggered the disciplinary procedure. *Id.* at ¶ 63. "Cheating or attempting to cheat on an examination fits the category of disciplinary matters." *Id.* at ¶ 64.

Indeed, "Defendants have customarily subjected to the CAPP procedure conduct that does not involve a student's intentional effort to gain an advantage over other students by engaging in irregular behavior at an exam." *Id.* at ¶ 65. The CAPP Student Interview Form

17

focuses, as excerpted above, on academic progress, not cheating. For an Irregularity Report describing "a student's behavior at an exam the appropriate way of investigating and considering discipline according to Defendants' policies is in the disciplinary, rather than professionalism and fitness for studies, process." *Id.* at ¶ 66.

If Mr. Endres was deemed by CAPP unsuitable to continue his medical studies based on the information before it, that conclusion was "directly connected to his disability." *Id.* at ¶ 67. That information was mainly his actions at the quiz reflected in the videotape, his ADHD, and "his corroborated explanation about his prescribed medications and the effect of the new medication on his ADHD symptoms." *Id.*

His ADHD did not, however, render him unfit to continue his medical studies. *Id.* at ¶ 68. In fact, he "is qualified with reasonable accommodation, such as test-taking conditions that eliminate suspicion if his ADHD symptoms are exhibited, that would not impose an undue hardship on Defendants to continue his medical studies and meet Defendants' professionalism standards." *Id.* at ¶ 69. In other words, "[b]ut for his disability and its symptoms Defendants would not have concluded Plaintiff was unprofessional and unfit to continue his studies." *Id.* at ¶ 70.

**G.      Defendant Emerick Limited the Information Mr. Endres Had Before His CAPP Hearing.**

Mr. Endres first met with Defendant Emerick on October 5, 2015, for approximately 15 minutes and was told about the allegations of cheating and the Irregularity Report and shown the videotape. FAC, ¶¶ 71; 72. She did not show him her email to the CAPP Co-Chairs, her opinion that he had "clearly" cheated, or the statistical analysis she performed and its misleading

18

conclusion.  *Id.* at ¶ 72.  No other NEOMED faculty or staff notified Mr. Endres about the accusation.  *Id.* at ¶ 74.

Mr. Endres explained his switch in medications and the effect on his fidgeting and distractions.  *Id.* at ¶ 73.  She asked for a letter from his doctor about the change in medication, and he readily agreed to provide one.  *Id.*

Because he was scheduled to take his first major exam two days later, Mr. Endres wanted to "avoid any further confusion or misinterpretation of his fidgeting and movements caused by distraction," and he asked "to be seated separately where he would not experience any distractions."  *Id.* at ¶¶ 75-78.  He also stopped taking Strattera and returned to Ritalin.  *Id.* at ¶ 78.  NEOMED agreed to that accommodation.  *Id.* at ¶ 79.

On or about October 11, 2015, Mr. Endres emailed Defendant Emerick explaining the physical impossibility of cheating and requesting information about the quiz and student performance.  *Id.* at ¶ 82.  He "reiterated that his new medication Strattera, a non-stimulant, did not suppress his fidgeting and movements when he was distracted, as the previous medication Ritalin had done."  *Id.*  He suggested that a field test would demonstrate the physical impossibility.  *Id.* at ¶ 83.

In response Defendant Emerick mailed on October 12, 2015, that the CAPP Committee "will be provided everything that currently exists, video tests, etc. and it will be up to the members of the committee to identify what they want beyond what is presented to them in your file."  *Id.* at ¶ 84.  She did not expressly address the field test.

Mr. Endres then went to the Student Enrollment Office to review his student file.  *Id.* at ¶ 87.  "There were hundreds of pages in the folder, lacking page numbers, and in no specific order."  *Id.*  The only documents pertinent to the charge of cheating were the emails Defendant

Emerick sent and received on October 2, 2015, referring the case to CAPP, along with the digital answers keys to his and the nearby students' exam.  *Id.* at ¶ 88.  Not seeing the Proctor's report of irregular behavior, Mr. Endres wrote Defendant Emerick about its absence and returned the next day, October 15, 2015, to secure it.  *Id.* at ¶ 89.

Mr. Endres was not shown a devastating statistical analysis prepared by Professor Thewissen and submitted to CAPP that ***erroneously*** concluded "there would be a 0.000036% chance that two students could have six identical wrongs" without cheating.  *Id.* at ¶ 90.  ~~Mr. Endres was not shown~~ An email was sent to CAPP on October 16, 2015, only after Mr. Endres' deadline to review the student file, from an Enrollment Services staff member telling member "to focus solely on [Mr. Endres'] eye movements during the four-timestamped portions of the video. The four timestamps were: 4:50, 14:35, 20:25, and 26:50."  *Id.* at ¶ 91.  Like Professor Thewissen's statistical analysis, that email was misleading: "The video timestamp showed that Student B finished his test and passed behind Plaintiff at 29:15; however, the ExamSoft timestamp showed Student B signed-off from ExamSoft at 34:42."  *Id.* at ¶ 92.  Both the statistical analysis and timestamps focal points were relied on by CAPP even though Mr. Endres did not see them before the initial hearing.  *Id.* at ¶¶ 93; 94.

On October 15, 2015, Mr. Endres met again with Defendant Emerick, for approximately 15 minutes, to review the Student Interview Form he had completed.  *Id.* at ¶ 95. She did not amplify on what evidence had been or would be submitted to CAPP.  *Id.*

### H.     The Anemic CAPP Procedures, As Implemented in Bad Faith by Defendant Emerick, Concealed Misleading Evidence and Robbed Mr. Endres of An Opportunity to Refute that Evidence.

Mr. Endres attended the first CAPP hearing on October 21, 2015, and was excluded from the room while CAPP members and Defendant Emerick discussed the evidence, including the

20

misleading Thewissen analysis, and reviewed the documents.  FAC, ¶¶ 98; 99.  At the first hearing, ***Mr. Endres did not use his disability as an excuse for cheating***.  Besides medical records of his ADHD, medication history, and an evaluation report of his behavior from Dr. Ramos, Mr. Endres presented pictures of the field test he conducted at the Olson Hall, the same location as the exam at issue.  All the evidence demonstrated that Mr. Endres had never cheated.

After he presented the photographs of the field test and explained that he had not cheated, CAPP members did not ask him any questions about the Thewissen analysis or Defendant Emerick's discussion with them.  *Id.* at ¶¶ 100; 101.  She did not talk when he was present, *Id.* at ¶ 111, though she remained while CAPP deliberated and voted.  *Id.* at ¶ 112.

"To prove that it is physically impossible to commit the alleged misconduct, Plaintiff showed the field test he conducted that was a reenactment at the same location with three randomly selected NEOMED students from the nearby library."  *Id.* at ¶ 102.  Students who participated in the field test signed the test results that they "could not clearly see the screen of the neighboring computer screen, even by turning their heads directly towards that computer screen and staring for longer periods of time than Plaintiff had during the Exam."  *Id.* at ¶ 103.  Mr. Endres also explained the ExamSoft zoom-in, zoom-out feature and its distracting color change and flash and his change in medication and its consequences.  *Id.* at ¶¶ 104; 105.

Mr. Endres had not then been provided the answer key for the entire class, but he explained that quiz scores correlated to the number of correctly and incorrectly answered questions; thus, "to compare any students who scored 64 or 72, the normal distribution range of similarity would be between 64% - 92%.  The 84% similarity with Student B is in the middle of the range, which is by no means unique but instead quite common."  *Id.* at ¶ 106.

21

Only after the initial CAPP meeting was Mr. Endres afforded the opportunity to review the entire class scoring, and that review confirmed "that more than 80 out of 160 students had 85% similarity with at least one other student," meaning that Defendant Emerick's emphasized language in her email proved by her misleading analysis that more than half the class had cheated.  *Id.* at ¶ 107.

The CAPP questioning focused on "why he did not apply for accommodation beforehand," and Mr. Endres "explained that he never had the need [for] any type of academic accommodation throughout his education while on Ritalin, which had helped him concentrate and suppress his hyperactivity."  *Id.* at ¶ 108.  He added that the accommodation to be separated from other students that he requested on October 7, 2015, was made after he learned about the videotape and Defendant Emerick's misinterpretation of his movements.  *Id.* at ¶ 109.  He had made that request "just in case he could not tolerate Ritalin and had to stay on Strattera until he could find a nearby physician for his medication adjustment" but "he had switched back to Ritalin for the October 9, 2015 exam."  *Id.*

He told CAPP that, while he knew "Strattera did not suppress his fidgeting or movements caused by distraction," he had never taken a test without Ritalin before and had no reason "to think his fidgeting or any movements caused by distraction would be an issue during an exam or would be misinterpreted in such a way."  *Id.* at ¶ 110.

CAPP found him responsible for misconduct.  *Id.* at ¶ 113.  The only explanation Mr. Endres was given came in an October 22, 2015 email: "After a thorough review of your overall academic record, student file, and our discussion with you, the Committee voted to dismiss you." *Id.* at ¶ 115.  On a Student Progress Report placed without notice to Mr. Endres, there was one

22

line about the CAPP decision: "Preponderance of evidence indicates dishonesty / academic misconduct," followed by the word "Dismiss."  *Id.* at ¶ 116.

CAPP did not even have the requisite quorum at that meeting.  *Id.* at ¶ 117.

**I.      Following the CAPP Decision, Mr. Endres Exercised His Right under CAPP Procedures to Appeal.**

One of the options NEOMED gave Mr. Endres was to "request an appeal if there is significant and compelling new information that was not available for presentation to the CAPP Committee, or if Plaintiff had evidence that there was a defect or irregularity in the CAPP Committee proceedings." FAC, ¶ 119.  A deadline of three working days was set.  *Id.* at ¶ 119.

The NEOMED Student Handbook establishes CAPP Procedures.  Section XI of the Handbook is entitled "CAPP Procedures – Additional Information."   MtD Appx. at 184-85.  Regarding an appeal, Section XI states:

> (5) Opportunity to appeal an adverse decision: When the student meets with the Chief Student Affairs Officer before the CAPP meeting, he or she is informed of all potential actions that could be taken by the committee. The student is also informed of the appeal process to be followed should the CAPP Committee recommend dismissal. CAPP decisions are conveyed to the student within 24 hours after the CAPP meeting by the Chief Student Affairs Officer.   Formal written notification of the decision is sent promptly by the Office of Enrollment services. For cases of dismissal, the timeline for appealing the decision is also included in the notification.

> (6) CAPP Executive Review

> (a) The sole purpose of the CAPP Executive Review Committee is to consider appeals from students who were recommended for dismissal by the CAPP Phase 2 Committee. Such appeals require presentation of "significant and compelling new information that was not available for presentation to the CAPP 2 Committee, or evidence of a defect or irregularity in the CAPP 2 Committee proceeding.

> (b) The appeal process begins when a student is informed of the CAPP 2 decision to recommend dismissal. If the student wishes to appeal, he or

23

she must submit a completed Petition for Executive Review form by noon on the fourth working day following the date of written notification of the decision to dismiss. ***Failure to respond by that deadline is considered a waiver of the right to appeal, and the decision becomes final.***

(c) The Petition for Executive Review form requests the student to document any procedural error(s) or new information that will form the basis of the appeal. The Executive Review Committee is obliged to conduct the appeal within ten working days of receipt of the Petition for Executive Review form.

(d) As is the case when a student is invited to meet with the CAPP 2 Committee, the student has the right to be accompanied at the appeal hearing by an advisor of the student's choosing, who may be a member of the faculty, staff or student body, but may not be a blood relative or attorney. The student has the opportunity to present and elaborate on the information outlined in the Petition for Executive Review. The Executive Review Committee will also have access to the original Phase 2 Committee recommendation, the official student file and any other information relevant to the appeal.

(e)  The student must be informed in writing of the Executive Review Committee's decision within seven working days of the meeting.  If the Executive Review Committee denies the appeal, ***the original decision to dismiss becomes final*** and is not subject to further appeal.  If the appeal is upheld, the decision is referred back to the CAPP Phase 2 Committee for reconsideration.

*Id.* at 185 (emphases added).  Thus, the CAPP decision before appeal does not become final until either a student fails to timely appeal or the Executive Review Committee ("ERC") denies the appeal.  Neither event occurred.  The appeal was upheld in part and the initial CAPP decision was referred back to CAPP for reconsideration.

Confirming this understanding, the Student Handbook lists under the heading "Interruptions of Education" section (B), "Curricular Interruption," and subsection (4)(a): "All students who have been dismissed by CAPP are considered enrolled up to the date of the dismissal decision. ***If the student appeals this decision, and the appeal is granted, the student is***

24

*considered enrolled up to the date of the final CAPP decision*."  MtD Appx. at 35-36 (emphasis added).

The Student Handbook's description of CAPP under its own heading further confirms the point in (9)(b)1. on the outcome: "If the petition to appeal is not granted, the action/decision of CAPP Phase 2 stands and is final, a dismissal will appear on the official transcript[.]"  MtD Appx. at 69.

**J.** **After the CAPP Hearing, Defendant Emerick Disclosed Some Evidence CAPP Relied Upon, But NEOMED Stonewalled Public Records Request about the Evidence.**

Neither CAPP nor NEOMED's letter listing his options explained what evidence fueled the dismissal decision.  FAC, ¶ 122.  On October 23, 2015, Defendant Emerick finally told Mr. Endres about the Thewissen statistical analysis.  *Id.* at ¶ 123.  "Defendant Emerick disclosed that the evidence the CAPP Committee had relied on in reaching a decision was (i) the Thewissen Analysis, and (ii) Defendant Emerick's verbal interpretation of the Exam's video recording."  *Id.* at ¶ 124.  She added that CAPP "did not believe Plaintiff's saccadic eye movements were manifestations of his ADHD[.]"  *Id.*  Neither Defendant Emerick nor any CAPP member at the initial hearing was a physician, psychiatrist, psychologist, or certified counselor specializing in ADHD.  *Id.*

At their post-hearing meeting, Defendant Emerick pressed Mr. Endres on "why he did not stop glancing over to Student B's computer screen if he could not see the answers. Defendant Emerick also stated it was the opinion of the CAPP committee that when people got distracted, they would look over initially but would stop and not 'continue' to look over to a neighboring student's computer screen. She also reasoned that if Plaintiff continued to look over at a

25

neighboring screen due to a bothersome distraction, he should have used his right hand to shield his eyes from the distraction." *Id.* at ¶ 125.

On October 23, 2015, Mr. Endres requested public records essential to his defense: (i) "the Student Performance Report for the entire HDS class showing each individual score and digital answer key data, (ii) Thewissen's Probability Analysis; and (iii) timestamp reports associated with student test responses, in order to show the time in which Plaintiff and Student B, each completed the identically and incorrectly answered questions." *Id.* at ¶ 129.  Incredibly, NEOMED's initial response on October 26, 2015, to the request was that an answer key did not exist and no timestamp reports had been created, even though CAPP had earlier been told information that could only have come from an answer key and timestamp reports.  *Id.* at ¶ 130.

The same day Mr. Endres again requested that NEOMED conduct a "field test in order to conclusively prove that it was physically impossible to commit the misconduct he was accused of by doing the same quick side-glances seen in the video toward Student B's computer screen." *Id.* at ¶ 131.  The director of the Media Department, Mr. Ray Notareschi, who also supervised Mr. Endres on a part-time job at NEOMED, "was ready and willing to set up and record the field test, participate as a tester, and operate the video camera using the exact same angles that the proctor used."  *Id.*  NEOMED rejected that request, mandating "that NEOMED staff is not to participate in the open field test conducted by" Mr. Endres, and "he could only use the location, but he was not allowed to use the same video equipment and camera at Olson Hall, and the Media Department was prohibited from setting up and recording the field test."  *Id.* at ¶ 132.

As for the Thewissen statistical analysis, NEOMED responded that it was only verbally presented to CAPP.  *Id.* at ¶ 133.  No record of the hearing had been made by CAPP, and students are not permitted to record a CAPP hearing.  *Id.*

26

Facing these barriers, Mr. Endres realized that the deadline – October 27, 2015 -- for submitting substantive evidence was too short for him to meet. *Id.* at ¶¶ 134; 136. He met on October 26, 2015, with Dr. Elizabeth Young, the Vice Dean of NEOMED School of Medicine, and received a one day extension. *Id.* at ¶ 135.

Finally, at 3:21 p.m. on October 27, 2015, NEOMED produced "the answer key and score of the HDS's class for the Exam, the timestamps of his answer key and Student B's, and the Thewissen Analysis." *Id.* at ¶ 136. Mr. Endres did not receive this information until five business hours before his appeal deadline. The interval until the next day at noon deprived Mr. Endres of "a meaningful time to review and address the evidence." *Id.*

Nevertheless, Mr. Endres petitioned ERC and presented "(1) Hundreds of cases based on the actual class data prov[ing] Thewissen's probability analysis was flawed and Emerick's similarity was meaningless. (2) Signatures collected from a survey that it is not possible to get answers from the computer screen of next seat by simply glancing-over. The survey was conducted during the five minutes break in between classes of that morning. All students who took the survey also took the same HDS quiz, at the same time and location. (3) A psychological evaluation completed by a psychiatrist who specializes in ADHD, Dr. Andrew A. Trauben, M.D., wherein Dr. Trauben reviewed the video and met with Plaintiff in person to evaluate his ADHD symptoms (the "Psychological Evaluation"). The psychologist attested to the fact that the video recording was consistent with the symptoms and manifestations of ADHD." *Id.* at ¶ 137. Information he later secured was refused by ERC as tardy. *Id.* at ¶ 138.

**K.** **At the ERC Hearing on His Appeal, Mr. Endres Was Denied Sufficient Process, Including the Acceptance of a Reliable Statistical Analysis.**

27

The ERC convened on November 2, 2015.  FAC, ¶ 139.  Defendant Emerick refused to allow Mr. Endres to submit the statistical analysis he had prepared to expose how misleading the Thewissen analysis had been.  *Id.* at ¶ 140.  (Appendix A) She "cited a rule from the CAPP Procedures that no evidence from Plaintiff would be accepted and allowed to be on record after October 28, 2015." *Id.*  He was permitted to speak about the flaws in the Thewissen analysis, *see Id.* at ¶ 143, but his report was neither on record nor read by CAPP before its final hearing on November 18, 2015.  *Id.* at ¶ 141.   He also noted that the videotape timestamps did not sync with the ExamSoft ones.  *Id.* at ¶ 144.

He was not permitted to be in the ERC hearing before or after his testimony or to hear and respond to what Defendant Emerick said to ERC or members said during their deliberations while she remained.  *Id.* at ¶¶ 142; 145.

ERC granted a rehearing limited to Dr. Trauben's evaluation report.  *Id.* at ¶ 146.  Mr. Endres would not be permitted to submit additional evidence at the final CAPP hearing.  *Id.*  His report on the Thewissen Analysis was to be excluded.  *Id.* at ¶ 147.  "The ERC deemed Plaintiff's report – which contained hundreds of cases based on the actual Exam data – as unsubstantial. In contrast, the Thewissen Analysis was based on only one comparison, but was used as the key evidence to support the accusation and the Decision." *Id.* at ¶ 148.  Professor Thewissen also refused Mr. Endres' entreaty to correct his statistical analysis.  *Id.* at ¶ 149.  NEOMED refused to include a statement in the record that the Thewissen statistical analysis had been misleading.  *Id.* at ¶ 153.

The grounds for the ERC decision were given in the Student Progress Report: "1 – statistics: not new, not compelling; 2 – survey of students: not compelling; 3 – psych eval: compelling."   The order was: "Remand back to CAPP2 for consideration in context."

28

**L.     At the ERC Appeal and CAPP Final Hearing Mr. Endres Was Again Denied Sufficient Process, Including Disclosure of a Misleading Rendition by Defendant Emerick of Her Conversations with His Treating Physician and an Expert.**

The CAPP final hearing was held on November 18, 2015.  FAC, ¶ 157.  The day before Mr. Endres had requested that CAPP invite Dr. Trauben to attend, and CAPP agreed to call him around 2:00 p.m. to both testify and respond to questions.  *Id.* at ¶ 154.

In the morning of November 18, 2015, NEOMED's legal counsel issued a limiting instruction to CAPP: "Please be advised that during our deliberations today, the Committee should accord no weight to any statement made or documents presented during the initial hearing in [Mr. Endres'] CAPP case that recounted any statistical analysis performed on his test answers. Consistent with disregarding any statements made or documents presented about any statistical analysis, the committee is to likewise accord no weight to any documents set forth by [Mr. Endres] throughout his appeal that include any statistical analysis of his test answers. While these documents were included in the record received by the Committee in advance of today's meeting, they should not be considered during our review of this matter today, or in making a decision." *Id.* at ¶ 157.  In fact, apart from Professor Thewissen and Defendant Emerick, no member of CAPP had been provided those documents. *Id.* at ¶ 158.

Less than two hours before the final CAPP hearing, NEOMED emailed Mr. Endres that it was not allowed to accept or distribute any material from him. *Id.* at ¶ 160.  His reliable statistical analysis and a recorded field test were thus excluded, *see* Appendix A hereto, as well as much of what he wanted to present orally.  *Id.* at ¶¶ 160; 162.  As before, he was not allowed in the hearing room when Defendant Emerick presented evidence and argument and otherwise did not hear what had been presented and discussed in his absence. *Id.* at ¶ 161.

29

Dr. Trauben was called 55 minutes late and corroborated Mr. Endres explanation about ADHD and its symptoms.  *Id.* at ¶ 163.  CAPP members questioned only his credentials and qualification to write his report, while Defendant Emerick asked no questions and made no comments during the telephone call.  *Id.* at ¶¶ 163; 164.  Dr. Trauben was not privy to any portion of the meeting other than his own testimony.  *Id.* at ¶ 167.

On November 19, 2015, Mr. Endres received a letter of his dismissal. There was only one word on the line for CAPP Final Vote and Decision of the CAPP's Student Progress Report for final hearing: "Dismiss."  *Id.* at ¶ 165.  Nothing was said about the evidence CAPP had relied upon.  *Id.*

The next day Mr. Endres secured a hard copy of his student file and was amazed to see a memorandum purportedly drafted by Defendant Emerick on November 2, 2015.  *Id.* at ¶ 168.  He had never seen the memorandum before, and it had not been in the electronic copy of his ~~official~~ digital student file provided to him by NEOMED on November 11, 2015.  *Id.*  It was the first page of the hard copy.  *Id.*

The memorandum falsely summarized Defendant Emerick's conversations with Mr. Endres' treating physician, Dr. Ramos, and one of his experts, Dr. Trauben.  *Id.* at ¶ 169.  It was a hit-job on their opinions that the behavior in the videotape was a manifestation of Mr. Endres' ADHD.  *Id.*  Dr. Trauben had not been asked about what Defendant Emerick represented in the memorandum that he had confided to her.  *Id.*  Both doctors have submitted signed affidavits that her rendition of their conversations was false, misleading, or taken out of context.  *Id.* at ¶ 170. They specified material misrepresentations.

Dr. Trauben never told Defendant Emerick that he believed they were acting under the standard of beyond a reasonable doubt after she told him the level of evidence in these types of

30

hearings is a "preponderance of evidence." *Id.* at 172. Dr. Trauben never conveyed to Defendant Emerick that his analysis of Mr. Endres or the opinion he rendered was compromised because of the timeframe in which it was completed. Dr. Ramos never told Defendant Emerick that she simply prepared her report based upon the materials Mr. Endres' parents sent her via jump drive. She stated in her affidavit that Defendant Emerick's statement is completely false. *Id.* at ¶¶ 171-77.

Defendant Emerick also lied to Dr. Ramos, telling her that Mr. Endres blamed Dr. Ramos for switching the medication, in order to elicit a response from Dr. Ramos that would damage Mr. Endres' credibility. *Id.* at ¶ 178. For the same reason, Defendant Emerick falsely told Dr. Ramos that Mr. Endres ignored her recommendation to request a seating accommodation. In fact, Mr. Endres requested a temporary accommodation to be seated away from other students the day after he was first notified of the allegation by Defendant Emerick *Id.* at ¶ 179.

Defendant Emerick's memorandum was considered, either as a document or through her oral report of its contents, by CAPP at the final hearing, yet Mr. Endres was never afforded an opportunity to refute it. *Id.* at ¶ 181. The memorandum or its contents poisoned the CAPP final hearing. *Id.* at ¶ 182.

### M. Mr. Endres' Treating Physician and Experts Corroborated His Changed Medication and ADHD Symptoms.

On October 13, 2015, Dr. Ramos sent Defendant Emerick a letter explaining his ADHD, providing medical records detailing his adjustment in medication between April 2015 and August 2015, and opining that the videotape reflected ADHD symptoms. FAC, ¶ 85. Dr. Ramos requested CAPP consider his adjustment to new medication. *Id.* at ¶ 86. Dr. Andrew A. Trauben, M.D., a board-certified psychiatrist who specializes in teenager and adult ADHD, and

31

Dr. Scott Kollins, the Duke ADHD Program Director and Professor of Duke Psychiatry & Behavioral Science Department of Duke University, School of Medicine, both confirmed in written reports that "Mr. (Endres') behavior during the exam as reviewed on the video is consistent with someone with ADHD. His motor behavior and *frequent visual distractions are common for patient with ADHD, especially under condition that are cognitively demanding*" *Id.* at ¶¶ 126-27 (emphasis noted).

Yet CAPP, consisting of individuals who lacked significant knowledge about ADHD, were informed by Defendant Emerick, another individual without significant knowledge about ADHD; did not secure any NEOMED or other expert to address the information and opinions of Mr. Endres' treating physician and experts; and failed to formally assess whether the behavior on the videotape was a product of ADHD.  *Id.* at ¶ 128.

**N.  The NEOMED Expectations of Student Conduct and Professional Commitment 2015-16 Did Not Contain a Waiver of Mr. Endres' Constitutional Right to Procedural Due Process.**

On August 31, 2015, Mr. Endres signed the "NEOMED EXPECTATIONS OF STUDENT CONDUCT AND PROFESSIONAL COMMITMENT 2015-16," MtD Appx. at 190-92, which stated in an italicized preface:

> Northeast Ohio Medical University (NEOMED) students are expected to read, understand, sign and abide by the "Expectations of Student Conduct and Professional Commitment" while enrolled and involved in NEOMED, its partner institutions and hospitals, and NEOMED-sponsored activities.  Failure to do so may result in referral and review by either the Committee on Academic and Professional Progress (CAPP) or Student Conduct procedures.

Contrary to Defendants' intimation that two airtight spheres, one for disciplinary and another for academic and professional matters, existed, the NEOMED Expectations combined the spheres.

32

Thus, the body of the NEOMED Expectations began with Part "I.  Student Conduct Code," and stated: "Violations of the Student Conduct Code may result in disciplinary action and subsequent sanctions which may include, but are not limited to probation, suspension, dismissal or other sanctions addressing the behavioral issue." *Id.* at 190.  All violations were, therefore, potentially disciplinary ones.

The next paragraphs were headed, "Definitions of Student Misconduct," and began in Section A.1 with "Academic Misconduct" defined as "Cheating (use of unauthorized assistance, submitting substantially the same work that has been submitted for another course, use of a prohibited source, inappropriate acquisition or distribution of academic materials or engaging in any behavior specifically prohibited by a faculty member)." *Id.*  No specific definition was given under cheating for stealing quiz answers from another student's computer screen, though another portion of the Student Handbook is quoted below on copying answers.

Next came "Behavioral Misconduct" which Section B illustrated, including in B.15. "Failure to exemplify those professional commitments to which students should aspire." *Id.* at 191.  Section C illustrated "Criminal misconduct." *Id.*  Part II is headed "Professional Commitments to Which Students Should Aspire." *Id*. at 191-92.

Above the signature line was the bold-faced sentence: **"Signature of the 'Expectations of Student Conduct and Professional Commitment" constitutes an understanding of these expectations and an agreement to abide by the expectations herein."**  Nowhere in this portion or the rest of the NEOMED Expectations is there any reference to "waiver"; "constitutional rights"; "discretion"; or "procedural due process."  Defendants rely for their waiver argument on the "may result" and "either" language in the preface.

33

The Student Handbook, which NEOMED Expectations want the student to read and comprehend, lists in XI. CAPP Procedures, MtD Appx. at 184, and states that notification of a CAPP initiation will come from listed administrators.  Nothing is stated there about the administrative choice to use CAPP Procedures rather than disciplinary ones.

Earlier in the Student Handbook, under the heading of "Student Conduct,  Administration of Student Conduct," "Body of Policy," (B)(5) provides: "As the recipient of all Complaints alleging student misconduct, the Chief Student Affairs Officer will work in collaboration with the Director of Enrollment Services and Registrar, and, if necessary, the associate dean for Academic Affairs of the student's college to make the initial determination as to whether the matters alleged in the Complaint are best resolved through the formal disciplinary process contained in this policy or by way of a referral to the Committee on Academic and Professional Progress (CAPP) or some other mechanism such as counseling or mediation."  *Id.* at 107.  No criteria for that initial determination or other procedure for making it are provided.  Nor is there any reference to "waiver"; "constitutional rights"; or "procedural due process."  Notably, the one party omitted from the determination chain is CAPP Chair, from whom Defendant Emerick sought feedback on the initial determination.

Relative to the cheating NEOMED accused and convicted Mr. Endres of committing, the Student Handbook section entitled "Examination Guidelines & Procedures," included in (C)(28) that proctors would document and report incidents of irregular behavior.  Subsection (d) is "Copying answers."  MtD Appx. at 28-31.

Under the heading, "Proctoring," the Student Handbook at (A)(8) explains that Proctors observe examinees to ensure that "Examinees are not looking at other students' examinations papers or computers."  MtD Appx. at 42-43.

34

The province of CAPP is detailed under a heading with its name, and in (A)(1)(a) its purposes are described: "(i) Evaluate academic performance and assess intellectual readiness[;] (ii) Review unprofessional behavior concerns[; and] (iii) Evaluate requests for Leave of Absences[.]" MtD Appx. at 64-65. The overall description is in (b): "CAPP enforces specific guidelines for academic advancement, while at the same time providing due process and an individual review of each student's particular situation based on CAPP Academic Guidelines." *Id.*

The CAPP approach is that "[e]ach student is considered individually, on a case-by-case basis and the student's entire record is evaluated." *Id.* Its means are explained: "A strong student support system is the underlying foundation of CAPP. Student Affairs and Enrollment Services staff strives to work with students in a proactive and sensitive manner to provide early intervention, enabling the student to make necessary changes and increase his/her chances of success in the curriculum." *Id.*

Under (2)(b), CAPP jurisdiction is broad: "Students may be referred to CAPP for review of their records for any of the following reasons: (i) Academic performance[;] (ii) Professional behavior[; and] (iii) Exceeding the maximum length of study (six years within a single college including leaves of absences)." MtD Appx. at 69-70. The "CAPP Standards for Unsatisfactory Performance and Academic Action" in (C)(1) indicate, though, that its main focus is on performance and highlights the omission at any CAPP or ERC hearing of discussion regarding Mr. Endres' capability, apart from the cheating, to succeed academically: "(a) Students may be referred to CAPP for review as a result of unsatisfactory performance including: 1. Course failure[;] a. Single year performance[;] b. Aggregate performance[;] i. Course requirements[;] ii. Graduation requirements[; or] iii. Matriculation requirements[.]" *Id.*

35

In (C)(2)-(4), the Student Handbook discussed remediation of repeating and passing courses and graduation requirements. *Id.* Listed separately under 5. is "Unprofessional behavioral misconduct." *Id.*

## IV. Argument

### A. Mr. Endres' Claims Accrued When a Final and Official Dismissal Decision Was Made and Communicated to Him.

The accrual date for Mr. Endres' claim -- "when the statute of limitations begins to run, that is, when the cause of action accrues" – is governed by federal law. *Dixon v. Anderson,* 928 F.2d 212, 215 (6th Cir. 1991). The limitation period is triggered "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir. 1984)). In other words, "what event should have alerted the typical lay person to protect his or her rights." *Id.* (citing *Conlin v. Blanchard,* 890 F.2d 811, 815 (6th Cir. 1989)).

That accrual date was when NEOMED reached a "definitive conclusion" to dismiss Mr. Endres. *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1419 (3rd Cir. 1991) (*en banc*). When an individual "receives unequivocal notice of the adverse . . . decision," the statute of limitations starts running. *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1100 n. 19 (11th Cir. 1996).

To avoid using the date when the NEOMED dismissal decision was final after Mr. Endres' successful appeal, Defendants cite *Delaware State College v. Ricks,* 449 U.S. 250, 261 (1980) (emphasis in original), for the proposition that "[t]he grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made[.]" That language concerned a far different process than the one at NEOMED: the "prior decision" in *Ricks* was denial of tenure, and the grievance procedure was an opportunity to have that denial

36

reversed. At NEOMED the process was explicit: the "prior decision" of the first CAPP hearing **never became final**, instead it was replaced upon remand from ERC for reconsideration.

Mr. Endres remained a student in good standing until the CAPP decision after remand. His property and liberty interests were deprived and the adverse decision made when he was dismissed, even though he had also been denied a fair process and misapprehension about his disability infected the process along the way.

By granting, at least in part, his appeal and remanding for reconsideration, NEOMED arguably cured earlier procedural deprivations and disability discrimination, rendering the initial CAPP decision background and only the final CAPP decision the accrual event. *See, e.g., Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601 (S.D. Ohio 2016) ("The Court concludes that to the extent that Plaintiffs base their due process claims on alleged defects in their first hearings, those alleged errors were harmless because their appeals were sustained and they both received new hearings."), *aff'd, Doe v. Cummins*, 662 Fed. Appx. 437, 447 (6th Cir. 2016) ("[A]lthough both Doe I and Doe II allege that numerous procedural deficiencies existed in their first ARC hearings, those defects were cured by UC's decision to grant their appeals, vacate the finding of responsibility, and provide each a second hearing."). Because NEOMED never informed CAPP about the video, photographs, and reliable statistical analysis in Appendix A, the earlier deprivations and discrimination were not actually cured, but the final CAPP decision remains the accrual event.

A separate distinction is that *Ricks* did not involve a challenge to the grievance process itself, 449 U.S. at 257–58, n. 8, whereas Mr. Endres has alleged a deprivation of due process and disability discrimination by CAPP, ERC, and Defendant Emerick at both the first and second appeals and during the appeal. *See also Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) ("There

37

were no other allegations, either in *Ricks* or in these cases, of illegal acts subsequent to the date on which the decisions to terminate were made.") (*per curiam*).

"***A claim that the grievance process itself resulted in an injury, however, necessarily cannot accrue until the completion of that process.***"  *JiQiang Xu v. Michigan State Univ.*, 195 Fed. Appx. 452, 456–57 (6th Cir. 2006) (emphasis noted) (citing *Kelly v. Burks,* 415 F.3d 558, 561 (6th Cir. 2005)).

*Ricks* focused on an allegedly discriminatory denial of tenure and sought to use the end of a terminal year which was granted a professor after denial of tenure as the accrual date.  490 U.S. at 257.  Rejecting that effort, *Ricks* distinguished "one of the *effects* of the denial of tenure–the eventual loss of a teaching position—"from the tenure denial.  *Id.* at 258.

The holding in *Ricks* was that accrual occurs when a final decision is made and communicated.  449 U.S. at 258 ("alleged discrimination occur[s]—and the filing limitations periods therefore commence[s]—at the time the tenure decision was made and communicated to [the plaintiff]").

There, "the Board of Trustees had made clear well before September 12 that it had formally rejected Ricks' tenure bid. The June 26 letter itself characterized that as the Board's 'official position.'"  *Id.* at 261.  *Accord Chardon*, 454 U.S. at 8 ("[R]espondents were notified, when they received their letters, that a final decision had been made to terminate their appointments.").

The availability of a grievance process did not change that date because "entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative."  *Id.*  This comported with labor relations law that pursuing a grievance did not change the accrual date of a claim about the decision or action being grieved.  *Id.* (citing

*Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976)).  Similarly, Defendants cite a case where the availability of some alternative position did not change the date the employee received final and unequivocal notice of the allegedly discriminatory discharge.  *Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir. 1987) ("Plaintiff's seeking a new position within the company before his last day of work ended did not toll the period of limitations.").

The reason *Ricks* distinguished the grievance from the original decision was that "[t]he existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made." *Id.*  When the decision was made and communicated more closely parallels Mr. Endres' treatment at NEOMED.  The accrual date of June 26, 1974, was used in *Ricks* because "[b]y June 26, the tenure committee had twice recommended that Ricks not receive tenure; the Faculty Senate had voted to support the tenure committee's recommendation; and the Board of Trustees formally had voted to deny Ricks tenure."  *Id.* at 262 (footnote omitted).  "In light of this unbroken array of negative decisions, the District Court was justified in concluding that the College had established its official position–and made that position apparent to Ricks–no later than June 26, 1974."  *Id.* (footnote omitted).

The internal process at Delaware State College had several tiers, just as the one at NEOMED, and the use of the term "appeal" at NEOMED does not equate to the use of the term "grievance" in *Ricks*.  *See also Harris v. Ladner*, 127 F.3d 1121, 1125 (D.C. Cir. 1997) ("[T]he reconsideration may have been a continuation of the original application process [rather than "collateral review" as in *Ricks*].").

The communication to Professor Ricks on June 26, 1074, was a letter from the College President that the Trustees had earlier "officially endorsed" the Faculty Senate recommendations,

39

and, rather than await the outcome of the grievance process, the Board was using the letter to "notify you of its intent not to renew your contract at the end of the 1974–75 school year." *Id.* at 254 n.2. At NEOMED the parallel communication was telling Mr. Endres of the dismissal decision after remand from ERC and upon reconsideration by CAPP. *See also Datto v. Harrison*, 664 F. Supp. 2d 472, 485 (E.D. Pa. 2009) ("This language is not equivocal. It describes a completed decision to dismiss the plaintiff and describes his current status as 'officially dismissed.'").

*Ricks* was precise: "The application of the general principles discussed herein necessarily must be made on a case–by–case basis." 449 U.S. at 257-58 n. 9. In applying the holding in *Ricks* about a grievance to the appeal process at NEOMED Defendants are imprecise. Mr. Endres was not making a "[m]ere request to reconsider," as Professor Ricks was. *Id.* at 261, n. 15. He was pursuing NEOMED's own procedures for reaching a final and official decision.

The statute of limitations for a § 1983 action arising in Ohio is two years. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989) (*en banc*)). The same period applies to the Americans with Disabilities Act and the Rehabilitation Act. Mr. Endres commenced this action within two years of receiving final, official notice that he had been dismissed on November 18, 2015. He timely filed.

At a minimum, "because it is not clear from the pleadings alone that plaintiff's . . . claim is time-barred, dismissal at this stage would be inappropriate." *Doe v. The College of Wooster*, No. 5:16-CV-979, 2018 WL 838630, at *5 (N.D. Ohio Feb. 13, 2018) (citing *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (Rule 12(b)(6) "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations") (citation omitted)).

40

**B.** **By October 2015, the Law Was Clearly Established that the Fourteenth Amendment Due Process Clause Required a State Graduate Student Facing a Disciplinary Cheating Charge Be Afforded a Robust Process Before Being Dismissed.**

A public official is entitled to qualified immunity shielding her from damages if her conduct does not violate a clearly established constitutional right of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The contours of the right must be sufficiently clear that a reasonable official would understand that what she was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The official, however, is only entitled to qualified immunity for actions taken in objective good faith within the scope of her duties. *Id.* at 819 n. 34. Defendant Emerick's bad faith allegedly permeates her conduct at bar.

A two-step inquiry is used. First, the Court must determine, judged in the light most favorable to the party asserting the injury, whether the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional right would have been violated on the facts alleged, the inquiry stops and the official will be entitled to qualified immunity. *Id.* If a violation can be made out based on a favorable view of the pleadings, the Court must then determine whether the right at stake was clearly established. *Id.*

A case on all fours is not required to demonstrate that the law had been clearly established. *See, e.g., Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011) (absent binding authority, a "robust 'consensus of cases of persuasive authority'" suffices) (quoting *Wilson v. Layne,* 526 U.S. 603, 617 (1999)). While the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier,* 533 U.S. at 201, "officials can still be on

41

notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).

Courts consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201. "[I]n [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful[.]" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal quotation marks and alteration omitted)).

The determinative inquiry is not whether a college administrator had ever been liable for damages because she chose an anemic process over a robust one or failed to implement even the anemic process, but rather whether any reasonably competent college administrator would have known by October 2015 that an anemic process may not be used, consistently with the Due Process Clause, to adjudicate a charge of cheating or copying answers by a state graduate student. *See Anderson*, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... [but] in the light of pre-existing law the unlawfulness must be apparent.").

"If the court can find, 'on a favorable view of the [plaintiff's] submissions,' a violation of a constitution[al] right, the next step in *Saucier's* sequential analysis is to determine if the right was clearly established." *Leonard v. Robinson,* 477 F.3d 347, 354–55 (6th Cir. 2007) (quoting *Saucier,* 533 U.S. at 194). "The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury,* 567 F.3d 302, 313 (6th Cir. 2009). "'[I]n an obvious case, general standards can clearly establish the answer, even without a body of relevant case law.'"

*Sample v. Bailey,* 409 F.3d 689, 699 (6th Cir. 2005) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004)).  *Accord United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 485 (6th Cir. 2014).

By October 2015, every competent official would have known that the Due Process Clause of the Fourteenth Amendment prohibits States from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  The elements of Mr. Endres' claim are that a state entity, NEOMED, deprived him of protected interests, his graduate student medical studies, chosen career, and unblemished reputation, without adequate notice and a meaningful opportunity to be heard.  *Goss v. Lopez,* 419 U.S. 565, 579 (1975); *Albrecht v. Treon,* 617 F.3d 890, 894 (6th Cir. 2010).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Procedural due process is "implicated by higher education disciplinary decisions." *Flaim*, 418 F.3d at 633.  *Accord Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).

A long line of cases has assumed both a property interest in the contractual relationship between a college and a student and a liberty interest in allegations that impugn a student's reputation and integrity have been assumed.  *Univ. of Cincinnati*, 872 F.3d at 399 ("State universities must afford students minimum due process protections before issuing significant disciplinary decisions.").  *Accord Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at *14 (6th Cir. Feb. 9, 2018); *Doe v. Cummins*, 662 Fed. Appx. 437, 445 (6th Cir. 2016) ("We have recognized that these [due process] protections apply to higher education disciplinary decisions.").

43

In her motion to dismiss, Defendant Emerick challenges the third element, arguing that NEOMED had given her the right to choose between robust disciplinary procedures and the anemic procedures of the academic and professionalism committee for adjudication of the charge that Mr. Endres had cheated at the quiz, copying answers from another student's computer screen and that no clearly established law prevented her from choosing the anemic over the robust.

### 1.     NEOMED's Procedures, Including its Choice to Use CAPP, Do Not Establish the Process Due under the Fourteenth Amendment.

Defendant Emerick's argument obscures the source of law on an adequate process. "[T]he Constitution—and the case law interpreting it—mandates what procedures are constitutionally required following the deprivation of a property or liberty interest, and not internal school rules or policies[.]" Cummins, 662 Fed. Appx. at 445 n. 2.  While NEOMED's Student Handbook and its Expectations may be a source of Mr. Endres' property interest, he is not required to take the "bitter" of its procedures with the "sweet" of its anchor.

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540 (1985), flatly rejected the argument that the statutory procedures for a termination control the Fourteenth Amendment analysis.  The Court traced confusion to the plurality opinion in *Arnett v. Kennedy,* 416 U.S. 134, 152-54 (1974): "[W]here the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet."

Six Justices had rejected that portion of the plurality opinion.  *Loudermill*, 470 U.S. at 540.  Since then, "the Court has clearly rejected" that theory.  *Id.  Vitek v. Jones,* 445 U.S. 480, 491 (1980), held that "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem

44

adequate for determining the preconditions to adverse official action."   Then, *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432 (1982), reversed a lower court's holding that, because the entitlement arose from a state statute, the legislature had the prerogative to define the procedures to be followed to protect that entitlement.

*Loudermill*, 470 U.S. at 540, was unrelenting on this point: "In light of these holdings, it is settled that the 'bitter with the sweet' approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today."  The Court then confirmed the law: "The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology." *Id.*  Federal constitutional law decides what process is due.  *Id.*

Even if NEOMED bestowed on Defendant Emerick the unfettered discretion to choose between anemic CAPP procedures and robust disciplinary ones, she would still be liable for depriving a student of the process guaranteed by the Fourteenth Amendment.  What has been clearly established for all these years is that she had no constitutional right to choose a constitutionally deficient process.

> **2.      Labeling an Accusation of Cheating or Copying Answers an Academic or Professionalism Matter Does Not Convert the Accusation from a Disciplinary One.**

"The type of notice and hearing will vary and be judged for sufficiency based on context in which the dispute arose."  *Flaim*, 418 F.3d at 634.  Defendant Emerick fastens on the dichotomy between disciplinary and academic or professional matters recognized in *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 87 n.4  (1978) ("There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals.").

There, a medical school student was expelled for being unprofessional: she "lacked a critical concern for personal hygiene" and was untimely in her performance.  *Id.* at 81.  The Court held that "far less stringent procedural requirements" apply to an "academic" dismissal rather than a disciplinary one.  *Id.* at 86.  There was a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct."  *Id.*

Professionalism and fitness are "academic evaluations," *Al–Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 360 (6th Cir.), *cert. denied*, 135 S.Ct. 2817 (2015); exhibiting ADHD symptoms and being falsely accused of cheating and copying answers are palpably distinguishable.  Cheating or copying answers is "conduct that could have been the subject of a disciplinary proceeding" and "[t]hus, there is merit in Keefe's contention that procedural due process required more than the 'careful and deliberate' decision-making *Horowitz* mandates for a strictly academic decision."  *Keefe v. Adams*, 840 F.3d 523, 534 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 1448 (2017) (nursing college).

Unlike the student in *Al–Dabagh*, Plaintiff was accused of ***a single incident*** of cheating. *See also Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1006-07 (E.D. Mich. 2017), *appeal dism.*, No. 17-1784, 2017 WL 6569599 (6th Cir. Dec. 15, 2017) ("Plaintiff received warnings about his failure to take make-up exams promptly and recommendations to seek regular medical care from a specialist to avoid continued absences. * * * He similarly received several hearings during his time at the medical school regarding the multiple allegations of unprofessional conduct.  * * * Plaintiff failed exams after receiving accommodations in December 2014, repeatedly missed make-up exams scheduled specifically for him, failed to take exams in a timely fashion, and submitted a forged police report to the school to substantiate an absence.")

(academic dismissal); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 227 (1985) ("Before failing the NBME Part I, Ewing accumulated an unenviable academic record characterized by low grades, seven incompletes, and several terms during which he was on an irregular or reduced course load.").

Defendant Emerick's channeling of the accusation to an anemic academic and professional process, rather than a robust disciplinary process, must not stand because colleges should not be afforded the simple expedient of characterizing disciplinary matters, to which robust procedural due process applies, as academic misconduct, to which anemic process suffices.

*Al-Dabagh*, 777 F.3d at 361, recognized this danger: "As for the danger that an expansive view of professionalism might forgive, or provide a cloak for, arbitrary or discriminatory behavior, we see no such problem here. Nothing in the record suggests that the university had impermissible motives or acted in bad faith in this instance. And nothing in our deferential standard prevents us from invalidating genuinely objectionable actions when they occur."  On a motion to dismiss, the record regarding Defendant Emerick's perfidious actions must be recognized as presenting just such a danger.

Mr. Endres alleges that Defendant Emerick acted in bad faith, purposely ignoring exculpatory evidence, distorting the record, feeding CAPP and ERC misinformation, and constructing a moving-target for him.  Mr. Endres understands that an objective, reasonable person-standard, rather than a subjective one, is used for determining qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982) ("bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery").  *Accord Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("Under that

47

[*Harlow*] standard, a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated.  Evidence concerning the defendant's subjective intent is simply irrelevant to that defense.").

Her bad faith supports his argument, however, that merely complying with NEOMED's process in choosing the academic/professional process does not determine whether sufficient due process has been afforded a student charged with stealing answers.  Even if Defendant Emerick had complied with the NEOMED's process, which as detailed above she did not, the danger of mischaracterization in bad faith remains.

Mr. Endres is not arguing that "[t]he mere fact that the [his] conduct carried both disciplinary and academic implications does not, without more, transform the character of [the college's] action or support the inference that the college used its academic decisionmaking power as a back door to achieve disciplinary goals."  *Hennessy v. City of Melrose*, 194 F.3d 237, 251 (1st Cir. 1999) (footnote omitted).  He is, however, submitting that the totality of the circumstances demonstrate that Defendant Emerick improperly used the "back door."

As the scope and means of CAPP indicate, its process is mainly concerned with the academic progress of students and their professionalism.  Obviously, exhibiting symptoms of ADHD cannot be found unprofessional.  Cheating by copying answers from another student's computer screen was alleged, and the accusation reeks of a disciplinary measure, rather than a failure to progress academically.

Unlike disciplinary proceedings, academic ones are "not by nature adversary."  *Horowitz*, 435 U.S. at 90.  The academic decision in *Horowitz* "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal," based on the fact that faculty had

48

for two years expressed dissatisfaction with her clinical performance.  *Id.* at 89–90.  *Accord Id.* at 87, n.4 (academic judgment involved a "failure to attain a standard of scholarship") (citation omitted).

Courts largely defer to academic decisions.  Such decisions are tremendously discretionary and consist of professors' opinions regarding a particular student's ability to succeed.  Cheating or copying answers involves a retrospective factual determination of the type courts make every day on both the civil and criminal side and for which robust procedures make a difference.  *See Horowitz,* 435 U.S. at 88–89 (academic determinations bear little resemblance to "traditional judicial and administrative factfinding"); *Id.* at 87 ("the evaluative nature of the inquiry"); *Id.* at 90 (academic dismissal "more subjective and evaluative" than the "typical factual questions presented in the average disciplinary decision").

*Fenje,* 398 F.3d at 625, captured this critical distinction: "Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians," require robust procedures.  *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 158–59 (5th Cir. 1961), likewise appreciated how the dichotomy must be applied: "By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved."

In contrast to Mr. Endres, Mr. Al-Dabagh virtually set the record for unprofessionalism. 777 F.3d at 360.  During his first semester, he "came late to almost thirty percent of the" mandatory medical student discussion sessions, "holding up the class as a result."  *Id.* at 357-58.

49

"[H]e does not deny the tardiness or its frequency." *Id.* At least once he even asked the instructor to not mark him late. *Id.*

Later in his matriculation, two female students accused him of inappropriate behavior at a formal medical school dance, including propositions for sex and improper touching. *Id.* That evening a police incident report reflected that he had "jumped out of a moving taxi after attempting to stiff its driver out of a twenty-dollar fare." *Id.*

His performance on an internship was equally unprofessional. "Nurses and hospital staffers 'consistently complained about his demeanor'; a patient's family once 'kicked him out of the room'; and he sometimes gave patient-status presentations without first preparing." *Id.* He was convicted of driving while intoxicated. *Id.* The anemic process reserved for professionalism sufficed.

In a case involving an accusation of plagiarism, this Court has recognized the distinction: "Where, as here, the institution takes action against a student for a conduct violation, as opposed to an academic reason, a 'more searching inquiry' is warranted." *Carney v. Univ. of Akron*, No. 5:15CV2309, 2016 WL 4036726, at *7 n. 6 (N.D. Ohio July 28, 2016), *appeal dism.*, No. 16-3993, 2016 WL 9610018 (6th Cir. Dec. 1, 2016) (citing *Yoder v. Univ. of Louisville*, 526 Fed.Appx. 537 (6th Cir. 2013) (quoting *Flaim*, 418 F.3d at 634)). The recognition is steeped in precedent.

*Horowitz*, 435 U.S. at 86-90, characterized sanctions for "disruptive or insubordinate behavior" as disciplinary. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 595 (8th Cir. 2007), recognized that a dismissal for "alleged, but not conceded drug use, might constitute a disciplinary dismissal." *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 663–64 & n.4 (7th Cir. 2004), surveyed precedent treating academic dishonest as disciplinary. *Henson v. Honor Comm.*

50

*of U. Va.*, 719 F.2d 69, 73–74 (4th Cir. 1983), deemed an investigation of a law student for alleged Honor Code violations disciplinary.  *Accord Roach v. University of Utah,* 968 F.Supp. 1446, 1453 (D. Utah 1997) (admission to graduate program rescinded, effective immediately, on the sole basis that student had provided inaccurate information on his admission form).  *See also Wheeler v. Miller*, 168 F.3d 241, 248 (5th Cir. 1999) ("Of these academic failings, Wheeler offers no direct summary judgment proof that allegations of cheating had anything whatever to do with failing the two oral exams.  The evidence is uncontradicted that the three faculty members who administered the second oral exam were unaware of the cheating allegations, and all judged the performance the worst they had ever seen.").

### 3.      The Requirements of the Due Process Clause Were Clearly Established Regardless of Defendant Emerick's Discretion under the Student Handbook.

Ultimately, whether Defendant Emerick chose the anemic CAPP procedures improperly under NEOMED's Student Handbook is not even before the Court.  The failure to follow a state law or procedure does not itself violate due process.  *Heyne v. Metropolitan Nashville Pub. Sch.*, 655 F.3d 556, 569 (6th Cir. 2011); *Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir. 1987).  "[I]t is only when the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions."  *Bates v. Sponberg,* 547 F.2d 325, 329–30 (6th Cir. 1976).  For example, the initial CAPP decision was made without a quorum, but that does not establish whether the process afforded Mr. Endres comported with the Due Process Clause.  *JiQiang Xu*, 195 Fed.Appx. at 457.

Mr. Endres had a constitutional right to defend himself in a meaningful and informed manner.  *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978).  That NEOMED

51

offers a robust procedure for disciplinary matters establishes that such process is consistent with its operations and conducive to fair and accurate retrospective fact-finding.  In determining what process is due, *Mathews,* 424 U.S. at 335, weighs three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

That NEOMED has already adopted a robust procedure resolves the *Mathews* issue: the process used by NEOMED for disciplinary matters is what Mr. Endres had requested.  Notably, the most fundamental process of notice and an opportunity to be heard was denied him by the way Defendant Emerick implemented the anemic CAPP process.

The most egregious deprivations were the failures to notify Mr. Endres of critical evidence against him, depriving him of the opportunity to address and refute that evidence. Minimal due process consists of "notice of the charges, ***an explanation of the evidence against the student, and an opportunity to present his side of the story*** before an unbiased decision maker." *Univ. of Cincinnati*, 872 F.3d at 399–400 (emphasis noted).  "[T]o the extent any of the evidence contained within this report was used by the Administrative Hearing Panel to adjudicate John's claim, and John was not provided this evidence, he has alleged a cognizable due-process violation."  *Doe v. Miami Univ.*, 2018 WL 797451, at *17.

A refusal to accept reliable evidence thwarts a meaningful defense.  *Doe v. Cincinnati*, 173 F.Supp. at 601 (noting that second hearing did not repeat alleged deprivation when first panel "would not accept his evidence, such as the surveillance videos, text messages between Roe I and Roe II, and the rape kit analysis and SANE examinations").  "The hearing, whether

52

formal, or informal, live or not, must be meaningful and must provide the accused with the opportunity to respond, explain, and defend." *Flaim*, 418 F.3d at 635–37 (quotations and citations omitted). *See also Id.* 636-38 (student has a right to be present at the hearing and present evidence; a record may be required, as might cross-examination, when necessary for a fair hearing).

These rights were well established by October 2015. *See, e.g., Doe v. Miami Univ.*, 2018 WL 797451, at *18 ("John's procedural-due-process right to an impartial adjudicator and access to the evidence used against him was also clearly established [in the fall of 2014]. * * * John's right to view all of the evidence against him is clearly established."). *Mathews*, 424 U.S. at 333, established the bedrock principle that due process is the right to be "heard at a meaningful time and in a meaningful manner."

Unlike a case where a student "received more process than mandated by the Due Process Clause," *Carney*, 2016 WL 4036726 at *1; *14 (expelled from law school for plagiarizing student thesis after hearing where represented by counsel and given written fact findings and an appeal), Mr. Endres was given at best an anemic, rather than robust, process. The denial of a sufficient process violated clearly established law.

**C.** **By October 2015, the Law Was Clearly Established that the Fourteenth Amendment Due Process Clause Required a State Graduate Student Facing a Disciplinary Cheating Charge Be Afforded at a Minimum Fair Notice and an Opportunity to Mount a Meaningful Defense Before Being Dismissed.**

Regardless of whether NEOMED owed Mr. Endres a robust disciplinary process to resolve the retrospective fact question of whether he cheated on a quiz when his ADHD produced saccadic eye-movements caused by distractions that appeared to indicate copying answers from another student's computer screen, it most certainly owed him minimal due

53

process.  As cited and quoted above, minimal due process includes fair notice of the charges and a meaningful opportunity to defend against them.

At each juncture, though, Defendant Emerick followed a moving-target tactic: Mr. Endres would know only after a hearing what guidance and evidence the CAPP committee had been given.  Then, when he tried to catch up with delayed disclosure, she blocked, or acceded in the blocking of, admission of his reliable evidence, including the video and photographs of a simple field test and a report containing indisputable data that the so called "statistically impossible" condition occurred with two thirds of the class, attached as Appendix A hereto. Beyond that, despite knowing that such exculpatory evidence existed, she did not pursue any fact-finding, such as a simple field test or reliable statistical analysis, and also prohibited any NEOMED staff from attending the open field test Mr. Endres conducted.

Under CAPP, the accused is sent to the student file to receive notice and prepare a meaningful defense.  Defendant Emerick decimated that minimum due process by omitting from the student file which Mr. Endres reviewed before the hearings critical documents and information, such as the instruction for CAPP to focus on the timestamps or her hit-job rendition of conversations with his treating physician and one of the experts.

Isolated from one another each act might not in and of itself deny minimal due process. *See, e.g., Flaim*, 418 F.3d at 639 ("We note that while Flaim's desire to have a comprehensive listing of evidence, witnesses, and copies of all documents intended to be produced is surely understandable given the penalty he was facing, we see no benefit to Flaim or any reduced risk of error by requiring such detail here.").

Cumulatively, though, these acts deprived Mr. Endres of minimal due process.  The charge of cheating depended on whether he was telling the truth about his ADHD and the effect

54

of changed medication.  More process is required when the "nature of that evidence posed a problem of credibility." *Doe v. Univ. of Cincinnati*, 872 F.3d at 405.  "If the hearing is live, the accused has a right to be present for all significant portions of the hearing."  *Flaim*, 418 F.3d at 635.  At a minimum, the dismissal decision must have been "careful and deliberate."  *Horowitz*, 435 U.S. at 85.

Defendant Emerick's bad-faith failure to disclosure critical evidence used against Plaintiff, her purposely blocking indisputable evidence and knowingly providing false information to the CAPP committee (Appendix A), and her failure to investigate exculpatory evidence were the antithesis of "careful and deliberate."  Mr. Endres was not permitted to attend "significant portions of the hearing," and he was purposely left in the dark about the documents and evidence given to CAPP Committee members.  As implemented by Defendant Emerick, the anemic CAPP process became fatal and deprived Mr. Endres of minimal due process.

> **D.**  **By October 2015 the Law Was Clearly Established that a Waiver of the Constitutional Right to Due Process Had to Be Knowing and Intentional by Signing Clear Language of Waiver.**

Defendant Emerick alternatively argues that, by signing NEOMED's Expectations in August 2015, Mr. Endres prospectively waived his right to a hearing using robust disciplinary process and accepted the anemic CAPP process.  It was clearly established, however, by October 2015, that a waiver was "the intentional relinquishment or abandonment of a known right." *Doxey*, 833 F.3d at 702.  NEOMED's Expectations simply stated a truism: a charge of misconduct "may result in referral and review by either" CAPP or Student Conduct disciplinary procedures.  They did not say further that a student waives the constitutional right to have the robust disciplinary procedures whenever a NEOMED administrator chooses the anemic CAPP process.

Defendant Emerick argues, though, that Mr. Endres' signature created a contract binding him under Ohio law to waive his rights under the Fourteenth Amendment. Waiver is not, however, governed by Ohio contract law. "[T]he question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law." *Brookhart*, 384 U.S. at 4.

In *Sambo's Restaurants, Inc.*, 663 F.2d at 690, the Defendant argued that Michigan contract determined whether the restaurants had waived any First Amendment rights. The Court held that federal law, not state contract law, governed the issue of waiver. Federal law mandates that courts "indulge every reasonable presumption against a waiver." *Aetna Ins. Co.*, 301 U.S. at 393.

Procedural due process may be waived by the appropriate "clear" language, *Fuentes,* 407 U.S. at 95-96, or by failing to participate in the process offered to the individual. *Farhat v. Jopke*, 370 F.3d 580, 596–97 (6th Cir. 2004); *Leary v. Daeschner*, 228 F.3d 729, 744 (6th Cir. 2000). Clear language or conduct ensures that an intentional and knowing relinquishment has occurred. As in *Fuentes*, 407 U.S. at 95, "the contractual language relied upon does not, on its face, even amount to a waiver."

Much like the Student Handbook, the contract in *Fuentes* "was a printed part of a form sales contract and a necessary condition of the sale." *Id.* That language had the same "may" tenor as in NEOMED's Expectations: "The conditional sales contracts here simply provided that upon a default the seller 'may take back,' 'may retake' or 'may repossess' merchandise. The contracts included nothing about the waiver of a prior hearing." *Id.* at 95-96. *Accord Morrison v. Warren*, 375 F.3d 468, 474 (6th Cir. 2004) ("The arbitration clause in the collective bargaining

agreement lacks the clear and unmistakable language that is necessary to waive procedural due process rights, and thus cannot be interpreted to waive Morrison's ability to assert those rights.").

*Doe v. Baum*, 227 F. Supp. 3d 784, 795–96 (E.D. Mich. 2017), labeled "groundless" a comparable argument that a student had waived his right to challenge dismissal, there by negotiating a voluntary withdrawal in lieu of a formal expulsion: "Nothing in the record suggests that the plaintiff intentionally relinquished or abandoned his resistance to the appeal panel's decision to discipline him, notwithstanding the plaintiff's tactical decision[.]"   Defendant Emerick points to nothing in the record that reflects intentional relinquishment, and her reliance on the NEOMED Expectations is undermined by the absence of clear waiver language.

## V.    <u>Conclusion</u>

NEOMED's accusation and conviction of Mr. Endres for cheating was a bum rap.  Had a robust process been afforded him, ignorance about ADHD symptoms and the effect of changed medication would not have informed what was perceived on the videotape;  unreliable statistical analyses would have been replaced with reliable statistical analyses; and a simple field test using the same frequent eye-movement seen in the video, would demonstrate beyond peradventure that one could not get any meaningful information from the other student's computer screen.  The video and photographs of field tests conducted by Mr. Endres demonstrate both that physical impossibility, Appendix A, and why sufficient due process includes the right to mount a meaningful defense.

His due process and disability discrimination claims were timely brought within two years of the final NEOMED decision on his dismissal.  In contrast to the *Ricks* regimen, NEOMED did not treat the CAPP decision as final ***until after*** it had been reviewed and upheld

on appeal. The CAPP decision was reviewed and remanded for reconsideration on appeal. The final decision was issued as a result of that reconsideration on November 18, 2015.

His damages claim against Defendant Emerick for deprivation of due process survive her assertion of qualified immunity because a reasonably competent college administrator would have known by October 2015 that accusing and dismissing a state college graduate student for a disciplinary cheating charge triggered robust procedures. Alternatively, the anemic CAPP process, as she implemented it, withholding critical information from Mr. Endres, knowingly providing false information to the CAPP, and prohibiting him from presenting relevant material evidence rebutting the accusation against him, prevented Mr. Endres from mounting a meaningful defense. By agreeing that two tracks existed for resolving misconduct charges, Mr. Endres never waived his constitutional right to the disciplinary track or committed to Defendant Emerick a choice unbridled by the Fourteenth Amendment Due Process Clause of an academic and professionalism track with an anemic process.

Defendants' motion to dismiss should, therefore, be denied in its entirety. Once discovery is completed, Defendants may move for summary judgment to revisit the same grounds on a developed factual record. Aborting Mr. Endres' case at the outset, though, is not justified as a matter of fact or law.

Respectfully submitted

By: */s/ John S. Marshall*_____
John S. Marshall (0015160)
*(jmarshall@marshallforman.com)*
Edward R. Forman (0076651)
*(eforman@marshallforman.com)*
Samuel M. Schlein (0092194)

**OF COUNSEL:**
Louis A. Jacobs (002101)

58

(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007

(*sschlein@marshallforman.com*)
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a copy of the foregoing was filed with the Court on this 9th day of March, 2018, using the CM/ECF system, which will send notification of such filing to all counsel of record. Parties may access this filing through the court's filing system.

By: ____/s/ John S. Marshall
John S. Marshall (0015160)