# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| J. ENDRES, | ) | CASE NO. 5:17-cv-2408 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| NORTHEAST OHIO MEDICAL | ) | |
| UNIVERSITY,  et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the defendants' motion to dismiss (Doc. No. 24 ["Mot."]), supported by an appendix of exhibits (Doc. No. 25 ["App."]).[1] Plaintiff filed a memorandum in opposition (Doc. No. 27 ["Opp'n"]),[2] also supported by exhibits (Doc. No. 29 ["Ex."]). Defendants filed a reply. (Doc. No. 28 ["Reply"].) For the reasons set forth herein, defendants' motion to dismiss is granted.

## I. PROCEDURAL BACKGROUND

Julian Endres ("Endres") initially filed his complaint on November 16, 2017. With the consent of the defendants and leave of Court, he filed his first amended complaint on February 21,

---

[1] In ruling on a motion to dismiss under Fed. R. Civ. P. 12, a court "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Ath. Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

[2] The substantive portion of plaintiff's opposition brief is almost 59 pages long, far exceeding permissible page limitations under both the Court's Initial Standing Order (Doc. No. 4) and Local Rule 7.1. Plaintiff sought no leave to exceed the page limits. The Court would be well within its discretion to strike plaintiff's opposition brief, especially in view of the fact that defendants' motion and, even more notably its brief in reply to the non-conforming opposition, complied with the page limitations. But, since defendants have not raised this argument, the Court will not act *sua sponte* with respect to plaintiff's inexplicable disregard for rules and orders.

2018. (Doc. No. 23 ["FAC"].)[3] Endres named as defendants Northeast Ohio Medical University ("NEOMED"), "a public, state, coeducational university[,]" (FAC ¶ 9); NEOMED's Board of Trustees (the "Board"), "each member … sued in his or her official capacity[,]" (*id.* ¶ 10); Sandra Emerick ("Emerick"), "the Chief Officer of Student Affairs … [who] is being sued in both her individual and official capacities[,]" (*id.* ¶ 11); and Jay A. Gershen ("Gershen"), "President of NEOMED, [who] is being sued in his official capacity." (*Id.* ¶ 12.) Because "a suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent," *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 n.2, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997) (quotation marks and citations omitted), there are really only two defendants here: NEOMED and Emerick, in her individual capacity.

Endres alleges two claims for relief: (1) a claim under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment procedural due process rights ("§ 1983 claim") (FAC ¶ 189); and (2) a claim of disability discrimination under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehab Act") (together, the "disability discrimination claim") (*id.* ¶ 193). Although the § 1983 claim appears to be leveled at the Board and Gershen, as well as Emerick (*see* FAC ¶ 189), State entities and their officials are not "persons" within the meaning of § 1983. *Savoy v. Univ. of Akron*, No. 5:09CV958, 2009 WL 3417588, at *2 (N.D. Ohio Oct. 16, 2009) (citing *Wills v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)). Therefore, the § 1983 claim can only be asserted against Emerick, who is also sued in her individual capacity. The disability discrimination claim is leveled only against NEOMED.

---

[3] There were several exhibits attached to the original complaint. These were not refiled with the first amended complaint, but are incorporated by reference therein.

## II. DISCUSSION

### A.    Standard on a Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id*. at 555 n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts" (citation omitted)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "The court need not, however, accept unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

A motion to dismiss for failure to state a claim may also be granted if the factual allegations, taken as true, demonstrate that "relief is barred by an affirmative defense." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) ("In a situation involving an

affirmative defense, 'the claim is stated adequately …, but in addition to the claim the contents of the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim. In [such a] situation[ ] the complaint is said to have a built-in defense and is essentially self-defeating.'" (quoting 5B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed.2004))); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (the court may dismiss a claim under Rule 12(b)(6) when "the allegations in the complaint affirmatively show that the claim is time-barred.").

## B.  Factual Allegations

The first amended complaint contains extensive factual allegations, which are taken as true for purposes of the motion to dismiss. It also incorporates by reference rather extensive documentation, most of which has been made available to the Court.

Endres became a NEOMED student in August 2014, at the age of 20, having received the BS/MD undergraduate portion of a NEOMED medical degree from Kent State University. (FAC ¶ 17.) Upon enrolling at NEOMED, he was provided with the Student Handbook, which contained various policies and procedures, and which Endres acknowledged receiving.[4] (*Id.* ¶ 18; App. at 698.[5])

Endres was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") when he was six (6) years old, and took Ritalin to control the condition from grades 1 through 12. (FAC ¶ 15.) Endres has never requested any kind of academic accommodation throughout his school years

---

[4] The original complaint included a copy of the 2015-16 Student Handbook, as does the appendix to defendants' motion. Because this version is relied upon by both sides for the purposes of this motion, the Court will consider this version to be identical to the version in effect at the time the incident occurred in 2014.

[5] All page number references are to the page identification number generated by the Court's electronic docketing system.

and has always excelled in school. (*Id.* ¶ 16.) During his second semester at NEOMED (around March 2015), Endres began to experience problematic side effects from Ritalin (in the form of over-sedation) and started skipping the medication. (*Id.* ¶¶ 24, 26.) At about that same time, he failed his final course of the first year in medical school. (*Id.* ¶ 26.) After also failing the remediation exam, upon review by NEOMED, he was required to repeat his M1 year. (*Id.* ¶ 29.) By the time he returned for the fall semester of 2015, Endres had consulted with his doctor (Dr. Caroline Ramos, M.D. ("Dr. Ramos")) and had switched to a new ADHD medication, Strattera. (*Id.* ¶¶ 27-28, 31.) Although Strattera helped Endres concentrate without the side effects of Ritalin, it failed to suppress the fidgeting that is allegedly characteristic of ADHD. (*Id.* ¶ 31.)

Endres enrolled in Human Development & Structure ("HDS"), for which Hans Thewissen ("Thewissen") was the director. (*Id.* ¶ 32.) HDS was considered the most difficult first year course and it was weighted the most heavily. (*Id.*) Endres had taken the course in the fall of 2014 and passed, but had to re-take it as part of his repeated M1 year. (*Id.*)

NEOMED records all class lectures and exams on video, a fact that all students are well aware of due to unconcealed video cameras in the classrooms. (*Id.* ¶ 33.) Plaintiff himself was especially familiar with the recording equipment because he helped set it up when he held a part-time job as a student tech assistant. (*Id.*) NEOMED also employs a computerized testing system whereby students take exams online on laptops provided to them as they enter the exam room. (*Id.* ¶ 34.)

On September 28, 2015, while taking a quiz in HDS (the "exam"), Endres displayed behavior that made him look suspicious to the proctors. (*Id.* ¶ 36.) He described the behavior as "fidgety, looking around the room, restless, and distracted by something to his right." (*Id.*) These "sideway glances . . . lasted no more than one second each[.]" (*Id.* ¶ 40.) Having observed Endres'

5

actions, the proctors decided to zoom the camera in on him from approximately five minutes into the exam until the time when the student to his right completed the exam and left the room. (*Id.*)[6] After the exam, unbeknownst to Endres, one of the proctors completed an Irregularity Report stating that Endres, who was seated in Seat #29, "appeared to be repeatedly looking at the computer of the student in Seat #30." (*Id.* ¶¶ 38, 42-43; Doc. No. 1-7 [the "proctor's report"] at 252.) This report was emailed to Emerick, along with a link to the video of the exam. (*Id.* ¶ 45; App. at 702.) In this email, the proctor also noted that "perhaps the student is simply nervous[.]" (*Id.*)

Included in the "Conduct and Student Policies" section of the Student Handbook, was a section describing the "Committee on Academic and Professional Progress (CAPP)." (App. at 570-79.) The purpose of CAPP is to "evaluate[] the records of students on the basis of CAPP Academic Guidelines in order to: (i) [e]valuate academic performance and assess intellectual readiness[;] (ii) [r]eview unprofessional behavior concerns[;] [and] (iii) [e]valuate requests for Leave of Absences." (*Id.* at 570-71.)

Emerick decided that the exam incident with Endres should be referred to CAPP. (FAC ¶ 3.) Endres characterizes this as an "improper referral" because, in his view, it was a disciplinary issue rather than one of academic performance and professionalism. (*Id.*) He claims that the CAPP procedures "do not provide any of the minimum requirements that guarantee fundamental fairness and due process." (*Id.* ¶ 55.)[7]

On October 7, 2015, Endres was called to a brief meeting with Emerick. (*Id.* ¶ 71.) At that time he was "notified of the allegations against him and informed of the irregularity report." (*Id.*)

---

[6] A link to the video of the exam was supplied by defendants. (*See* App. at 699.)

[7] A different section of the Student Handbook is applicable to disciplinary matters. (*See* FAC ¶ 20; App. at 612, *et seq.*)

Emerick also showed Endres the video of the exam and told him the matter would be considered by CAPP. (*Id*. ¶ 72.) By letter dated October 8, 2015, Endres was given formal notice of the CAPP meeting scheduled for October 21, 2015, where the CAPP would discuss with Endres "a professional development concern (alleged academic misconduct)[.]" (*Id*. ¶¶ 56, 80; App. at 705.) The letter outlined five (5) steps that Endres was required to take prior to, and in preparation for, the meeting, including: confirming receipt of the notice; scheduling a pre-CAPP meeting with Emerick to discuss the incident; reviewing his student file (which would be shared with the committee); completing a student interview form; and preparing a five-minute explanation "of the reasons for your professional development issue." (App. at 705.) Endres appears to have complied with all of these requirements. In fact, Endres "submitted the Student Interview Form together with his personal statement, Dr. Ramos's letter,[8] and his medical records[.]" (FAC ¶ 97; App. at 711-30.) He also submitted a letter from his then attorney, dated October 15, 2015. The attorney's letter thoroughly challenged every aspect of the cheating allegations, yet raised no challenge to the use of the CAPP procedures (as opposed to the disciplinary procedures) and made no argument that the CAPP process would be procedurally inadequate to protect Endres' rights. (*See* App. at 725-29.)

Endres attended the CAPP meeting on October 21, 2015. (FAC ¶ 98.) He claims that "[t]he CAPP procedures do not allow an accused student to be in the room when the committee members review[] documents of the case, and only after concluding their review of the documents is the

---

[8] In her letter (App. at 713-14), Dr. Ramos "explain[ed] Plaintiff's ADHD, along with medical records that contained the details of his medication adjustment between April 2015 and August 2015." (FAC ¶ 85.) She asked the CAPP members to "please take into account he had just started a new medication within 2 months of the exam in question," and "while he is adjusting to medication, it may be helpful to make accommodations for exam[s] so that his fidgeting and movements are not misinterpreted as academic misconduct." (*Id*. ¶ 86.) She also "highlighted portions of Plaintiff's medical record that were relevant to her assessment of the situation." (*Id*.)

student called in." (*Id.*) Endres "present[ed] his own evidence and answer[ed] the CAPP committee's questions[,]" but other materials that the committee considered "had not been shared with [him.] (*Id.* ¶¶ 99-100.) Endres' disability-related explanation for his behavior during the exam was explored by the CAPP committee. (*Id.* ¶¶ 104-05.) Endres also reported on his own reenactment of the exam wherein he used three randomly selected NEOMED students, who all reported the impossibility of seeing the neighboring computer screen. (*Id.* ¶¶ 102-03.)

The CAPP committee voted after Endres left the room, and he was advised by Emerick later in the day that he had been found "'Responsible' of misconduct[.]" (*Id.* ¶¶ 112-13.) This was memorialized in a letter to Endres dated October 22, 2015, wherein he was informed that the committee voted to dismiss him from NEOMED. (*Id.* ¶ 115; App. at 731.) Endres was offered three options: (1) submit a letter of withdrawal within four working days, whereupon his transcript would indicate withdrawal; (2) accept the decision, whereupon his transcript would indicate dismissal; or (3) request an appeal based upon new information or on a defect or irregularity in the CAPP proceedings. (App. at 731.)

On October 28, 2015, Endres submitted his appeal to the Executive Review Committee ("ERC") only on the basis of new information. (App. at 732-33.) It included, *inter alia*, a letter/report from Andrew A. Trauben, M.D. ("Dr. Trauben"). (*Id.* at 742-43 (the "Trauben Report").)[9] On November 2, 2015, a hearing was conducted. (FAC ¶ 139.) Endres alleges that the procedures at the appeal hearing were as defective, in plaintiff's view, as those at the CAPP committee hearing. (*Id.* ¶ 142.)

---

[9] Endres submitted other materials that were ultimately not permitted by the ERC.  (*See* FAC ¶¶ 137, 140.)

On November 3, 2015, Endres received a letter from the ERC advising that it granted him a rehearing, but "was restricting the information [he] was allowed to use for the [rehearing] to Dr. Trauben's evaluation report … of his behavior as seen in the video recording of the [e]xam." (*Id.* ¶ 146.)[10] This letter "also stated that material [Endres] had submitted on October 28, 2015, countering the Thewissen Analysis, would not be considered as substantial or new evidence, and therefore [he] could not use any of that information at his [rehearing]." (*Id.* ¶ 147.[11]) At the request of plaintiff's counsel,[12] at the rehearing on November 18, 2015, Dr. Trauben was permitted to participate by telephone and to explain his report. (*Id.* ¶¶ 154, 157, 163.) Plaintiff alleges several procedural problems with the entire process of the rehearing, just as he did for the other hearings. (*See id.* ¶¶ 161-64.)

On November 19, 2015, Endres "received a letter [from the CAPP committee] that *reiterated* his dismissal from NEOMED." (*Id.* ¶ 165 (emphasis added).)[13]

## C.   Analysis

Defendants raise two arguments: (1) that both the disability discrimination claim and the § 1983 claim are barred by the two-year statute of limitations; and (2) that defendant Emerick is entitled to qualified immunity.

### 1.   Timeliness of the Claims

---

[10] There does not appear to be a copy of this letter in the record.

[11] The referenced "Thewissen Analysis" (which was allegedly "later debunked as completely flawed" (FAC ¶ 99)) is Thewissen's "statistical analysis regarding the probability of two students answering certain questions identically, which would later become a document relied on by Defendants in their case against Plaintiff[.]" (FAC ¶ 90.) Endres claims this information was not disclosed to him prior to the CAPP hearing, nor was it contained in his official student file. (*Id.* ¶ 93.) The analysis was allegedly taken at face value and Endres was not allowed to submit his analysis that he claimed "debunked" Thewissen. (*See id.* ¶ 140.)

[12] Plaintiff's counsel made this request in a letter dated November 17, 2015. (*See* App. at 744-50.) Once again, as with counsel's letter of October 15, 2015, it is notable that counsel raised no challenge to the use of the Student Handbook's CAPP procedures, as opposed to its disciplinary procedures.

[13] Again, there appears to be no copy of this letter in the record.

Endres does not dispute that his claims are subject to a two-year statute of limitations. (Opp'n at 904-05, acknowledging two-year limitations period for both claims.) *See McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012) (Rehab Act); *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475, 482-83 (N.D. Ohio 2007) (ADA); *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (§ 1983).

The issue is when each claim accrued, a matter governed by federal law. *Sevier v. Turner*, 742 F.2d 262, 272-73 (6th Cir. 1984) (citing cases). "The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* at 273 (citations omitted). "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id.* (citations omitted). The Sixth Circuit looks to "what event should have alerted the typical lay person to protect his or her rights." *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991), *abrogated on other grounds by Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003).[14]

### a.    *Timeliness of Disability Discrimination Claim Against NEOMED*

NEOMED argues that Endres' disability discrimination claim accrued on October 22, 2015, when the October 21, 2015 decision to dismiss him was formally communicated to Endres. At the CAPP hearing, Endres had asserted that the actions that had been perceived as cheating were actually manifestations of his disability. (*See also* FAC ¶ 193 ("By … deciding on dismissal by willfully ignoring the symptoms of his ADHD and reaction to prescribed medication … NEOMED violated … the ADA and the Rehabilitation Act.").) NEOMED argues that the decision

---

[14] The same standard for accrual of a claim is used for actions under the ADA, the Rehab Act, and § 1983. *See, e.g.*, *Bishop v. Children's Ctr. for Dev. Enrichment*, 618 F.3d 533, 537 (6th Cir. 2010).

to dismiss Endres was "necessarily a rejection of that assertion; the dismissal therefore put him on notice of the injury upon which he eventually sued." (Mot. at 495.)

NEOMED also asserts that the pendency of a grievance process does not toll the limitations period or affect accrual of the claims. (*Id.*, citing *Del. State Coll. v. Ricks*, 449 U.S. 250, 261 & n.15, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980); *Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir. 1987).) "The 'proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful.'" (Mot. at 496, quoting *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981) (emphases in original) (citing *Ricks*, 449 U.S. at 258), and citing *Janikowski*, 823 F.2d at 947.)

Endres argues in opposition that the accrual date "was when NEOMED reached a 'definitive conclusion' to dismiss [him]." (Opp'n at 900, quoting *Colgan v. Fisher Sci. Co.*, 935 F.2d 1407, 1419 (3d Cir. 1991).) According to Endres, "[w]hen an individual 'receives unequivocal notice of the adverse . . . decision,' the statute of limitations starts running." (*Id.*, quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996).) But Endres cites no Sixth Circuit case law in support of this position.

In *Ricks*, a faculty member claimed he was denied tenure because of his national origin. 449 U.S. at 252. In February 1973, the tenure committee recommended that Ricks be denied tenure, but it agreed to reconsider that decision the following year. *Id.* In February 1974, the committee adhered to its original recommendation, and, on March 13, 1974, the Board of Trustees formally voted to deny tenure to Ricks, but, as was the college's policy, he was subsequently granted a one-year terminal contract after which his employment would end. *Id.* Ricks pursued a grievance, which was denied on September 12, 1974. *Id.* at 252-53. He filed his discrimination lawsuit on September 9, 1977. *Id.* at 254. The district court dismissed his claims as untimely under

11

Tennessee's three-year statute of limitations, concluding that the accrual date was June 26, 1974, when the Board had officially notified Ricks that he would be offered a terminal contract. *Id.* at 254-55. The Third Circuit reversed, *id.* at 255-56, but the Supreme Court sided with the district court's choice of June 26, 1974, concluding that "the only alleged discrimination occurred -- and the filing limitations periods therefore commenced -- at the time the tenure decision was made and communicated to Ricks." *Id.* at 258. The Court further confirmed a prior holding "that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period." *Id.* at 261 (citation omitted).

Endres rejects defendants' reliance on *Ricks*, arguing that *Ricks* involved a tenure decision that was final despite the grievance process, whereas his case never involved a final decision, as evidenced by the remand from ERC for reconsideration. (Opp'n at 901.) This is contrary to Sixth Circuit law, which holds that "[i]t is irrelevant that [a plaintiff] also had an administrative remedy available to [him] . . ., or that [he was] required to exhaust that remedy before bringing suit; redress was available at the time of injury." *Bishop*, 618 F.3d at 537 (affirming district court's finding that accrual occurred when a child's parents "knew [the child] had been expelled").[15]

From the very start, Endres submitted his disability explanation to the CAPP committee as his *sole* defense, asserting that his "wandering attention, internal restlessness and eas[y] distractibility" were not signs of cheating, but the result of his ADHD. (App. at 711.) The CAPP committee rejected this defense and advised Endres that he was dismissed from NEOMED on October 22, 2015. (*Id.* at 731; FAC ¶ 115.) This is the date when he "ha[d] reason to know of the

---

[15] In *Bishop*, the Sixth Circuit ultimately reversed the district court's dismissal on the ground that the case was time-barred because it also concluded that Ohio's tolling of the statute of limitations due to the child's minority applied. There is no minority tolling at work here.

injury which is the basis of his action." *Sevier*, 742 F.2d at 273 (citations omitted). It was the "event [that] should have alerted the typical lay person to protect his or her rights." *Dixon*, 928 F.2d at 215.

When Endres received the October 22, 2015 letter stating that "the [CAPP] Committee voted to dismiss [him] from the College of Medicine[,]" (App. at 731), since, in his view, this was a dismissal based on the Committee's rejection of his argument that his actions during the exam must be attributed to his disability (ADHD), he was at that time on notice that he had suffered injury due to his alleged disability. His own complaint acknowledges that the letter he received on November 19, 2015, following the Committee's review, merely "*reiterated* his dismissal from NEOMED[,]" (FAC ¶ 165, emphasis added). The October 22, 2015 letter started the clock running on his two years to bring his disability discrimination claim. He filed this action on November 16, 2017, after the two-year statute had run.

NEOMED is entitled to dismissal of the disability discrimination claim in Section V. B. of the first amended complaint and the same shall be granted.

### b.  Timeliness of § 1983 Claim Against Emerick

Endres' § 1983 claim against Emerick in her individual capacity is premised on his assertion that she set in motion an entire procedure that deprived him of his liberty and property interests without procedural due process. In particular, he alleges that, "[t]he CAPP Procedures do not provide any of the minimum requirements that guarantee fundamental fairness and due process." (FAC ¶ 55.) According to plaintiff, "Emerick knew that [p]laintiff was accused of engaging in academic misconduct by cheating on the [e]xam and should have triggered the

13

procedure [d]efendants afforded for disciplinary matters." (*Id.* ¶ 63.)[16] Endres further alleges that, because of Emerick's actions, he was denied "his right to a fair investigation and adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact-finder; his right to challenge the credibility of any adverse witnesses; his right to access evidence presented against him; his right to present evidence and witnesses in support of his defense and later appeal[;] his right to know the evidence relied upon in reaching a determination; and his right to be present at all proceedings." (*Id.* ¶ 189.)

"'Procedural due process' at its core requires notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965) (further citation omitted)). Like the disability discrimination claim, the two-year statute of limitations began to run when Endres "ha[d] reason to know of his injury[,]" *Sevier*, 742 F.2d at 273, as evidenced by "[an] event [that] should have alerted the typical lay person to protect his or her rights." *Dixon*, 928 F.2d at 215. Here, the complaint, whose allegations are taken as true, is replete with assertions that should have alerted Endres of every one of the deprivations he listed in FAC ¶ 189. In fact, events occurred on several different dates, each of which should have been sufficient to alert Endres of the need to protect his rights.

First, on October 8, 2015, Endres received a letter, which he characterizes as the "CAPP Notification Letter," advising him of the CAPP meeting. (FAC ¶ 80.) The letter stated, in part, that, "[a]s a result of a professional development concern (alleged academic misconduct) … [he

---

[16] Since Endres' due process claim is that he had a right to disciplinary proceedings rather than academic (*i.e.*, CAPP) proceedings, for purposes of this timeliness analysis, the Court is focused on when Endres should have (or did) know that he was being denied that alleged right. The propriety (or not) of Emerick's choice of procedures from a constitutional standpoint is discussed more fully below in the section on qualified immunity.

was] required to attend the Committee on Academic and Professional Progress (CAPP) meeting … [where] [t]he committee will discuss the professionalism concern … and decide how best to proceed." (App. at 705.) Therefore, in light of his specific claim that he was denied due process because he was subjected to CAPP procedures, rather than disciplinary procedures, as of October 8, 2015, Endres "[h]ad reason to know of his injury[,]" *Sevier*, *supra*, that is, as of that date, he had reason to know that he was being denied the process that he now alleges he was due. (*See* FAC ¶ 55 ("The CAPP Procedures do not provide any of the minimum requirements that guarantee fundamental fairness and due process.").) Whether that view would ultimately prove correct or not, Endres was on notice.

Next, on October 21, 2015, Endres attended the scheduled CAPP meeting, at which time he experienced not being "allow[ed] . . . in the room when the committee members reviewed documents of the case[,]" and being "instructed to wait in the lobby" while "Emerick presented her case against [him] and held a discussion with the CAPP members behind closed doors." (*Id.* ¶ 98.) Taking all of this as true, even if Endres was *not* on notice as of October 8, 2015, on October 21, 2015, Endres was on notice that he was not afforded the process to which he believed he was entitled. Again, he "[h]ad reason to know of his injury." *Sevier*, *supra*.

Then, on October 22, 2015, Endres was formally informed that "the [CAPP] Committee voted to dismiss [him] from [NEOMED]. (App. at 731; FAC ¶ 115.) Despite the fact that the letter offered him three options for response to his dismissal, it was not "in any respect tentative." *Ricks*, 449 U.S. at 261. If nothing else had "alerted [him] to protect his … rights[,]" *Dixon*, 928 F.2d at 215, this formal notice should have.

Further, even if all of those opportunities would be deemed insufficient, on October 26, 2015, Endres "realized that there was no possible way" he could supply "'substantial' evidence"

because "he was being denied access to the information and evidence used against him[.]" (*Id.* ¶ 134.) And on November 2, 2015, "[j]ust four hours prior to the [ERC] Appeal Hearing," he received an email "rejecting [his] Statistical Analysis" and "prohibit[ing] [him] from distributing hard copies of the report to the ERC members[.]" (*Id.* ¶ 139-40.) Finally, on November 3, 2015, he was notified by the ERC that he had been granted a rehearing, "but [it] was restricting the information [he] was allowed to use . . . to Dr. Trauben's evaluation report[,]" and that he "would not be allowed to submit any evidence" for the rehearing. (*Id.* ¶ 146.)

The events that occurred on any one of these dates, beginning with October 8, 2015 and ending with November 3, 2015, should have been sufficient, by themselves or in combination, to alert Endres of due process injuries for which he might be entitled to seek redress. All of these dates fall outside the two-year period prior to the filing of the complaint.

But Endres argues that, by granting him a rehearing, "NEOMED arguably cured earlier procedural deprivations . . . rendering . . . only the final CAPP decision the accrual event." (Opp'n at 901.) Under this theory, Endres would have had to wait until he experienced the rehearing on November 18, 2015, to know for certain that none of these procedural violations would actually be corrected. This theory is contrary to the law in the Sixth Circuit, which states, "Even if the entity sued has not yet reached a 'final decision' on the underlying substantive issues, a plaintiff has reason to know of its procedural-due-process claim at the moment process is denied." *Am. Premier Underwriters, Inc. v. Nat'l R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (citation omitted).[17]

---

[17] Endres argues in the alternative that, "[a]t a minimum, 'because it is not clear from the pleadings alone that plaintiff's . . . claim is time-barred, dismissal at this stage would be inappropriate.'" (Opp'n at 905, quoting *Doe v. The College of Wooster*, No. 5:16-CV-979, 2018 WL 838630, at *5 (N.D. Ohio Feb. 13, 2018) (further citation omitted).) *Doe v. College of Wooster* bears no resemblance to the instant case. Here, it is clear from the pleadings alone that plaintiff's claims are time-barred.

The first amended complaint is replete with plaintiff's own allegations as to *what* he knew, and *when*, with respect to the procedural protections he claims to have been denied, namely, the "robust" disciplinary proceedings outlined in the Student Handbook (as opposed to the "anemic" process he received in the CAPP proceedings). Taking all of these allegations as true, in light of controlling Sixth Circuit law, although any one of several dates, as discussed above, could have alerted Endres to his potential claim, the Court concludes that Endres' procedural due process claim accrued as early as October 8, 2015, when he received the CAPP Notification Letter, and no later than October 22, 2015, when he received the formal notice of his dismissal from NEOMED.[18]

Emerick is entitled to dismissal of the § 1983 procedural due process claim in Section V.A. of the first amended complaint because it is time-barred.

### 2.      Qualified Immunity

Defendants argue that, even if Endres' § 1983 due process claim were not time-barred, Emerick is entitled to dismissal on the basis of qualified immunity.

"Government officials are entitled to qualified immunity, and thus are shielded from actions for damages, 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *MSI Regency, Ltd. v. Jackson*, 433 F. App'x 420, 428 (6th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "'[M]ore concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action.'" *Id.* (quoting *Anderson*, 483 U.S. at 638 (quoting *Harlow v.*

---

[18] The Court also notes that Endres was represented by counsel throughout this entire process and his counsel was regularly writing letters on his behalf that were submitted as part of the procedural process. It is not as if Endres was blindly muddling his way through a confusing process and only belatedly discovered that he had certain rights he was entitled to enforce.

17

*Fitzgerald*, 457 U.S. 800, 819, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))). "Thus, officials are 'entitled to qualified immunity [when] their decision was *reasonable*, even if mistaken.'" *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (quoting *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994) (alteration and emphasis in original)). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

"When resolving government officials' qualified immunity claims, courts conduct a two-pronged inquiry, asking: (1) 'whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right'; and (2) 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" *Stanfield v. City of Lima*, 727 F. App'x 841, 845 (6th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L. Ed. 2d 565 (2009)). "These two prongs, which a court can address in whichever order it deems appropriate, must both be answered in the affirmative in order for a plaintiff to defeat a defendant's claim of qualified immunity." *Id*. (quoting *Pearson*, 55 U.S. at 236).

Although "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity[,]" *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015), "certain immunity questions can still be resolved at the pleading stage with a sufficiently developed record." *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017).

Endres' complaint articulates the following as the gravamen of his § 1983 claim:

189. By depriving him of his liberty and property interest in continued enrollment at Defendant NEOMED without procedural due process, including, but not limited to, his right to a fair investigation and adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact-finder; his right to challenge the credibility of any adverse witnesses; his right to access evidence presented against him; his right to present evidence and witnesses in support of his defense and later appeal, his right to know the evidence relied upon in reaching a

> determination; and his right to be present at all proceedings, … Emerick … [has]
> violated and [is] violating the Fourteenth Amendment.

(FAC ¶ 189.) Plaintiff argues that, by October 2015, "every competent official would have known that the Due Process Clause of the Fourteenth Amendment prohibits States from depriving 'any person of life, liberty, or property, without due process of law.'" (Opp'n at 907, quoting U.S. Const. amend. XIV, § 1.)

Indeed, the Sixth Circuit has recognized that "the Due Process Clause is *implicated* by higher education disciplinary decisions." *Flaim v. Med. Coll. of Oh.*, 418 F.3d 629, 633 (6th Cir. 2005) (citations omitted) (emphasis added). But, it has also "note[d] that the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause[,]" *Doe v. Miami Univ.*, 882 F.3d 579, 598 (6th Cir. 2018), and, further, that "whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has [also] not been resolved." *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 437 (6th Cir. 2006) (alteration added). "Courts have avoided [these] issue[s] where possible by assuming for the sake of argument that such an interest exists." *Id*.

Endres argues that he had a Fourteenth Amendment due process right to have his dismissal considered under the disciplinary section of the Student Handbook, rather than under the academic section, whose difference he characterizes as a "robust" process versus an "anemic" process. (Opp'n at 906.) He claims that "colleges should not be afforded the simple expedient of characterizing disciplinary matters, to which robust procedural due process applies, as academic misconduct, to which anemic process suffices." (*Id.* at 911.)[19]

---

[19] By means of artful pleading, plaintiff is arguably attempting to create a constitutional claim out of an underlying assertion that Emerick failed to properly apply NEOMED's Student Handbook. But a state's failure to follow its own

19

Defendants argue that, aside from failing to make out *any* due process violation (given that Endres was provided more than sufficient process), there is no clearly established right to have a disciplinary dismissal rather than an academic dismissal, and, in any event, Endres' dismissal was properly treated as academic.

As noted by the Supreme Court, "there are distinct differences" between disciplinary dismissals and academic dismissals. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 87, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978). "This difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id*. at 86.

"[A] dismissal proceeding is 'academic in nature if there is a nexus between the … conduct and the prospects of success in a student's field of study.'" (Mot. at 498, quoting *Stevenson v. Owens State Cmty. Coll.*, 562 F. Supp. 2d 965, 971 (N.D. Ohio 2008).) There can be no doubt that honesty is among the "core competencies" of the medical profession. *Al-Dabagh v. Case W. Res. Univ.*, 777 F.3d 355, 356 (6th Cir. 2015); *see also id*. at 360 (discussing a broad range of cases from sister circuits where dismissal was characterized as "academic" in nature, including, for example, dismissal for lack of personal hygiene, for having sex with a vulnerable patient, for "sleeping in," for failing to attend practicums, and for tardiness).

Furthermore, the NEOMED Student Handbook classifies cheating under "academic misconduct" rather than under "behavioral misconduct." (App. at 618.)[20] Cheating on an examination not only reflects on a student's character, but also has implications for the true depth

---

laws or regulations does not, by itself, state a claim under § 1983, which aims at remedying violations of federal law, not state law. *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *Spruytte v. Walters*, 753 F.2d 498, 508-09 (6th Cir. 1985).

[20] Defendants also point out that Ohio law makes dishonesty a ground for permanently disqualifying a physician and/or denying licensure. (Mot. at 498, citing *Gaunzon v. State Med. Bd. of Oh.*, 704 N.E.2d 598, 603 (Ohio Ct. App. 1997) and Ohio Rev. Code § 4731.22(A).)

of the student's knowledge. Thus, cheating was clearly linked to Endres' prospects of success as a doctor and, was, therefore, an academic issue that was properly addressed under the CAPP section of the handbook.

As set forth in the complaint, Endres was provided with at least as much process as an academic dismissal requires. He was called to a meeting with Emerick and "notified of the allegations against him" (FAC ¶ 71); he was shown "the video recording of the [e]xam" and told that Emerick "had brought the case to CAPP[]" (*id.* ¶ 72); he received advance, formal notice of the CAPP meeting scheduled for October 21, 2015, in a letter that outlined the five steps he was required to take prior to that meeting (*id.* ¶¶ 56, 80 & App.705); he was permitted to submit, and did submit, his own personal statement, as well as information from his doctor and a letter from his lawyer (which, notably, did not challenge the CAPP procedures) (*id.* ¶ 97 & App. at 711-30); he attended the CAPP meeting and "present[ed] his own evidence and answer[ed] the CAPP committee's questions[]" (*id.* ¶ 100); he was advised of "the official First Hearing Decision" and "was given several options[,]" including "request[ing] an appeal," which he did (*id.* ¶¶ 115, 118); he was later afforded a rehearing which he attended, having submitted another letter from his lawyer which again failed to challenge the CAPP procedures, and where he was permitted to submit additional information, albeit not everything he wanted to submit (*id.* ¶¶ 146-64); and he received a final letter "reiterat[ing] his dismissal from NEOMED[]" (*id.* ¶ 165).

Endres cannot establish that he was denied due process or that it was clearly established that he was entitled to a different form of process. In other words, Endres is unable to show that Emerick violated one of his clearly established constitutional or statutory rights.

Therefore, even if Endres' § 1983 claim were not time-barred, Emerick would still be entitled to dismissal on the basis of qualified immunity.

21

## III. CONCLUSION

There is no doubt that being dismissed from medical school is a serious event, and probably life-altering. In such a circumstance, one might be tempted to find some "wiggle-room" in a statute of limitations and, as here, decide that thirteen days late is close enough. But this Court has no such authority. *See, e.g., Johnson v. U.S. Postal Serv.*, 863 F.2d 48 (Table), 1988 WL 122962, at *3 (6th Cir. 1988) (rejecting an argument for tolling because plaintiff was only "one day late," stating "[t]he line must be drawn somewhere" and that such requirements "'are not to be disregarded by courts out of a vague sympathy for particular litigants[]'") (quoting *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 104 S. Ct. 1723, 80 L. Ed. 2d 196 (1984)); *In re Royal Manor Mgmt., Inc.*, 652 F. App'x 330, 339-40 (6th Cir. 2016) (citing various cases dismissed due to having missed "deadlines over which courts have no authority, including . . . statute-of-limitations deadlines[]").

Further, it is the very gravity of a possibly well-founded claim that requires a party to pursue it without any delay and to err on the side of caution if there is any question relating to accrual. Plaintiff failed to do so, and his claims are time-barred. In any event, defendant Emerick is entitled to dismissal on the basis of qualified immunity.

For the reasons set forth herein, defendants' motion to dismiss (Doc. No. 24) is granted.

**IT IS SO ORDERED**.

Dated: August 22, 2018

_____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**